**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| Samuel Calderon, et al., | ) | Civil Action No.: 8:10-cv-01958 RWT |
| individually and on behalf of other | ) | |
| similarly situated individuals, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| GEICO General Insurance Company, et al., | ) | |
| | ) | |
| Defendants. | ) | |

_____

**PLAINTIFFS' MEMORANDUM OF LAW**
**IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................................v

INTRODUCTION ...............................................................................................................1

PROCEDURAL HISTORY...................................................................................................3

UNDISPUTED FACTS .......................................................................................................5

I.     INVESTIGATOR JOB DUTIES AND RELATIONSHIP TO CLAIMS ......................5

     A.  Defendant's Business Purpose....................................................................5

     B.  Defendant's Claims Department..................................................................5

     C.  Defendant's Special Investigations Unit.....................................................6

     D.  Claims are Deemed Potentially Fraudulent or Suspicious Before they
         are Referred to SIU ....................................................................................7

II.    THE LIFE OF AN INVESTIGATION...................................................................9

     A.  Investigators Develop Action Plans with Claims Adjusters ......................9

     B.  Investigators Engage in Investigatory Activities ......................................10

     C.  Investigators Report their Findings to Claims Adjusters Who Then Decide
         Whether to Pay or Deny Claims ...............................................................12

     D.  Defendant Closely Controls and Limits Formal Communications
         Between Investigators and Claims Adjusters ...........................................14

          1.  Defendant strictly controls the form and content of the reports Investigators
               write for Claims Adjusters .................................................................15

          2.  SIU Supervisors review, edit, approve, and grade Investigators' reports...........15

          3.  Defendant audits Investigators' closed files .....................................17

     E.  Investigators Provide Facts Related to the Claim, Not Their Opinion as to
         Whether the Claim Should be Paid...........................................................18

     F.  Work Performed by Investigators is Far Different than that Performed by
         Claims Adjusters and SIU Analysts..........................................................20

ARGUMENT ..........................................................................................................20

I.      LEGAL STANDARD..................................................................................20

II.     THE FLSA AND THE ADMINISTRATIVE EXEMPTION ......................................21

III.    THE DOL AND RELEVANT CASE LAW FIND INVESTIGATORS
        ARE NOT ADMINISTRATIVELY EXEMPT..............................................................22

IV.     PLAINTIFFS' PRIMARY DUTY DOES NOT CONSIST OF WORK DIRECTLY
        RELATED TO MANAGEMENT POLICIES OR GENERAL BUSINESS
        OPERATIONS OF DEFENDANT OR ITS CUSTOMERS ..........................................24

        A.  Plaintiffs' Investigatory Activities Are Not Directly Related to Management
            or Defendant's General Business Operation..............................................25

        B.  Plaintiffs Do Not Perform Administrative Tasks Contemplated by
            the Regulations.......................................................................................25

        C.  Authorities Governing Public Sector Employees are Persuasive .............30

            1.  The Regulations Addressing Investigators Apply to Both Public and
                Private Investigators............................................................................30

            2.  Plaintiffs' Relationship with Defendant's Claims Adjusters Does Not Make
                Them Exempt.....................................................................................31

V.      INVESTIGATORS DO NOT EXERCISE DISCRETION AND INDEPENDENT
        JUDGMENT WITH RESPECT TO MATTERS OF SIGNIFICANCE .......................33

        A.  Investigators' Primary Duty is to Investigate Claims...............................33

        B.  Investigators' Investigatory Duties Do Not Include the Exercise of Discretion and
            Independent Judgment With Respect to Matters of Significance...........................34

        C.  The Regulations Do Not Support a Finding that Plaintiffs Are Administratively
            Exempt ..................................................................................................34

        D.  The Nature of Plaintiffs' Work is Not Significant...................................35

            1.  Plaintiffs' Experience Does Not Make them De Facto Exempt .........36

            2.  The DOL Has Consistently Found that Investigators Do Not Exercise
                Discretion and Independent Judgment.................................................37

3. Courts Have Found Investigators with Nearly Identical Duties as Investigators Do Not Meet the Discretion and Independent Judgment Element .....................38

E. Investigators' Primary Duty Does Not Include Providing Opinions or Recommendations on Claims Disposition or on Fraud Determinations...................40

VI. DEFENDANT CANNOT SATISFY THE ADMINISTRATIVE EXEMPTION AS IT RELATES TO PLAINTIFFS' NEW YORK STATE LAW OVERTIME CLAIM.......41

CONCLUSION......................................................................................................................41

## <u>TABLE OF AUTHORITIES</u>

**CASES**

Acebal v. United States, 60 Fed. Cl. 551 (Fed. Cl. 2004) ...........................................................30

Adams v. United States, 26 Cl. Ct. 782 (Cl. Ct. 1992).............................................................24

Adams v. United States, 78 Fed. Cl. 536 (Fed. Cl. 2007) ........................................ 24-25, 28, 32

Ahern v. New York, 807 F. Supp. 919 (N.D.N.Y. 1992) ...........................................................24

Ahle v. Veracity Research Co., 738 F. Supp. 2d 896 (D. Minn. 2010) .............. 23, 28, 35, 39-40

Ale v. Tenn. Valley Auth., 269 F.3d 680 (6th Cir. 2001)...........................................................33

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986)....................................................... 20-21

Arnold v. Ben Kanowsky, Inc., 361 U.S. 388 (1960)..........................................................22, 32

Barbour v. Int'l Union, 640 F.3d 599 (4th Cir. 2011) ...............................................................31

Barner v. Novato, 17 F.3d 1256 (9th Cir. 1994).......................................................................24

Batterton v. Francis, 432 U.S. 416 (1977) ...............................................................................22

Bertrand v. Children's Home, 489 F. Supp. 516 (D. Md. 2007) ...........................................21

Bothell v. Phase Metrics, Inc., 299 F.3d 1120 (9th Cir. 2002)........................................... 25-27

Celotex Corp. v. Catrett, 477 U.S. 317 (1986) ........................................................................20

Clark v. J.M. Benson Co., Inc., 789 F.2d 282 (4th Cir. 1986)............................................27, 35

Darveau v. Detecon, Inc., 515 F.3d 334 (4th Cir. 2008) ...........................................................22

Davis v. J.P. Morgan Chase & Co., 587 F.3d 529 (2d Cir. 2009) ..............................................29

Desmond v. PNGI Charles Town Gaming, L.L.C.,
  564 F.3d 688 (4th Cir. 2009) ........................................................................21-22, 25-27, 29

Drewitt v. Pratt, 999 F.2d 774 (4th Cir. 1993).........................................................................21

In re Farmers Ins. Exch., Claims Reps.' Overtime Pay Litig.,
  481 F.3d 1119 (9th Cir. 2007) ...........................................................................................36

Felty v. Graves-Humphreys Co., 818 F.2d 1126 (4th Cir. 1987) ...............................................21

Fenton v. Farmers Ins. Exch., 663 F. Supp. 2d 718 (D. Minn. 2009)............23, 30, 34-36, 38-39

v

Fleming v. Carpenters/Contractors Cooperation Comm., Inc.,
  834 F. Supp. 323 (S.D. Cal. 1993)................................................................ 24, 30-31

Foster v. Nationwide, 695 F. Supp. 2d 748 (S.D. Ohio 2010).................................. 23, 28, 30-31

Foster v. Nationwide, 2012 WL 407442 (S.D. Ohio Jan. 5, 2012)............................................23

Gusdonovich v. Bus. Info., 705 F. Supp. 262 (W.D. Pa. 1985)....................23, 25, 27, 30, 36, 39

Haines v. S. Retailers, Inc., 939 F. Supp. 441 (E.D. Va. 1996)...................................................33

Harris v. District of Columbia, 741 F. Supp. 254 (D.D.C. 1990).........................................24, 27

IntraComm, Inc. v. Bajaj, 492 F.3d 285 (4th Cir. 2007) ............................................................23

Jastremski v. Safeco Ins. Co., 243 F. Supp. 2d 743 (N.D. Ohio 2003) .....................................31

Kahn v. Super. Chicken & Ribs, Inc., 331 F. Supp. 2d 115 (E.D.N.Y. 2004) ..........................41

Lockwood v. Prince George's County, Md., 58 F. Supp. 2d 651 (D. Md. 1999)......................21

Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574 (1986) .........................21

Martin v. Ind. Mich. Power Co., 381 F.3d 574 (6th Cir. 2004).....................................26-27, 29

Meyer v. Worsley Companies, Inc., 881 F. Supp. 1014 (E.D.N.C. 1994) .................................33

Minor v. Bostwick Laboratories, Inc., 669 F.3d 428 (4th Cir. 2012).........................................31

Reich v. Am. Int'l Adjustment Co., Inc., 902 F. Supp. 321 (D. Conn. 1994) ......................24, 30

Reich v. Gateway Press, Inc., 13 F.3d 685 (3d Cir. 1994) ........................................................33

Reich v. John Alden Life Ins. Co., 126 F.3d 1 (1st Cir. 1997) ...................................................26

Robinson-Smith v. GEICO, 590 F.3d 886 (D.C. Cir. 2010)...........................................20, 22, 31

Roney v. United States, 790 F. Supp. 23 (D.D.C. 1992) .............................................................32

Rossignol v. Voorhaar, 316 F.3d 516 (4th Cir. 2003) ................................................................20

Ruggeri v. Boehringer Ingelheim Pharm., Inc., 585 F. Supp. 2d 254 (D. Conn. 2008) .............34

Schaefer v. Ind. Mich. Power Co., 358 F.3d 402 (6th Cir. 2004)........................................27, 33

Shockley v. City of Newport News, 997 F.2d 18 (4th Cir. 1993) ..............................................22

Young v. Cooper Cameron Corp., 586 F.3d 201 (2d Cir. 2009) .................................................36

## STATUTES

29 U.S.C. § 207.................................................................................................................21

29 U.S.C. § 213............................................................................................................ 21-22

## REGULATIONS AND RULES

29 C.F.R. § 541.2.............................................................................................................32

29 C.F.R. § 541.3..................................................................................................... 23, 30-31

29 C.F.R. § 541.200......................................................................................................22, 33

29 C.F.R. § 541.201......................................................................................................24, 26

29 C.F.R. § 541.202............................................................................................. 34-36, 38

29 C.F.R. § 541.203...................................................................................... 31-32, 36, 40

29 C.F.R. § 541.205......................................................................................................30, 32

29 C.F.R. § 541.301............................................................................................................36

29 C.F.R. § 541.700............................................................................................................33

29 C.F.R. § 541.704......................................................................................................34, 36

Fed R. Civ. P. 56(a) .........................................................................................................20

## OTHER AUTHORITIES

Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside
Sales and Computer Employees, 69 Fed. Reg. 22,122
(Apr. 23, 2004).................................................................................22, 25-26, 34-35

Dep't of Labor, Wage & Hour Div., Opinion Letter,
   1997 WL 971811 (Sept. 12, 1997)........................................................................23, 37

Dep't of Labor, Wage & Hour Div., Opinion Letter,
   1998 WL 852752 (Jan. 23, 1998) ....................................................................23, 30, 37

Dep't of Labor, Wage & Hour Div., Opinion Letter,
   1998 WL 852783 (April 17, 1998) .............................................................................23

Dep't of Labor, Wage & Hour Div., Opinion Letter, FLSA 2005-21
  2005 WL 3308592 (Aug. 19, 2005).................................................................... *passim*

Dep't of Labor, Wage & Hour Div., Opinion Letter, FLSA 2005-24
  2005 WL 3308595 (Aug. 26, 2005)........................................................................31

Merriam-Webster Dictionary, http://www.merriam-webster.com ............................................35

## INTRODUCTION

Plaintiffs[1] are forty-eight (48) current and former Security Investigators ("Investigators") who worked for Defendant GEICO General Insurance Company and GEICO General (together, "Defendant") in its Special Investigation Unit ("SIU"). Defendant's undisputed policy is, and has been, to classify its Investigators as exempt from the overtime pay protections of the Fair Labor Standards Act ("FLSA") and corresponding state laws.[2] It is also undisputed that Defendant relies on one exemption defense for its classification decision, the administrative exemption. In this lawsuit, Plaintiffs challenge Defendant's reliance on the administrative exemption and seek to recover the overtime pay withheld by Defendant. This motion does not ask the Court to determine the amount of wages they are owed. Rather, Plaintiffs simply ask this Court to find as a matter of law that Defendant misclassified Plaintiffs as exempt employees, and to set a trial date to determine the amount of Plaintiffs' damages.

Defendant bears the unmistakably heavy burden of proving that its exempt classification was appropriate. To be sure, Defendant must clearly establish that Plaintiffs satisfy each of the elements of the administrative exemption. Here, only two of the three elements are at issue: (1) whether Plaintiffs' primary job duty as Investigators consists of the performance of office or non-manual work directly related to Defendant's management or general business operations; and (2) whether Plaintiffs' primary job duty includes the exercise of discretion and independent judgment with respect to matters of significance.[3]

---

[1] Plaintiffs also bring this motion on behalf of the Rule 23 New York Class certified by this Court on February 14, 2012. For the purposes of this Motion, any reference to Plaintiffs includes the New York class members.

[2] The only exception to this rule is for Defendant's Investigators who work in California. Defendant has classified these Investigators as non-exempt since approximately 2002.

[3] Plaintiffs agree that Defendant paid its Investigators at least $455 per week, thus satisfying the first element of the administrative exemption.

To prevail on this motion, Plaintiffs need only show that Defendant has failed to carry its heavy burden on either one of these two elements.  But Plaintiffs maintain that Defendant fails on both.  With respect to the first element, summary judgment should be granted for Plaintiffs because the relevant and persuasive authority from district courts and the Department of Labor confirms what the applicable regulations explicitly state: investigators are not administrative workers.

Summary judgment should likewise be granted for Plaintiffs under the second element because Defendant cannot prove by clear and convincing evidence that Plaintiffs' primary job duty includes the exercise of discretion and independent judgment with respect to matters of significance.  This is true for two reasons.  First, Defendant's documents, the testimony of its executives, and the deposition and declaration testimony of Plaintiffs confirm that an Investigator's primary job duty does not include providing opinions on whether a claim should be paid or denied.  In fact, they are prohibited from rendering opinions on claims adjustment. That determination is made by a claims professional, whose primary job duty, making claims adjusting decisions, arguably involves the exercise of independent judgment and discretion with respect to matters of significance, *e.g.*, whether Defendant will pay or deny a claim for insurance benefits.  Defendant purposefully and explicitly excludes Investigators from that decision.

Even if the Court is not convinced that Plaintiffs' prohibition from claims adjusting is in itself dispositive to grant summary judgment in Plaintiffs' favor, it should still find that Investigators do not exercise discretion and independent judgment ***with respect to matters of significance***.  While Plaintiffs acknowledge that they exercise some limited discretion and independent judgment with regards to their day-to-day job duties, such discretion has been deemed insufficient by federal courts and the Department of Labor to prove the administrative

exemption applies to other comparable investigator positions.  Defendant, moreover, takes great pains to limit Plaintiffs' even limited discretion through constant oversight by SIU Supervisors, as well as its restrictions on when and how Investigators conduct their investigations.  In fact, unlike any of the other cases involving investigators discussed *infra*, Defendant's SIU Supervisors conduct open-file audits of every claim that is investigated by the Investigators before the file is returned to the claims professional for adjusting.  This is done to ensure that Investigators' reports are drafted in conformance with Defendant's guidelines and that all of the relevant investigative activities are conducted.

For these reasons, and those stated more fully below, Plaintiffs respectfully request that the Court grant their Motion for Partial Summary Judgment, find as a matter of law that Defendant has failed to satisfy the elements of the administrative exemption under the FLSA and New York state law, and set a date for a trial to determine Plaintiffs' damages.

## PROCEDURAL HISTORY

Plaintiff Samuel Calderon filed his Complaint against Defendant on July 19, 2010.  (ECF No. 1.)  In his Complaint, he brought a single claim against Defendant on behalf of himself and all other similarly situated Investigators: failure to pay overtime wages in violation of the FLSA.  (Id.)  On August 10, 2010, Defendant filed its Answer denying Plaintiff Calderon's allegation that it violated the FLSA.  (ECF No. 10.)  Defendant's Answer contained three affirmative defenses, one of which is relevant to this motion: that Plaintiff Calderon was an administrative employee and thus exempt from the overtime pay requirements of the FLSA.  (Id.)  Plaintiff Calderon moved for Conditional Certification and Judicial Notice pursuant to Section 216(b) of the FLSA on October 22, 2010.  (ECF No. 23.)  The Court granted the motion on January 12, 2011, conditionally certifying the case as a collective action and authorizing Plaintiff to send

notice to any Investigators who worked for Defendant within the past three years.  (ECF Nos. 31-32.)  In accordance with the Court's order, Plaintiff mailed the Court-approved notice to the putative opt-in plaintiffs.  (Declaration of Matthew H. Morgan ("Morgan Decl.") ¶ 3.)  At the end of the notice period, a total of forty-eight (48) current and former Investigators joined Mr. Calderon as opt-in Plaintiffs in this action.[4]  (Id. ¶ 4.)

Plaintiffs amended their Complaint to add individual and Rule 23 overtime pay claims under New York state law on June 1, 2011.  (ECF No. 56-2.)  As part of the amendment, opt-in Plaintiff Tom Fitzgerald, Joan Bischoff, Dennis Fulton, Vincent Greco, Joseph Miles, Jr., and Michael Russell, were added as named Plaintiffs.  (Id.)  Plaintiff Tom Fitzgerald was identified in the Amended Complaint as the proposed class representative.  (Id.)  Defendant filed its Answer to Plaintiffs' Amended Complaint on June 7, 2011.  (ECF No. 58.)  Again, Defendant raised the same three affirmative defenses, including the administrative exemption.  (Id.)  Plaintiffs moved for Rule 23 Class Certification of their New York state law claims for overtime pay on August 15, 2011.  (ECF No. 61.)  The Court granted Plaintiffs' motion on February 14, 2012.  (ECF Nos. 67-68.)  Notice was agreed upon by the parties, (ECF No. 75), approved by the Court, (ECF No. 78.), and mailed to the seventy-five (75) members of the New York class (Morgan Decl. ¶ 5).  Plaintiffs' Counsel received exclusion (opt-out) requests from five (5) individuals.  (Morgan Decl. ¶ 6.)

Plaintiffs filed their Second Amended Complaint on March 9, 2012, adding a request for liquidated damages under New York state law.  (ECF No. 77.)  Defendant preemptively filed its

---

[4] One of the opt-in Plaintiffs, Michael Shane Brown, later withdrew his claim.  (ECF No. 79.)

Answer on March 5, 2012.  (ECF No. 74.)[5]  Yet again, Defendant raised the same three

affirmative defenses, including the administrative exemption.  (Id.)

## UNDISPUTED FACTS

### I.   INVESTIGATOR JOB DUTIES AND RELATIONSHIP TO CLAIMS

#### A.  Defendant's Business Purpose

Defendant is in the business of providing auto and power-sports insurance to its

policyholders.  (Rule 30(b)(6) Deposition of Steven Rutzebeck[6] ("Rutzebeck 30(b)(6) Dep.")

39:22-40:4.)[7]  Its purpose is to sell insurance policies and then handle claims for insurance

coverage made by its policyholders.  (Deposition of Nancy Pierce[8] ("Pierce Dep.") 65:15-18.)

#### B.  Defendant's Claims Department

When a policyholder submits a claim for insurance coverage to Defendant, it is handled

by an employee called a "Claims Adjuster"[9] in Defendant's Claims Department.  (Ex. 1 at

NKA0001272-1279.)  It is the Claims Adjuster's job to determine whether to deny or pay a

claim.  (Rutzebeck 30(b)(6) Dep. 66:12-17.)  A Claims Adjuster is considered to be "the owner

of the file."  (Deposition of Sharyl Derenthal[10] ("Derenthal Dep.") 29:14-17; Deposition of Gary

---

[5] The parties filed a Stipulation agreeing to the Amendment on March 1, 2012.  (ECF No. 73.)  Plaintiffs' proposed amendments were attached to the stipulation.  (ECF Nos. 73-1, 73-2.)  As a result, Defendant knew exactly what Plaintiffs' proposed Second Amended Complaint stated and simply filed its Answer before the Court officially permitted Plaintiffs to file the amendment.

[6] Mr. Rutzebeck is the Director of Claims Security/Special Investigations Unit.  (Rutzebeck 30(b)(6) Dep. 9:17-25.)

[7] Full transcripts of all depositions cited herein are attached to the Declaration of Matthew H. Morgan as Exhibits 26-34 (in alphabetical order by deponent's last name).

[8] Ms. Pierce has worked for Defendant as the Vice-President of Claims since 2008.  (Pierce Dep. 5:20-6:1.)

[9] Defendant also refers to these employees as "Claims Examiners."  (Rutzebeck 30(b)(6) Dep. 100:3-10.)

[10] Ms. Derenthal is the SIU Manager for Region 2, which covers New York.  (Derenthal Dep. 3:8-4:7.)

Hodge[11] ("Hodge Dep.") 71:3-10.)  The Claims Department is divided into two divisions:

Liability and Auto Damage.  (Ex. 1 at NKA0001268.)  There are different types and levels of

Claims Adjusters, including Claims Service Representatives, Telephone Claims Representatives,

Continuing Unit Examiners, and Auto Damage Adjusters. (Id. at NKA0001269; Rutzebeck

30(b)(6) Dep. 98:13-99:8.)  All of these adjusters can work with Investigators.  (Rutzebeck

30(b)(6) Dep. 99:9-19.)  The primary job duty of Defendant's Claims Adjusters is to

"adjust[]insurance claims by investigating, assessing and resolving them."  (Ex. 2, Declaration of

John W. Pham ¶ 3.)[12]  Their duties include negotiating settlements.  (Id.)

## C.  Defendant's Special Investigations Unit

Defendant's Investigators[13] work in the Special Investigations Unit ("SIU"), which is part

of its Claims Department.  (Ex. 1 at NKA0001269.)  Investigators occupy the lowest level of

SIU.  (Rutzebeck 30(b)(6) Dep. 19:7-10.)  Investigators report to SIU Supervisors, who report to

SIU Managers.  (Id. 19:11-15.)  SIU Managers in turn report to Assistant Vice-Presidents of

Claims,[14] who report to Regional Vice-Presidents.  (Id. 19:16-19.)  Defendant divides SIU into

eight geographic regions which are aligned with its Claims Department regions.  (Id. 20:20-

21:8.)  Investigators typically work out of their homes and connect to Defendant's network

through an internet connection.  (Id. 46:25-47:4, 88:8-11; Derenthal Dep. 81:19-24; Deposition

---

[11] Mr. Hodge is an SIU Supervisor in Region 6.  (Hodge Dep. 8:6-9:5.)

[12] At the time he signed his Declaration, Mr. Pham was employed by Defendant as Assistant Vice-President of Claims for Region 2.  (See Ex. 2.)  He submitted his declaration in support of GEICO's Motion for Summary Judgment in Harper v. GEICO, No. 09-CV-2254 on September 9, 2010.  (Id.)  That motion was denied on November 16, 2010.  See Harper v. GEICO, 754 F. Supp. 2d 461 (E.D.N.Y. 2010).

[13] Defendant also refers to its Security Investigators as Special Investigators.  (Rutzebeck 30(b)(6) Dep. 11:8-13.)

[14] By law, SIU Managers in New York and New Jersey report to Defendant's Regional Vice-Presidents, not to the Vice-President of Claims.  (Rutzebeck 30(b)(6) Dep. 18:2-19:2.)

of Samuel Calderon ("Calderon Dep.") 36:10-37:7; Deposition of Thomas Fitzgerald ("Fitzgerald Dep.") 23:3-20.)

Defendant's SIU, and by extension its Investigators, have no role in the areas of tax, finance, accounting, budgeting, auditing, human resources, employee benefits, government relations, marketing, advertising, or payroll.  (Rutzebeck 30(b)(6) Dep. 41:23-43:16.)  Rather, their primary job duty—approximately 90% of their working hours—is to conduct investigations.  (Id. 46:10-21, 47:18-24; Deposition of Michael College ("College Dep.") 33:3-5; Hodge Dep. 51:9-12; Exs. 19-25[15] ¶ 4.)  Michael College, the former Operations and Training Manager for SIU from February 2003 until March 2011,[16] described the main job of the Investigator as assisting Claims Adjusters in uncovering the facts of claims and how the claim was reported to Defendant.  (College Dep. 9:6-11, 21:7-12.)

### D. Claims are Deemed Potentially Fraudulent or Suspicious Before they are Referred to SIU

Investigators have no role in determining whether a newly filed claim is suspicious, appears to be fraudulent, or requires investigation.  (Rutzebeck 30(b)(6) Dep. 27:5-7; Derenthal Dep. 11:20-23; Exs. 19-25 ¶ 5.)  Rather, that authority rests with a computer program, an Intake Associate, and in some instances, Claims Adjusters.  (Rutzebeck 30(b)(6) Dep. 17:11-13, 25:22-28:16; Exs. 19-25 ¶ 5.)

The first level of review is performed by a computer program called Intelligence Claims Evaluation ("ICE").  (Rutzebeck 30(b)(6) Dep. 17:11-13, 25:22-26:6.)  ICE automatically

---

[15] Attached to the Declaration of Matthew H. Morgan as Exhibits 19-25 are the Declarations of Plaintiffs Thomas Brady (Ex. 19), Candido Cubero (Ex. 20), John Halliday (Ex. 21), Michael Headley (Ex. 22), Joseph Miles (Ex. 23), Michael Russell (Ex. 24), and Patrick Weise (Ex. 25). Unless otherwise noted, these declarations will be cited collectively as "Exs. 19-25," followed by the relevant paragraph number.

[16] At the time of his deposition in April 2011, Mr. College was working for Defendant as an internal investigator.  (College Dep. 7:10-24.)

7

reviews all policyholder claims for insurance coverage as they are filed, and "red-flags" those

with indicators of potential fraud.  (Id.)  When working properly,[17] ICE flags a claim and sends it

to an employee called an "Intake Associate."  (Id. 26:7-27:4.)  The Intake Associate then

conducts a second level of review to determine if the flagged claim requires further investigation.

(Id.)  If so, she "refers" the flagged claim electronically to the appropriate regional SIU

Supervisor (id. 27:8-22) or, in some cases, directly to an Investigator (Hodge Dep. 43:13-45:14;

Exs. 19-25 ¶ 5).  If the Intake Associate sends the referral to the SIU Supervisor, she then assigns

the flagged claim to an Investigator.  (Rutzebeck 30(b)(6) Dep. 27:23-28:1.)

The Claims Adjuster assigned to each claim has the ability to perform a third level of

review by manually making a referral to SIU.  (Id. 28:2-4.)   Put differently, if ICE and the

Intake Associate determine that a claim does not appear to be fraudulent or need additional

investigation, but the Claims Adjuster sees something suspicious during her review, the Claims

Adjuster refers it directly to SIU management for investigation.  (Id. 28:5-16.)  Again, in this

circumstance an SIU Supervisor assigns the referral to an Investigator.  (Id. 51:25-52:13.)

Investigators do not decide which claims appear to be fraudulent and thus require

investigation.  (Id. 27:5-7; Derenthal Dep. 11:20-23; Exs. 19-25 ¶ 5.)  Their discretion and

judgment is so limited, in fact, that Defendant does not even allow them to reject a referral that

they believe was mistakenly flagged.  (Deposition of Donald Marine[18] ("Marine Dep.") 17:25-

18:17.)  Rather, the authority to reject a referral lies solely with SIU management.  (Id.)

---

[17] Due to software problems, Defendant has been unable to use ICE to fully automate the
claims review process. (Rutzebeck 30(b)(6) Dep. 28:17-29:24.)  Instead, since 2008 Defendant
has used ICE to automatically filter claims, which are then manually reviewed by an Intake
Associate. (Id.)  The results and process for referring claims to SIU are the same. (Id.)

[18] At the time of his deposition, Mr. Marine was Defendant's Supervisor of Operations
and Training for SIU.  (Marine Dep. 6:8-12.)  In that position, he was responsible for

Once the referral is made, Investigators are required to adhere to "written procedures for the investigation of possible suspected insurance fraud" and to complete all of the following activities:

(1) A thorough investigation of the referral;

(2) Identification and interviews of potential witnesses who may provide information on the accuracy of the claim and/or application;

(3) Utilization of industry recognized databases as necessary;

(4) Preservation of documents and evidence; and

(5) A Concise and complete summary of the investigation, including the investigator's findings regarding the suspected insurance fraud and the basis for their findings.

(Ex. 3 at GEICO.000588.)

## II.     THE LIFE OF AN INVESTIGATION

### A.  Investigators Develop Action Plans with Claims Adjusters

Receiving an assignment is the first of four steps in the investigation process. (Rutzebeck 30(b)(6) Dep. 51:4-10; Derenthal Dep. 18:21-19:10.) To complete an assignment, Investigators must make a "plan of action,"[19] gather evidence, and create a written report of the results of the investigation. (Id.) Investigators have no authority to deviate from this process without pre-approval from management. (Derenthal Dep. 32:4-10.) Throughout the life of an investigation, SIU Supervisors monitor Investigators' activities by, among other things, accessing their Microsoft Outlook calendars to see the amount and type of work they have scheduled. (Hodge Dep. 37:9-38:2.)

Once Investigators receive an assignment, they do the "pre-work" of reviewing the claim, any attached documents, and public records. (Rutzebeck 30(b)(6) Dep. 52:14-21.) Public record searches include a review of the claimant's driving history, claims history, court records, and

---

coordinating SIU performance reviews and audits. (Rutzebeck 30(b)(6) Dep. 21:16-22:4.) He reported to Michael College until approximately March or April 2011. (Marine Dep. 14:4-23.)

[19] The plan of action may also referred to as the "summary." (Marine Dep. 41:24-42:7.)

vehicle ownership history.  (Ex. 4 at GEICO.000482.)  After this review, Investigators contact

the Claims Adjuster.  (Rutzebeck 30(b)(6) Dep. 55:24-56:15; Derenthal Dep. 19:17-20:3;

College Dep. 33:13-34:11.)  Investigators are required to communicate with the Claims Adjuster

within twenty-four hours of receiving the referral.  (Marine Dep. 19:9-21.)  During this

conversation, Investigators should begin the second step, making a plan of action, with the

Claims Adjuster.  (College Dep. 34:21-35:1.)  The "plan of action" is where Investigators

"determine what activities they need to perform in order to investigate the particular

circumstances of that particular case."  (Rutzebeck 30(b)(6) Dep. 55:15-23.)  The plan of action

is "easy to produce," and as a result, is not a significant factor in the closed file audits discussed

below.  (Marine Dep. 35:17-36:10.)  It normally contains simple instructions like, "conduct a

complete background investigation of the insured," "inspect vehicle," "contact the alibi witness .

. . and interview him about the circumstances of the case," and "contact [the local police

department] to determine who is assigned the case."  (Ex. 17 at NKA0012436; Ex. 18 at

NKA0011257.)  Once the plan of action is made, Investigators enter it into Defendant's SIU

Case Management System, otherwise known as "SICM."  (Rutzebeck 30(b)(6) Dep. 56:7-17.)

### B.  Investigators Engage in Investigatory Activities

After creating the plan of action with Claims Adjusters, Investigators move on to the

third step, gathering evidence.  (Id. 56:18-57:2; College Dep. 35:2-17.)  Investigators gather

evidence by, among other things, interviewing witnesses, taking photographs, and reviewing

property damage.  (Rutzebeck 30(b)(6) Dep. 56:21-57:2; Derenthal Dep. 20:5-14, 22:16-24; Ex.

3 at GEICO.000588; Ex. 4 at GEICO.000482, 491-492, 498-499; Exs. 19-25 ¶ 6.)  Although

Investigators are permitted to incur routine expenses for things like parking, larger expenses

like forensic examinations, surveillance, and expert retention must be pre-approved by either

the Claims Adjuster assigned to the file or their SIU Supervisor.  (Rutzebeck 30(b)(6) Dep.

71:14-72:8, 78:20-79:17; Derenthal Dep. 20:15-22:6; Exs. 19-25 ¶ 6.)

Investigators may also take formalized face-to-face interviews of insurance claimants in

what are called examinations under oath ("EUOs").  (Rutzebeck 30(b)(6) Dep. 72:18-73:21;

College Dep. 64:13-18.)  Defendant's policyholders have a duty to submit to an EUO when

requested by the company.  (Ex. 6 at GEICO.000406.)  The purpose of the EUO is to (1)

"[o]btain or clarify information necessary to properly handle a claim"; (2) "[p]rovide an

opportunity for an insured to explain or further substantiate their claim"; (3) "[e]liminate as

many gray areas as possible"; "[e]valuate the insured as a witness"; and (4) "[p]reserve

testimony."  (Id. at GEICO.000407.)  The scope of the questioning should be focused on "facts

bearing on evaluation of the claims and obligations under the policy," like financial condition,

details regarding the loss, and credibility, including criminal history.  (Id. at GEICO.000426.)  In

terms of the facts that Investigators gather, there is no difference between an informal interview

and an EUO.  (Rutzebeck 30(b)(6) Dep. 74:5-8.)  The primary difference between a run-of-the-

mill interview and an EUO is that in an EUO, as the name suggests, the insurance claimant is

testifying under oath, whereas they are not in an interview.  (Rutzebeck 30(b)(6) Dep. 73:12-

16.)

When Investigators take EUOs, they primarily ask questions taken from scripts provided

to them by Defendant.  (Calderon Dep. 76:5-77:5; Fitzgerald Dep. 111:21-113:8.)  These scripts

identify how Investigators should begin the EUO, how they should respond to "special

situations," and specific questions for the various types of claims (accident, medical, theft, and

arson).  In the event that a claimant makes a statement that is inconsistent with the facts

uncovered at that point in the investigation, Investigators have to ask follow up questions which were not part of the script.  (Calderon Dep. 77:6-13; Fitzgerald Dep. 113:9-13.)

Although not required, Defendant's preference is for Investigators to obtain the Claims Adjuster's approval before initiating an EUO.  (Rutzebeck 30(b)(6) Dep. 79:24-80:15; Calderon Dep. 83:5-20, 164:12-165:4; Fitzgerald Dep. 107:21-109:25; Ex. 17 at NKA0012437.)  When an EUO is necessary, Investigators email their SIU Supervisors, who in turn approve the request. (Hodge Dep. 115:1-116:1.)  Some Investigators are not permitted to take EUOs when the claimants are represented by an attorney.  (Calderon Dep. 129:11-130:6.)  In these and other circumstances, attorneys retained by Defendant take the EUOs.  (Rutzebeck 30(b)(6) Dep. 73:1-7; College Dep. 64:19-21.)

After taking an EUO, Investigators speak to the Claims Adjuster to update them on the investigation, and then describe the EUO in their final report.  (Fitzgerald Dep. 141:4-17.) Defendant specifically instructs Investigators to only include facts, and to exclude recommendations or conclusions, in their SICM notes regarding the EUO.  (Ex. 6 at GEICO.000430.)  Transcripts of EUOs are sent directly to the Claims Department.  (Fitzgerald Dep. 173:9-19.)  Although Investigators could order a copy of the transcripts for themselves, they have no use for them because they do not have any role in determining whether a claim will be paid or denied.  (Id.)

### C. Investigators Report their Findings to Claims Adjusters Who Then Decide Whether to Pay or Deny Claims

Throughout an investigation Defendant recommends that Investigators keep in "constant and ongoing communication" with Claims Adjusters.  (Rutzebeck 30(b)(6) Dep. 64:25-65:11; Ex. 4 at GEICO.000483.)  But because Claims Adjusters cannot access SICM (and therefore they cannot see or rely on Investigators' daily notes regarding their investigative activities)

(Rutzebeck 30(b)(6) Dep. 65:12-25), Defendant also requires Investigators to communicate with their SIU Supervisors and Claims Adjusters through written reports.  (Ex. 4 at GEICO.000483-484; Ex. 5; Ex. 8; Ex. 9; Exs. 19-25 ¶ 8.)  Investigators must submit an initial report[20] ten days after receiving the referral, interim reports every twenty days during the investigation, and a final closing report when Investigators believe that the investigation is over.  (Rutzebeck 30(b)(6) Dep. 57:7-17; Ex. 5 at GEICO.000573-583; Exs. 19-25 ¶¶ 8-9.)  Investigators take an average of thirty days to complete an investigation.  (Rutzebeck 30(b)(6) Dep. 57:19-22.)  Despite this scheduled reporting framework, Defendant recommends (if not requires) that Investigators update SICM every time an "investigative activity occurs."  (Id. 58:12-22; Derenthal Dep. 40:5-19; Marine Dep. 24:9-17; Exs. 19-25 ¶ 7.)

After Investigators finish gathering evidence, they must call the Claims Adjuster to discuss their findings.  (Derenthal Dep. 58:19-59:19.)  Assuming the Claims Adjuster agrees that the file should be closed, Investigators then move to the fourth step, writing a final report.  (Id.)  Like the other reports, the final report, or "closing report" must be entered in the SICM system.  (Marine Dep. 24:23-25:5.)  The final report contains a "synopsis of all pertinent investigative findings" and, if recommendations are provided, they must "be based upon the facts of the investigation" and "not include statements regarding payment of claims unless required by state law."  (Marine Dep. 80:19-81:16.)  Indeed, Defendant trains its Investigators to exclude opinions from their reports.  (College Dep. 23:10-19; Marine Dep. 47:22-24 (Investigators' reports should be free of subjectivity); Ex. 5 at GEICO.000576.)  The final report should be non-accusatory.  (Ex. 4 at GEICO.000483.)  As explained *infra*, the Investigators' reports must be approved by SIU Supervisors before they are sent to the Claims Adjusters.  (Rutzebeck 30(b)(6) Dep. 64:7-

---

[20] The initial report is different from the action plan.  (Rutzebeck 30(b)(6) Dep. 58:7-9.)

13; Marine Dep. 59:4-19.)  SIU Supervisors and Claims Adjusters have the ability to reject

Investigators' final reports and order Investigators to perform additional work.  (Derenthal Dep.

49:17-50:8.)

When Investigators are preparing to close a file, they may also refer the claim to the

National Insurance Crime Bureau ("NICB") or other state agencies.  (Id. 51:6-15; Calderon Dep.

165:13-167:9, 174:11-175:11; Fitzgerald Dep. 67:13-68:9.)  Investigators, however, are not

obligated to do so.  (Derenthal Dep. 54:12-25.)  As part of the SIU Supervisors' file review, they

check to see if referrals are necessary and if they were made.  (Hodge Dep. 94:13-21.)  In the

event that an SIU Supervisors believes that a referral is necessary but was not made, they will

direct Investigators to make the referral.  (Id.; see also Ex. 17 at NKA0012438.)  Once a referral

is made to the NICB, Investigators have no control over what it does with that information.

(Derenthal Dep. 54:6-11; Calderon Dep. 232:15-233:8; Fitzgerald Dep. 69:7-70:3)  In the event

that the NICB chose to look into a referred claim further, Investigators may discuss the claim

with a NICB agent and, if NICB agent felt that it was worthy of being investigated further, the

police.  (Fitzgerald Dep. 161:21-162:16; Exs. 19-25 ¶ 6.)  Similar referrals may also be made to

Defendant's underwriting department.  (Fitzgerald Dep. 72:17-73:12.)  Claims Adjusters cannot

see any of the written submissions to either the NICB or underwriting.  (Fitzgerald Dep. 168:10-

21.)

**D.  Defendant Closely Controls and Limits Formal Communications Between
    Investigators and Claims Adjusters**

Defendant purposefully limits formal communications between Investigators and Claims

Adjusters.  As an initial matter, Claims Adjusters do not have access to Investigators' SICM

investigation activities because Defendant wants their claims determination to be independent of

what Investigators are doing on the investigation until the actual investigation is complete.

(Rutzebeck 30(b)(6) Dep. 65:17-66:11.)

### 1. *Defendant strictly controls the form and content of the reports Investigators write for Claims Adjusters*

Defendant's regulations and corresponding review of Investigators reports scrutinize not only the content of the report (i.e., the investigative activities performed during an investigation), but also the minutiae, including Investigators' proper use of grammar, punctuation, and formatting.  (See generally, Exs. 5, 8-10, 19-25 ¶ 11.)  For example, Defendant requires Investigators' reports to be written chronologically, in the first person, in the past tense, using the active voice, as concisely as possible.  (Ex. 5 at GEICO.000573, 577-578; see also Exs. 8-10.) Defendant also instructs Investigators to capitalize some, but not all words, and to use a particular paragraph format. (Ex. 5 at GEICO.000579-580; Ex. 8 at GEICO.000623-625; Ex. 10 at GEICO.000175-177.)  With respect to the actual content, Defendant requires Investigators to write their initial, interim, and final reports according to a specific template.  (Ex. 8 at GEICO.000623-625; Ex. 10 at GEICO.000175-177.)  Each report must contain a summary, reason for the referral, a plan of action, and the details of the investigation, which constitutes the body of the report.  (Ex. 5 at GEICO.000567; see also Exs. 8-10.)  The final line of each final report must be "CASE CLOSED."  (Ex. 5 at GEICO.000583; see also Exs. 8-10.)

### 2. *SIU Supervisors review, edit, approve, and grade Investigators' reports*

All reports, whether initial, interim, or final, are reviewed by SIU Supervisors, even for the small number of Investigators with "self-approval" authority.  (Rutzebeck 30(b)(6) Dep. 75:11-16; Derenthal Dep. 43:23-44:10; Hodge Dep. 24:2-25:21, 67:9-24, 68:9-25, 71:13-72:15,

87:2-4.)[21]  For the vast majority of Investigators, the reports are reviewed and approved by SIU

Supervisors *before* they are communicated to the Claims Adjuster.  (Rutzebeck 30(b)(6) Dep.

58:23-60:19, 61:15-25, 64:7-13; Marine Dep. 26:10-18; College Dep. 26:22-27:1; Hodge Dep.

24:2-25:21.67:9-24, 68:9-25, 71:13-72:15; Exs. 19-25 ¶ 11.)  The review process is so integral to

SIU operations that SIU Supervisors spend between *fifty and eighty percent* of their time

reviewing, editing, approving, and grading Investigators' reports.  (Hodge Dep. 81:7-18;

Derenthal Dep. 46:18-21.)  SIU Supervisors are required to approve or reject each report and

grade it on a scale of one to five.  (Rutzebeck 30(b)(6) Dep. 61:15-25; Derenthal Dep. 72:19-23;

Exs. 19-25 ¶ 12.)  When SIU Supervisors identify deficiencies in reports, they contact the

Investigator and tell them to make corrections.  (Derenthal Dep. 45:7-15; Hodge Dep. 106:12-23;

Exs. 19-25 ¶ 11.)  In this circumstance, the SIU Supervisor exercises his or her independent

judgment and discretion to determine whether the Investigator has not only satisfied the report

writing requirements (i.e., capitalization, paragraph format, etc.), but also whether the

Investigator has completed all necessary investigation activities.  (Hodge Dep. 106:12-23; see

also Ex. 18 at NKA0011274-11275 (SIU Supervisor Hodge instructing Investigator to remove

and change particular paragraphs and sentences from report); Ex. 17 at NKA0012438 (SIU

Supervisor Hodge instructing Investigator to add database searches to the investigative events

portion of a report); Exs. 19-25 ¶ 11.)

---

[21] No Investigator had self-approval authority until March 1, 2010.  (Ex. 13, GEICO.000110-111; Rutzebeck 30(b)(6) Dep. 75:17-76:12.)  After that date, Defendant's SIU Managers had the discretion to decide which, if any, Investigators would be able to self-approve their reports.  (Ex. 13 at GEICO.000110-111.)  Regardless, reports written by Investigators with self-approval authority are still reviewed by their SIU Supervisors at the end of the investigation.  (Derenthal Dep. 43:23-44:10 (in Region 2, all reports are reviewed before published to the Claims Adjuster); Hodge Dep. 24:2-25:21 (in Region 6, review of reports for those with self-approval authority occurs after they are published to the Claims Adjuster).)

The purpose of SIU Supervisor reviews of Investigators' reports is to make sure that reports conform to Defendant's expectations.  (Hodge Dep. 87:5-10.)  In other words, SIU Supervisors review final reports to determine whether "the investigator answer[ed] the question or the concern that the [Claims Adjuster] had when he submitted the referral."  (Derenthal Dep. 44:7-45:1.)  Investigators receive lower grades when their reports fail to conform with Defendant's expectations and guidelines.  (Hodge Dep. 87:11-14; Exs. 19-25 ¶ 12.)  SIU Supervisors also check for spelling errors and other "logistical type things."  (Marine Dep. 26:10-18; Hodge Dep. 27:1-6; Exs. 19-25 ¶ 11.)  On every file that investigated, SIU Supervisors decide whether Investigators have included everything the Claims Adjusters needed in the report and "make sure that the investigation was basically completed correctly."  (Derenthal Dep. 78:19-23; Marine Dep. 26:10-18, 49:20-24.)  The review is ultimately one more check on the quality of the Investigators work (Derenthal Dep. 45:16-19), and an opportunity for the SIU Supervisor to provide additional input into the investigation (Rutzebeck 30(b)(6) Dep. 61:8-14).

### 3.  Defendant audits Investigators' closed files

Each year, and in addition to the open-file audits discussed *supra*, Defendant also audits at least four closed files per Investigator, primarily focusing on the format of the Investigators' written reports.[22]  (Rutzebeck 30(b)(6) Dep. 22:5-19; Marine Dep. 28:9-29:3; Derenthal Dep. 69:17-23; see also Exs. 11-12.)  These audits are conducted and the files are graded according to a "File Audit Guide" developed by management.  (Marine Dep. 29:20-30:17; Exs. 11, 12.)  Although these guides are updated by management from time to time, they have basically remained consistent over the years.  (Marine Dep. 36:11-37:1.)  The File Audit Guide measures Investigators performance based on their SIU Efficiency Ratio, File Compliance, and File

---

[22] In New York, SIU management audits an additional two files each month for each Investigator.  (Derenthal Dep. 68:1-16.)

Quality.  (Id. 40:13-20; Exs. 11, 12.)  Within these measures, Investigators are given between one and five points based on their communication during the investigation, their plan of action, the thoroughness of their investigation, and the readability of their report.  (Marine Dep. 40:21-41:12.)

With respect to the thoroughness category, Investigators can earn five points, the highest possible score, if they use "their expertise, experience, and resourcefulness to extrapolate facts from various unrelated sources to uncover several heretofore unknown salient facts that produces a final product that is superior."  (Ex. 11 at GEICO.000119; Marine Dep. at 42:8-43:1.)  The readability category scores how well the Investigator follows proper sentence structure and makes concise statements.  (Marine Dep. at 46:23-47:11.)  The results of these audits are a significant portion of Defendant's annual performance appraisal of each Investigator. (Rutzebeck 30(b)(6) Dep. 22:13-23:12.)  Investigators comply with the edicts of the guidelines because the audit grades directly impact their pay: if they receive a lower grade, they will not receive a raise, or will receive a smaller raise than if their grades were higher.  (Exs. 19-25 ¶ 12.) In addition, Defendant compiles the individual closed file audits to assess the overall performance of each of its eight SIU regions.  (Marine Dep. 85:7-86:6; Exs. 14-16.)  Through the overall results for each region, Defendant makes recommendations to SIU management regarding what they can do to improve their region's overall performance, as well as the performance of their Investigators.  (Ex. 14 at GEICO.000640-641; Ex. 15 at GEICO.000648; Ex. 16 at GEICO.000655.)

### E.  Investigators Provide Facts Related to the Claim, Not Their Opinion as to Whether the Claim Should be Paid

Investigators have no role in determining whether a claim will be approved or denied – that is solely the responsibility of Claims Adjusters.  (Rutzebeck 30(b)(6) Dep. 66:12-17;

Derenthal Dep. 74:18-75:3; Exs. 19-25 ¶ 13-14.)  In fact, Investigators are specifically prohibited from providing their opinions on whether a claim should be paid.  (Rutzebeck 30(b)(6) Dep. 107:22-108:11; Exs. 19-25 ¶ 13.)  The importance of differentiating facts from opinions comes up repeatedly in Defendant's training documents, which define a fact as "something that can be proven," whereas an opinion is defined as "a personal belief or judgment shared by many [and] it is not something that can be used to prove certainty."  (Ex. 5 at GEICO.000576; see also Ex. 4 at GEICO.000484.)  Defendant's former Operations and Training Manager, Michael College, admitted that Investigators are trained to exclude their opinions from reports.  (College Dep. 23:10-19.)

Relatedly, even if Investigators believe that a claim is suspicious after investigating the facts, and inform a third-party agency like the NICB about the claim, they are prohibited from making any reference to the specific agencies to which they referred a claim in their final report to the Claims Adjuster.  (Ex. 5 at GEICO.000582.)  Rather, they are instructed to state that "appropriate referrals were made based on these investigative findings."  (Id.; Ex. 8 at GEICO.000625 ("Do not mention NICB or Fraud Bureaus" in final report); Ex. 10 at GEICO.000177 (same).)  In addition, Defendant instructs Investigators that they should not enter any subjective views or conclusions in the SICM database, whether in case notes or in reports, because those notes are discoverable and could subject Defendant to a bad faith claim.  (Marine Dep. 51:3-52:15.)  This is documented in Defendant's SIU Administration and Operations Manual ("A & O Manual") (Ex. 4), which states that Investigators' "[r]eports will be free of innuendoes, opinions or rumors.  Reports will be based upon objective findings, observations, and physical evidence or other pertinent documentation."  (Ex. 4 at GEICO.000484.)

19

### F.  Work Performed by Investigators is Far Different than that Performed by Claims Adjusters and SIU Analysts

Claims Adjusters, not Investigators, negotiate with claimants and their attorneys, decide whether to deny or pay claims, and if payment is appropriate, decide how much money Defendant will actually pay.  (See Ex. 2; Derenthal Dep. 34:9-12 (Investigators do not resolve disputes between Defendant and claimants).)[23]  Security Analysts, not Investigators, perform advanced analysis of fraud trends, analyze large sets of complex data for tactical and operational purposes, and identify potential fraud rings.  (Rutzebeck 30(b)(6) Dep. 33:13-35:21; Marine Dep. 33:7-34:13; College Dep. 42:9-43:23; Personal Deposition of Steven Rutzebeck ("Pers. Rutzebeck Dep.") 37:15-38:16.)  In fact, Investigators request the help of Security Analysts (with the approval of their SIU Supervisor) when they need assistance in complex investigations.  (Id.)

## ARGUMENT

### I.    LEGAL STANDARD

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  When a court faces cross-motions for summary judgment, it reviews each motion separately on its own merits to determine whether either party deserves judgment as a matter of law.  Rossignol v. Voorhaar, 316 F.3d 516, 523 (4th Cir. 2003).

A party seeking summary judgment bears the initial responsibility of demonstrating an absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). But ultimately, the party opposing a properly supported motion bears the burden of establishing the existence of a genuine issue of material fact.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242,

---

[23] See also Robinson-Smith v. GEICO, 590 F.3d 886, 888-890 (D.C. Cir. 2010) (describing in detail the job duties of GEICO's auto damage adjusters and explaining that they "assess, negotiate and settle automobile damage claims," among other job duties.).

248-49 (1986); Bertrand v. Children's Home, 489 F. Supp. 2d 516, 518 (D. Md. 2007).  The non-

moving party must do more than show "there is some metaphysical doubt . . . ."  Matsushita

Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); see also  Lockwood v.

Prince George's County, Md., 58 F. Supp. 2d 651, 653 (D. Md. 1999) ("[A] party cannot create a

genuine dispute of material fact through mere speculation or compilation of inferences.").

Instead, a genuine issue of material fact only exists "if the evidence is such that a reasonable jury

could return a verdict for the non-moving party."  Anderson, 477 U.S. at 248.

The FLSA requires employers to pay their employees one-and-one-half times their

Assessing a motion for summary judgment, the facts, as well as the justifiable inferences

to be drawn from them, are viewed in a light most favorable to the nonmoving party.  Drewitt v.

Pratt, 999 F.2d 774, 778 (4th Cir. 1993) (quoting Anderson, 477 U.S. at 255).  However, a court

"cannot rely upon unsupported speculation."  Bertrand, 489 F. Supp. 2d at 519 (citing Felty v.

Graves-Humphreys Co., 818 F.2d 1126, 1128 (4th Cir. 1987)).  The courts in this Circuit have an

"affirmative obligation . . . to prevent factually unsupported claims and defenses from

proceeding to trial."  Drewitt, 999 F.2d at 778-79 (internal quotations omitted).

## II.    THE FLSA AND THE ADMINISTRATIVE EXEMPTION

The FLSA requires employers to pay their employees one-and-one-half times their

"regular rate" for each hour worked in excess of forty hours per week, 29 U.S.C. § 207(a)(1),

though there are exemptions to this overtime requirement.  Relevant here, Congress exempted

employees "employed in a bona fide executive, administrative, or professional capacity."  §

213(a)(1).  Defendant asserts only one defense, claiming the application of the administrative

exemption relieved the company from its obligation to pay Investigators overtime wages.

In the Fourth Circuit, employers bear the burden of proving each element of an

exemption defense by clear and convincing evidence.  Desmond v. PNGI Charles Town Gaming,

L.L.C., 564 F.3d 688, 691-92 (4th Cir. 2009) (citing Shockley v. City of Newport News, 997

F.2d 18, 21 (4th Cir. 1993)).  The FLSA exemptions are to be "narrowly construed against the

employers seeking to assert them and their application limited to those establishments plainly

and unmistakably within their terms and spirit."  Id. (quoting Arnold v. Ben Kanowsky, Inc., 361

U.S. 388, 392 (1960)).

The FLSA does not define the term "administrative," § 213(a)(1);[24] however, the

governing regulations define the terms as covering employees:

> (2) Whose primary duty is the performance of office or non-manual work directly
> related to the management or general business operations of the employer or the
> employer's customers; and
>
> (3) Whose primary duty includes the exercise of discretion and independent
> judgment with respect to matters of significance.

29 C.F.R. § 541.200(a).[25]  Defendant fails to satisfy both requirements.

## III.   THE DOL AND RELEVANT CASE LAW FIND INVESTIGATORS ARE NOT ADMINISTRATIVELY EXEMPT

Both the DOL, through its regulations and opinion letters, as well as district courts, have

repeatedly found investigators to be non-exempt.  According to the regulations, the

administrative exemption does not apply to:

> police officers, detectives . . . ***investigators***, inspectors . . . and similar employees,

---

[24] Congress provided the Department of Labor ("DOL") with broad rulemaking authority, and the regulations issued by the DOL have the binding effect of law.  See Batterton v. Francis, 432 U.S. 416, 425 n.9 (1977).

[25] The current regulations went into effect in 2004.  See generally 69 Fed. Reg. 22,122 (Apr. 23, 2004).  With respect to the administrative exemption, the new regulations were intended to be "as protective as the existing regulations," and "consistent with the [old] short test."  Id. at 22,138-39.  Indeed, courts have recognized that the revised regulations are not substantively different.  See, e.g., Desmond, 564 F.3d at 691 n.2; Robinson-Smith, 590 F.3d at 892 n.6.  They were not meant to substantively alter the scope of the administrative exemption, but rather to "provide[] clarity while at the same time maintaining continuity with the existing regulations." 69 Fed. Reg. at 22,144; see also Darveau v. Detecon, Inc., 515 F.3d 334, 338 (4th Cir. 2008). Thus, case law interpreting the pre-2004 regulations—along with the regulations themselves—is fully applicable and useful as precedent here.

regardless of rank or pay level, *who perform work such as* . . . preventing or detecting crimes; *conducting investigations or inspections for violations of law*; performing surveillance . . . *interviewing witnesses*; interrogating and fingerprinting suspects; *preparing investigative reports; or other similar work*.

29 C.F.R. § 541.3(b)(1) (emphasis added).

Consistent with the relevant regulations, the DOL has consistently concluded that the job of an investigator, private or public, is not administrative.[26]  See, e.g., Dep't of Labor, Wage & Hour Div., Opinion Letter, FLSA 2005-21, 2005 WL 3308592 (Aug. 19, 2005) [hereafter "2005 Opinion Letter"] (background investigators); Dep't of Labor, Wage & Hour Div., Opinion Letter, 1998 WL 852783 (April 17, 1998) (journeymen investigators); Dep't of Labor, Wage & Hour Div., Opinion Letter, 1998 WL 852752 (Jan. 23, 1998) (medical legal investigators); Dep't of Labor, Wage & Hour Div., Opinion Letter, 1997 WL 971811 (Sept. 12, 1997) (background investigators).

In accordance with the DOL, courts have unwaveringly concluded that employees with job duties analogous to Plaintiffs' do not qualify for the administrative exemption.[27]  See, e.g., Ahle v. Veracity Research Co., 738 F. Supp. 2d 896, 908 (D. Minn. 2010) (finding investigators investigating insurance claims non-exempt); Fenton v. Farmers Ins. Exch., 663 F. Supp. 2d 718, 727 (D. Minn. 2009) (finding special investigators for insurance company non-exempt); Gusdonovich v. Bus. Info., 705 F. Supp. 262, 265 (W.D. Pa. 1985) (finding insurance claims

---

[26] The Fourth Circuit has consistently given great deference to the DOL's interpretation of the FLSA and its exemptions.  See, e.g., IntraComm, Inc. v. Bajaj, 492 F.3d 285, 294 (4th Cir. 2007) ("As noted above, the Secretary's interpretation of her own regulation is controlling unless plainly erroneous or inconsistent with the regulation. Deference to the Secretary is particularly appropriate when the regulation itself is ambiguous.") (internal citations and quotations omitted).

[27] But see Foster v. Nationwide, 2012 WL 407442 (S.D. Ohio Jan. 5, 2012).  The Foster court's orders on summary judgment, 695 F. Supp. 2d 748 (S.D. Ohio 2010), and trial, 2012 WL 407442 (S.D. Ohio Jan. 5, 2012), are currently on appeal at the Sixth Circuit.  (Morgan Decl. ¶ 7.)  On appeal, the plaintiffs contend that the Foster court erroneously ruled in favor of the defendant against the overwhelming weight of authority and evidence showing that Nationwide's Investigators were misclassified as exempt administrative employees.

investigators non-exempt); <u>Adams v. United States</u>, 78 Fed. Cl. 536, 554 (Fed. Cl. 2007) (finding

fraud investigators non-exempt); <u>Reich v. Am. Int'l Adjustment Co., Inc.</u>, 902 F. Supp. 321, 325

(D. Conn. 1994) (holding automobile damage appraisers non-exempt); <u>Fleming v.</u>

<u>Carpenters/Contractors Cooperation Comm., Inc.</u>, 834 F. Supp. 323, 328 (S.D. Cal. 1993)

(holding field investigators to be non-exempt production employees), <u>overruled on other grounds</u>

<u>Barner v. Novato</u>, 17 F.3d 1256, 1261 n.7 (9th Cir. 1994); <u>Adams v. United States</u>, 26 Cl. Ct.

782, 794 (Cl. Ct. 1992) (concluding border patrol agents are non-exempt); <u>Ahern v. New York</u>,

807 F. Supp. 919, 926 (N.D.N.Y. 1992) (concluding police investigators to be non-exempt);

<u>Harris v. District of Columbia</u>, 741 F. Supp. 254, 262 (D.D.C. 1990) (finding the time that

supervisory housing inspectors spend inspecting residences to be non-exempt).  This Court

should similarly conclude that Investigators are non-exempt.

## IV.   PLAINTIFFS' PRIMARY DUTY DOES NOT CONSIST OF WORK DIRECTLY RELATED TO MANAGEMENT POLICIES OR GENERAL BUSINESS OPERATIONS OF DEFENDANT OR ITS CUSTOMERS

"The phrase 'directly related to management policies or general business operations'

refers to the type of work performed by the employee."  29 C.F.R. § 541.201(a).  "To meet this

requirement, an employee must perform work directly related to assisting with the running or

servicing of the business."  <u>Id.</u>  In addition,

> Work directly related to management or general business operations includes, but
> is not limited to, work in functional areas such as tax; finance; accounting;
> budgeting; auditing; insurance; quality control; purchasing; procurement;
> advertising; marketing; research; safety and health; personnel management;
> human resources; employee benefits; labor relations; public relations, government
> relations; computer network, internet and database administration; legal and
> regulatory compliance; and similar activities.

§ 541.201(b).

24

### A. Plaintiffs' Investigatory Activities Are Not Directly Related to Management or Defendant's General Business Operation

The primary duty of Investigators is to investigate insurance claims.  Their investigation results are turned over to Claims Adjusters, who make decisions on whether to pay a claim and negotiate on behalf of the company.  Although Investigators' activities are important, under the regulations, they do not "directly relate[] to the management or general business operations of the employer." See 2005 Opinion Letter, at *6 ("[T]he primary duty of the Investigator is diligent and accurate fact-finding, according to DSS guidelines, the results of which are turned over to DSS who then makes a decision as to whether to grant or deny security clearances.  Such activities, while important, do not directly relate to the management or general business operations of the employer within the meaning of the regulations."); Gusdonovich, 705 F. Supp. at 265; see also Adams, 78 Fed. Cl. at 794.

### B. Plaintiffs Do Not Perform Administrative Tasks Contemplated by the Regulations

In determining whether a set of job duties qualifies as administrative, courts often employ an analytical tool called the "production versus administrative" dichotomy.  This dichotomy is intended to distinguish "between work related to the goods and services which constitute the business' marketplace offerings and work which contributes to 'running the business itself.'" Bothell v. Phase Metrics, Inc., 299 F.3d 1120, 1127 (9th Cir. 2002) (citation omitted).  Although imperfect, "the administrative-production dichotomy . . . is still a useful construct."  Desmond, 564 F.3d at 694.  Thus, the dichotomy is "a relevant and useful tool in appropriate cases to identify employees who should be excluded from the exemption." *Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees*, 69 Fed. Reg. 22,122, 22,141 (Apr. 23, 2004).  And, the test has been determinative "when the

work 'falls squarely on the production side of the line.'"  Id. (quoting Bothell, 299 F.3d at 1127);

see also 2005 Opinion Letter, at *5.

Importantly, work does not qualify as administrative simply because it does not fall

squarely on the production side of the line.  Martin v. Ind. Mich. Power Co., 381 F.3d 574, 582

(6th Cir. 2004).  "On the contrary, non-manufacturing employees can be considered 'production'

employees in those instances where their job is to generate (i.e., 'produce') the very product or

service that the employer's business offers to the public."  Desmond, 564 F.3d at 694 (quoting

Reich v. John Alden Life Ins. Co., 126 F.3d 1, 9 (1st Cir. 1997)).   Put differently, there is no

"absolute dichotomy under which all work must either be classified as production or

administrative."  Martin, 381 F.3d at 582.  In Desmond, the Fourth Circuit reversed the district

court's order granting summary judgment for the employer on the applicability of the

administrative exemption, holding that the plaintiffs, racing officials who observed and

examined various aspects of horse races, did not have supervisory responsibility, and did not

develop, review, evaluate, or recommend the employer's business practices or strategies were

not part of management and thus "did not run or service the 'general business operations.'"  546

F.3d at 694.  Rather, the work these employees performed "consisted of tasks somewhat similar

to those performed 'on a manufacturing production line or selling a product in a retail or service

establishment.'"  Id. (quoting 29 C.F.R. § 541.201(a)).

Similarly, in Martin, the Sixth Circuit rejected an employer's argument that its

information technology support specialists were administrative employees because they

performed troubleshooting on computers on individual employees' desks and were not directly

involved with "producing" electricity at the nuclear power plant.  Otherwise, the Court asserted,

employees such as "the janitorial staff, the security guards, the cooks in the cafeteria, and various

26

other workers" would be viewed as doing administrative work.  Id.; see also Schaefer v. Ind.

Mich. Power Co., 358 F.3d 402-03 (6th Cir. 2004) (finding employee who was primarily

responsible for shipments of radioactive materials, inspecting containers, etc., is not engaged in

administrative work simply because he is engaged in an activity collateral to the principal

business purpose of producing electricity).  In other words, even if an employee's primary duty

appears to be ancillary to the line function of the employer, courts must still ascertain whether

the nature of that work fits within the bounds of exempt administrative work.  See Desmond, 564

F.3d at 693 (noting that although a construction company may be required by law to post a

flagman around a highway work site in order to coordinate traffic, the employer could not make

a "colorable argument . . . that the flagman's work is directly related to the construction

company's general business operations."); Clark v. J.M. Benson Co., Inc., 789 F.2d 282, 287

(4th Cir. 1986) ("[T]he regulations emphasize the *nature* of the work, not its ultimate

consequence.") (emphasis in original); Bothell, 299 F.3d at 1127-28 (noting that not all ancillary

work is administrative).

    In the context of investigators, some authorities have concluded they are engaged in the

day-to-day carrying out of the business' affairs (*i.e.*, production work), thus disqualifying such

employees from the administrative exemption. See, e.g., Harris, 741 F. Supp. at 262;

Gusdonovich, 705 F. Supp. at 265 (applying dichotomy to *insurance claims investigator* and

determining that he was non-exempt because he was engaged in production within the meaning

of the regulation, where his primary job duty was investigation of insurance claims).

    Other authorities have either rejected the application of the administrative/production

dichotomy, or concluded that while investigators' job duties are not strictly "production," the

investigators nonetheless do not perform the administrative functions contemplated by the

regulations.[28]  For example, in <u>Adams</u>, 78 Fed. Cl. at 537, the plaintiffs "spent the vast majority

of [their] time investigating or leading investigations into fraud upon [the Department of

Housing and Urban Development [HUD]]'s programs."  <u>Id.</u> at 550 (internal citation omitted).

The <u>Adams</u> plaintiffs' fraud investigations focused on "false statements, embezzlement, bribery

and kickbacks," and included day-to-day duties "such as planning and conducting investigations,

collecting and reviewing evidence, conducting surveillance and interviewing witnesses."  <u>Id.</u>

(internal citation omitted).  Importantly, <u>Adams</u> rejected the argument that "[c]rime detection and

prevention within HUD programs . . . is an 'administrative function,' because of its focus on the

integrity of the operations of HUD;" in other words, because the role of the fraud investigator

was ancillary to HUD's primary mission to "increase homeownership, support community

development and increase access to affordable housing free from discrimination . . . ." <u>Id.</u> at 541,

551.  Even accepting the premise that HUD investigators were not engaged in production work,

<u>Adams</u> concluded that the investigators at issue did not qualify for the administrative exemption

because they do not match the exempt administrative duties described in the governing

regulations.  <u>Id.</u> at 551-52.  The critical takeaway is that whatever analytical approach is used,

investigators with duties materially identical to Plaintiffs do not qualify for the administrative

exemption.

Indeed, Plaintiffs are engaged in Defendant's day-to-day production work.  Defendant is

in the business of selling insurance policies and handling policyholders' claims for coverage.

SIU, which is part of the Claims Department, is involved in the handling of policyholders'

---

[28] The <u>Foster</u> and <u>Ahle</u> courts wrongly concluded that because the plaintiffs' work was not
production, it must have been administrative.  <u>See</u> <u>Foster</u>, 695 F. Supp. 2d at 756; <u>Ahle</u>, 738 F.
Supp. 2d at 903.

claims through their investigation of the facts surrounding the claim.  The role of Investigators fits squarely within the production function.

And even if this Court rejects the notion that Investigators engage in production work, the undisputed facts demonstrate that at no point did Plaintiffs take part in many of the administrative duties described in the governing regulations: tax, finance, accounting, budgeting, auditing, payroll, human resources, benefits functions, labor relations, governmental relations, marketing or advertising.

The undisputed facts also show that Investigators provide the factual findings of their investigations to Claims Adjusters.  They are, therefore, not "running the business" of GEICO, and cannot be classified as administratively exempt.  See Desmond, 564 F.3d at 694 (holding that racing officials who observed and examined various aspects of horse races but did not have supervisory responsibility or develop, review, evaluate, or recommend the employer's business practices or strategies were not part of management and "did not run or service[e]" the employer's "general business operations"); Martin, 381 F.3d at 582 (holding computer and network maintenance employee was not covered by the administrative exemption because he was "in no way involved in advising the management, planning, negotiating, representing the company, purchasing, promoting sales, and business research and control"); Davis v. J.P. Morgan Chase & Co., 587 F.3d 529, 535 (2d Cir. 2009) (finding mortgage underwriters do not perform administrative work because underwriters "performed work that was primarily functional rather than conceptual," "were not at the heart of the company's business operations," "had no involvement in determining the future strategy or direction of the business, nor did they perform any other function that in any way related to the business's overall efficiency or mode of operation.").

### C.  Authorities Governing Public Sector Employees are Persuasive

> **1.  The Regulations Addressing Investigators Apply to Both Public _and Private_ Investigators**

The DOL regulations specifically state that investigators are non-exempt employees: "investigators, inspectors . . . and similar employees . . .  who perform work such as . . . conducting investigations or inspections for violations of law; . . . performing surveillance . . . interviewing witnesses . . . preparing investigative reports; or other similar work" are non-exempt.  29 C.F.R. § 541.3(b)(1).  Plaintiffs anticipate that Defendant will focus its attention on the district court's summary judgment order in Foster v. Nationwide, 695 F. Supp. 2d 748 (S.D. Ohio 2010), and in particular its holding that this regulation only applies to public sector employees.  Id. at 757-758.  The Court should reject the argument outright.

The FLSA, along with its overtime exemptions, applies fully to both public and private sector employees.  Acebal v. United States, 60 Fed. Cl. 551, 554 n.2 (Fed. Cl. 2004).  Nothing in the plain language of section 541.3(b)(1) limits its scope to public-sector employees.  In fact, the pre-2004 regulations, which are still illustrative, make clear that _private_ insurance company inspectors are generally non-exempt.  29 C.F.R. § 541.205(c)(2) (2003).  Inspectors are listed next to investigators in the current section 541.3(b)(1), clearly indicating that private, as well as public employees are contemplated by this regulation.

Relevant authority contradicts the Foster court's sweeping conclusion.  See Opinion Letter, 1998 WL 852752, at *1 (concluding that the medical legal investigators, found to be non-exempt, did not work for a public agency); Fenton, 663 F. Supp. 2d at 727 (concluding that private sector insurance investigators with duties identical to Plaintiffs' do not qualify for the administrative exemption); Gusdonovich, 705 F. Supp. at 265 (private sector insurance investigators); Reich., 902 F. Supp. at 325 (private sector automobile appraisers); Fleming, 834

F. Supp. at 328 (private sector field investigators).  This Court should reject the Foster court's conclusion and apply the plain language of section 541.3(b)(1) to this case. Minor v. Bostwick Laboratories, Inc., 669 F.3d 428, 434 (4th Cir. 2012) ("When interpreting a statute, we 'first and foremost strive to implement congressional intent by examining the plain language.'") (quoting Barbour v. Int'l Union, 640 F.3d 599, 610 (4th Cir. 2011)).

### 2. *Plaintiffs' Relationship with Defendant's Claims Adjusters Does Not Make Them Exempt*

Plaintiffs also anticipate that Defendant will argue that the Court should adopt the Foster court's holding that the relationship between investigators and exempt claims adjusters makes the work performed by investigators exempt.  695 F. Supp. 2d at 758.   Again, the Court should reject this argument.  The regulations governing insurance claims adjusters, unlike those governing investigators, plainly state that such employees are exempt:

> Insurance claims adjusters generally meet the duties requirements for the administrative exemption . . . if their duties include activities such as interviewing insureds, witnesses and physicians; inspecting property damage; reviewing factual information to prepare damage estimates; evaluating and making recommendations regarding coverage of claims; determining liability and total value of a claim; negotiating settlements; and making recommendations regarding litigation.

29 C.F.R. § 541.203(a).  Consistent with this regulation, the DOL and courts have held that adjusters are exempt.  See, e.g., Dep't of Labor Opinion Letter, Wage & Hour Div., Opinion Letter,  FLSA 2005-24, 2005 WL 3308595 (Aug. 26, 2005) (insurance adjusters exempt); Jastremski v. Safeco Ins. Co., 243 F. Supp. 2d 743, 758 (N.D. Ohio 2003); Robinson-Smith, 590 F.3d 886 (D.C. Cir. 2010).

As is self-evident from the regulations, adjusters perform numerous exempt duties that are simply not performed by insurance investigators, such as "evaluating and making recommendations regarding coverage of claims," "determining liability and total value of a

claim," "negotiating settlements," and "making recommendations regarding litigation."  See 29

C.F.R. § 541.203(a).

While Plaintiffs admit that Investigators provide information to exempt Claims Adjusters,

that fact does not make them exempt.  Indeed, this theory has been roundly rejected by other

courts.  In Roney v. United States, 790 F. Supp. 23, 28 (D.D.C. 1992), for example, the court

flatly rejected the defendant's argument that criminal investigators for the U.S. Marshalls Service

were exempt because their duties and responsibilities "significantly affect the policies and

programs of the Marshals Service, the Department of Justice, other law enforcement agencies

and the administration of justice."  The court reasoned that if it accepted the defendant's

argument, "the exemption would swallow the rule . . . [and] it would be difficult to isolate a law

enforcement officer or public safety official who would then be covered by the FLSA."  Id.;

accord Adams, 78 Fed. Cl. at 547; see also Arnold, 361 U.S. at 392 (holding FLSA exemptions

are to be narrowly construed).  Further, as the pre-2004 regulations illustrate:

> An inspector, such as, for example, *an inspector for an insurance company*, may
> cause loss to his employer by failure to perform his job properly.  But such
> employees, obviously, *are not performing work of such substantial importanc*e to
> the management or operation of the business that it can be said to be 'directly
> related to management policies or general business operations' as that phrase is
> used in § 541.2.

29 C.F.R. § 541.205(c)(2) (2003) (emphasis added).  This Court should not extend the "narrowly

construed" administrative exemption to include all employees who assist insurance claims

departments.

Because Defendant cannot prove this element of the administrative exemption, and no

issues of material fact exist, Plaintiffs' Motion for Partial Summary Judgment should be granted.

**V.     INVESTIGATORS DO NOT EXERCISE DISCRETION AND INDEPENDENT JUDGMENT WITH RESPECT TO MATTERS OF SIGNIFICANCE**

The third element of the administrative exemption contemplates whether the employee's "primary duty includes the exercise of discretion and independent judgment with respect to matters of significance."  29 C.F.R. § 541.200(a)(3).  The undisputed facts confirm that Defendant cannot by clear and convincing evidence meet this high burden.

**A.  Investigators' Primary Duty is to Investigate Claims**

"The term 'primary duty' means the principal, main, major or most important duty that the employee performs."  29 C.F.R. § 541.700(a).  The determination of an employee's primary duty places major emphasis on the "character of the employee's job as a whole."  Id.; see also Schaefer, 358 F.3d at 404.  The focus of the exemption analysis "must be on what 'activities or duties the employee *actually* performs.'"  Haines v. S. Retailers, Inc., 939 F. Supp. 441, 447 (E.D. Va. 1996) (quoting Meyer v. Worsley Companies, Inc., 881 F. Supp. 1014, 1019 (E.D.N.C. 1994)) (emphasis in original); see also Ale v. Tenn. Valley Auth., 269 F.3d 680, 688-89 (6th Cir. 2001).

Courts must consider whether particular tasks relate to the primary job function or to some other secondary function.  Schaefer, 358 F.3d at 406.  If the employee's job does not "require" the performance of tasks that would typically satisfy the elements of an exemption defense, those duties are not part of the primary duty, even if the employees "occasionally" perform them.  See, e.g., Reich v. Gateway Press, Inc., 13 F.3d 685, 700 (3d Cir. 1994) (finding reporters who "occasionally" perform "creative" work are not exempt under the professional exemption when their "day-to-day duties" do not require such creativity).

Identical to the special investigators in <u>Fenton</u>, Defendant's Investigators' "primary role" is to gather facts and present them to the Claims Adjusters who make the determination of whether to pay or deny a claim.  663 F. Supp. 2d at 727.

### B.  Investigators' Investigatory Duties Do Not Include the Exercise of Discretion and Independent Judgment *With Respect to Matters of Significance*

The exercise of "discretion and independent judgment" involves the comparison and the evaluation of possible courses of conduct, and acting or making decisions after all possibilities have been considered.  29 C.F.R. § 541.202(a).  This process is "more than the use of skill in applying well-established techniques, procedures or specific standards described in manuals or other sources."  § 541.202(e); <u>see also</u> § 541.704.

It is not enough that an employee exercises discretion, but rather, the discretion must be over significant matters.  <u>Ruggeri v. Boehringer Ingelheim Pharm., Inc.</u>, 585 F. Supp. 2d 254, 275 (D. Conn. 2008) ("Plaintiffs would not be exempt if the *performance* of their work was significant to Defendant, but the matters over which they had *discretion* were not.") (emphasis in original).  The term "matters of significance" refers to the "level of importance or consequence of the work performed."  § 541.202(a).  Administratively exempt work is "significant, substantial, important, or of consequence."  69 Fed. Reg. at 22,143.  Plaintiffs' primary duty did not include any acts of discretion as to significant matters.

### C.  The Regulations Do Not Support a Finding that Plaintiffs Are Administratively Exempt

First, Investigators do not regularly provide their investigatory findings to "management"—and they certainly do not do so on management's *behalf*.  While management reviews the Plaintiffs' investigative activities in SICM and their reports, Investigators conduct their investigations and report the facts they learn to Claims Adjuster (the owners of the file) as

part of the claims process.  Investigators do not provide consultation or "expert" advice to

management.  Rather, SIU Supervisors and Managers directly *supervise* Investigators.

Second, Investigators do not "resolve" significant matters or provide advice.  (See

Derenthal Dep. 34:9-12 (Investigators do not resolve disputes between Defendant and

claimants).)  To "advise," means "to give (someone) a recommendation about what should be

done."  Merriam-Webster Dictionary, available at http://www.merriam-

webster.com/dictionary/advise (last visited May 10, 2012).  It is undisputed that Investigators do

not advise Claims Adjusters regarding whether they should pay or deny claims.  The only thing

the Investigators attempt to "resolve" is whether the facts are consistent with the claim.

Investigators do this through certain regular "investigatory activities," which do not amount to

significant matters.  See 2005 Opinion Letter, at *4.

### D.  The Nature of Plaintiffs' Work is Not Significant

The fact that a particular Investigator's investigation may influence a Claims Adjuster's

decision to pay or deny a claim is of no consequence to the administrative exemption analysis,

which examines the "*nature* of the work, not its ultimate consequence."  Clark, 789 F.2d at 287

(emphasis in original); see also 69 Fed. Reg. at 22,142.  In other words, the exemption asks

whether discretion is exercised "*with respect to* a matter of significance," not whether it "*impacts

or affects* a matter of significance."  Ahle, 738 F. Supp. 2d at 908 (emphasis in original); see also

29 C.F.R. § 541.202(f) ("[A] messenger who is entrusted with carrying large sums of money

does not exercise discretion and independent judgment with respect to matters of significance

even though serious consequences may flow from the employee's neglect.").

Understanding this limitation, the court in Fenton refused to extend the regulations

discussing claims adjusters, whose duties include "discretion-laden activities," to special

investigators because "nothing in federal law [justifies] extending [29 C.F.R. § 541.203(a)] to the employees who merely gather facts for those representatives, particularly when those employees are formally barred from presenting their opinions about how to handle claims in their written reports."  663 F. Supp. 2d at 727.

Like the plaintiffs in <u>Fenton</u>, Plaintiffs in this case were trained and directed by Defendant to specifically omit all opinions from their written reports to the Claims Adjusters. (College Dep. 23:10-19; Ex. 5 at GEICO.000576 (explaining the difference between fact and opinion in the context of Investigators' reports to Claims Adjusters); (Ex. 4 at GEICO.000484 (stating that Investigators' "[r]eports will be free of innuendoes, opinions or rumors.  Reports will be based upon objective findings, observations, and physical evidence or other pertinent documentation.")

### 1.  Plaintiffs' Experience Does Not Make them De Facto Exempt

Plaintiffs anticipate that Defendant will point out that many of the Plaintiffs have prior experience as law enforcement officers as justification for the administratively exempt classification of its Investigators.  But an employee cannot be made exempt simply because she has performed the same non-exempt job tasks for many years.  See <u>Young v. Cooper Cameron Corp.</u>, 586 F.3d 201, 206 (2d Cir. 2009) (citing 29 C.F.R. § 541.301(d)).  The DOL and applicable case law have made clear that the use of skill and knowledge alone is not sufficient to establish the exercise of discretion and independent judgment contemplated by the regulation. 29 C.F.R. §§ 541.202(e), 541.704; <u>Gusdonovich</u>, 705 F. Supp. at 263; <u>see In re Farmers Ins. Exch., Claims Reps.' Overtime Pay Litig.</u>, 481 F.3d 1119, 1129 (9th Cir. 2007).  Otherwise, a line worker at a factory could become exempt simply by working for his company for an extended period of time.  This is not the law.

### 2.  The DOL Has Consistently Found that Investigators Do Not Exercise Discretion and Independent Judgment

Similar to the regulations, the DOL's opinion letters also make clear that investigators do not satisfy the discretion element of the administrative exemption.  In the 1997 Opinion Letter, the DOL concluded that the investigators, who conduct background investigations to develop "pertinent facts" concerning matters which may affect the subject's fitness for employment, did not "evaluate alternative courses of conduct [nor have] the authority to make independent choices, free from immediate direction or supervision with respect to matters of significance." 1997 WL 971811 at *3.  Because it was not enough that "an employee makes decisions regarding 'when and where to do different tasks, as well as the manner in which to perform them,'" or "that an employee may make limited decisions, within clearly 'prescribed parameters,'" the investigators' primary duty was not "*true* discretion and independent judgment on matters of significance or consequence." Id. (emphasis added.)  Four months later, the DOL confirmed its position.  See 1998 WL 852752 at *2.

Then in 2005, the DOL performed an exacting analysis of the discretion element, again concluding that investigators were non-exempt.  2005 Opinion Letter at *4-5.  The background investigators were responsible for (1) gathering and checking public records; (2) interviewing witnesses; (3) making decisions about whether to report security threats to the Defense Security Service ("DSS"); (4) determining what leads to follow; (5) resolving discrepancies in information with limited guidance; (6) stating whether a witness is credible; and (7) providing factual information to DSS so it can make a final determination about whether an individual should receive a security clearance. Id. at *1-2, 5-6.

Based on these enumerated tasks, the DOL found the investigators' job duties insufficient to qualify as discretion and independent judgment because tasks

37

> such as prioritizing the pursuit of leads, . . . , assessing whether the leads provided information that requires further investigation, determining which potential witnesses to see and which documents to review, and making similar decisions that promote effective and efficient use of that individual's own work time in performing assigned investigative activities, do <u>not</u> constitute exercising discretion and independent judgment with respect to matters of significance.

<u>Id.</u> at *6 (emphasis in original). Rather, these tasks involve the use of "skills in applying known standards or established techniques, procedures or specific standards." <u>Id.</u> (citing 29 C.F.R. § 541.202).

The investigators in the 2005 Opinion Letter perform strikingly similar duties as Defendant's Investigators. Defendant's Investigators, for example, interview witnesses, follow leads when appropriate, attempt to "resolve" discrepancies or inconsistencies that may exist, and compile a report for the Claims Adjusters, the owners of the file who make the ultimate determination as to whether Defendant will pay the claim or challenge it further. The DOL has made clear that the Investigators' tasks do not rise to the necessary level of discretion required by the administrative exemption. Investigators' investigations, moreover, require the use of skills in applying the specific standards and particular requirements set forth by Defendant in its numerous guidelines, policies, procedures, and handbooks.

### 3. *Courts Have Found Investigators with Nearly Identical Duties as Investigators Do Not Meet the Discretion and Independent Judgment Element*

The court in <u>Fenton</u> rightly adopted the 2005 Opinion Letter and found special investigators for Farmers Insurance Exchange to be non-exempt. Despite Defendant's anticipated claims to the contrary, Farmers' special investigators are *factually indistinguishable* in their job tasks from Defendant's Investigators: they contact a claims representative upon referral, develop action plans, take photographs, retrieve reports or records, interview witnesses, comply with laws that require suspected insurance fraud be reported to the state, recommend use

of a vendor, request permission from the claims representative to close an investigation, and submit "an exhaustive file of their research materials, including 'a list of all completed tasks (or an explanation of why a task was not completed), a report of any inconsistencies, discrepancies, and/or significant findings (both inculpating and exculpating); [and] a complete summary of the entire investigation.'" Fenton, 663 F. Supp. 2d at 722–23 (internal citations omitted).  The investigators in Fenton even came to "credibility determinations . . . and occasionally share[d] [their] impressions in informal conversations with . . . claims representatives."  Id.

Relying in part on the 2005 Opinion Letter, the Fenton decision hinged on the undisputed evidence demonstrating that the special investigators' "primary role" was to "gather facts and present them for someone else to analyze," and that they had "no authority to determine whether a claim [was] covered or whether [Farmers'] should seek to negotiate a settlement."  Id. at 727. Fenton also cited for support Gusdonovich, which similarly involved insurance-claims investigators.  705 F. Supp. at 263.  The court in Gusdonovich granted summary judgment in favor of the plaintiff, finding "investigators were merely applying their knowledge and skill in determining what procedure to follow, which . . . is not the exercise of discretion and independent judgment contemplated by the regulation."  Id. at 265.

Likewise, the Court in Ahle adopted the 2005 Opinion Letter in finding claims investigators to be non-exempt.  738 F. Supp. 2d at 907 ("Admittedly, claims investigators do make decisions regarding the precise manner in which they conduct an investigation—creating action plans, deciding who to interview, what documents to review, what leads to follow, and whether to recommend hiring an expert—however, such decisions . . . do not amount to the exercise of discretion and independent judgment with respect to matters of significance.").  Like the court in Fenton, the district court in Ahle held that "occasionally convey[ing] . . . subjective

opinions or conclusions regarding the credibility of the individual they interview" is not significant enough to satisfy the exemption and "is not equivalent to including his subjective opinion or recommendation as to whether the claim is legitimate or fraudulent and whether it should be paid or denied."  Id. at 907 n.3.  These cases all held consistently with the regulations and should be followed here.

Here, Plaintiffs' investigative work and their reports to the Claims Adjusters are highly scrutinized by their SIU Supervisors.  Indeed, most Investigators are unable to formally communicate with Claims Adjusters until they obtain their SIU Supervisors' authorization. Indeed, part of the job of the SIU Supervisors is to "monitor [Investigators'] activities."  (Hodge Dep. 37:25-38:2.)  These facts, combined with the fact that Defendant trains and instructs Investigators to abstain from providing their opinions in the reports, more than establishes that Plaintiffs do not exercise the level of discretion and independent judgment necessary for the administrative exemption to apply.

### E.   Investigators' Primary Duty Does Not Include Providing Opinions or Recommendations on Claims Disposition or on Fraud Determinations

It is undisputed that, through their investigations, Investigators attempt to confirm the facts surrounding a claim.  This means that they find facts that tend to support or contradict the suspicion identified by ICE or the Claims Adjuster.  It does not mean that Investigators determine whether fraud occurred.  Instead, Investigators find facts that allow Claims Adjusters to determine whether enough suspicion remains to warrant denial of a claim.

Of course, the goal in *any* investigation should be to "find the truth."  But, that is not enough to satisfy the exemption, otherwise every investigator position in this country would be exempt.  But, they resoundingly are not.  If any *true* discretion and independent judgment in this context exists, it belongs to Claims Adjusters.  See, e.g., 29 C.F.R. § 541.203(a).

## VI.  DEFENDANT CANNOT SATISFY THE ADMINISTRATIVE EXEMPTION AS IT RELATES TO PLAINTIFFS' NEW YORK STATE LAW OVERTIME CLAIM

The FLSA and New York overtime provisions are nearly identical.[29]  For the reasons cited above for Plaintiffs' claims under the FLSA, Defendant has likewise failed to satisfy the New York administrative exemption.

## CONCLUSION

Defendant bears the burden to prove by clear and convincing evidence that its Investigators satisfy every element of the administrative exemption.  The undisputed evidence, taken principally from Defendant's documents and the testimony of its executives and management-level employees, shows among other things that: (1) Investigators' primary job duty is to gather facts for Claims Adjusters; (2) Claims Adjusters take those facts and determine whether to pay or deny a policyholder's claim for insurance benefits; (3) Investigators are prohibited from providing their subjective opinions regarding whether a particular claim for insurance benefits is fraudulent or whether Defendant should pay or deny a claim; and (4) Investigators cannot submit reports to Claims Adjusters without first sending them to their supervisor for review, edits, and approval.  In light of these and other undisputed facts, Defendant cannot meet its heavy burden.  Accordingly, Plaintiffs respectfully request that the Court grant their Motion for Partial Summary Judgment, find as a matter of law that Defendant has failed to satisfy the elements of the administrative exemption under the FLSA and New York state law, and set a date for a trial to determine Plaintiffs' damages.

---

[29] See, e.g., Kahn v. Super. Chicken & Ribs, Inc., 331 F. Supp. 2d 115, 117 n.1 (E.D.N.Y. 2004) (recognizing the definition of "administrative" under New York Law is nearly identical to that under the FLSA).

Respectfully Submitted,

Date: May 11, 2012

/s/_____

**NICHOLS KASTER, PLLP**
Paul J. Lukas, MN State Bar No. 22084X
(admitted *pro hac vice*)
Matthew H. Morgan, MN State Bar No. 304657
(admitted *pro hac vice*)
Timothy C. Selander, MN State Bar No. 0387016
(admitted *pro hac vice*)
4600 IDS Center, 80 South 8th Street
Minneapolis, MN 55402
Telephone (612) 256-3200
Fax (612) 215-6870
lukas@nka.com
morgan@nka.com
selander@nka.com


/s/_____

(signed by Matthew H. Morgan with
permission of Sundeep Hora)
**ALDERMAN, DEVORSETZ & HORA PLLC**
Sundeep Hora, MD State Bar No. 28208
1025 Connecticut Avenue NW, Suite 615
Washington, D.C. 20036
Telephone (202) 969-8220
Facsimile (202) 969-8224
shora@adhlawfirm.com

ATTORNEYS FOR PLAINTIFFS AND THE
NEW YORK RULE 23 CLASS