EXHIBIT 33

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND

SOUTHERN DIVISION

------------------------+

SAMUEL CALDERON,          *

INDIVIDUALLY AND ON       *

BEHALF OF OTHER SIMILARLY*

SITUATED INDIVIDUALS,     *    CIVIL ACTION NO.

      Plaintiffs       *    8:10-c-019858 RWT

    v.                    *

GEICO GENERAL INSURANCE   *

COMPANY, ET AL.,          *

     Defendants       *

------------------------+

  Corporate Deposition of GEICO GENERAL INSURANCE

COMPANY, GEICO CORPORATION, GEICO INDEMNITY COMPANY,

  and GEICO CASUALTY COMPANY, by and through their

corporate designee,

STEVEN F. RUTZEBECK

Baltimore, Maryland

Friday, November 19, 2010

9:26 a.m.

Job No.:  1-189163

Pages 1 - 121

Reported by:  Linda H. Cole

```
 1        Corporate Deposition of GEICO GENERAL INSURANCE

 2   COMPANY, GEICO CORPORATION, GEICO INDEMNITY COMPANY,

 3   and GEICO CASUALTY COMPANY, by and through their

 4   corporate designee, STEVEN F. RUTZEBECK, held at the

 5   offices of:

 6

 7

 8        SHAWE & ROSENTHAL, L.L.P.

 9        20 South Charles Street, 11th Floor

10        Baltimore, Maryland  21201

11        (410) 752-1040

12

13

14        Pursuant to agreement, before Linda H. Cole,

15   Notary Public of the State of Maryland.

16

17

18

19

20

21

22

23

24

25
```

```
 1              A P P E A R A N C E S

 2   ON BEHALF OF PLAINTIFFS:

 3        MATTHEW H. MORGAN, ESQUIRE

 4        NICHOLS KASTER, P.L.L.P.

 5        4600 IDS Center

 6        80 South Eighth Street

 7        Minneapolis, Minnesota  55402

 8        (612) 256-3200

 9

10   ON BEHALF OF DEFENDANTS:

11        ERIC HEMMENDINGER, ESQUIRE

12        SHAWE & ROSENTHAL, L.L.P.

13        20 South Charles Street, 11th Floor

14        Baltimore, Maryland  21201

15        (410) 752-1040

16

17   ALSO PRESENT:  William Robinson

18

19

20

21

22

23

24

25
```

1                    C O N T E N T S

2     EXAMINATION OF STEVEN F. RUTZEBECK              PAGE

3         By Mr. Morgan                               5

4

5

6

7

8

9

10

11                    E X H I B I T S

12                 (Exhibits attached.)

13     RUTZEBECK DEPOSITION                           PAGE

14     Exhibit 1       Amended Notice of Taking

15                        Deposition                  5

16     Exhibit 2       Affidavit of Steven Rutzebeck   5

17     Exhibit 3       SIU Case Management System (SICM)

18                        User's Manual              106

19     Exhibit 4       Memorandum                    109

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S

 2                   STEVEN F. RUTZEBECK

 3          having been duly sworn, testified as follows.

 4              (Exhibits 1 and 2 were premarked for

 5      identification and were attached to the transcript.)

 6              EXAMINATION BY COUNSEL FOR PLAINTIFFS

 7      BY MR. MORGAN:

 8          Q    Good morning.

 9          A    Good morning.

10          Q    Would you introduce yourself and please

11      spell your last name for the record?

12          A    Steven Rutzebeck, R-U-T-Z-E-B-E-C-K.

13          Q    Mr. Rutzebeck, my name is Matt Morgan.  I

14      introduced myself and we chatted a little bit this

15      morning before we went on the record.  I'm one of the

16      lawyers that represents the plaintiffs in a collective

17      action that's been brought against GEICO.  Do you

18      understand that?

19          A    Yes, sir.

20          Q    Have you ever been deposed?

21          A    No, I haven't.  I've testified, but never

22      deposed.

23          Q    All right.  When you say you've testified,

24      you mean in a courtroom?

25          A    That's correct.
```

```
 1        Q    It's sort of like that, the statement under

 2   oath, and I'm going to be asking you a series of

 3   questions.  I would appreciate you responding to those

 4   questions as accurately and truthfully as you can;

 5   okay?

 6        A    Okay.

 7        Q    I'm confident your counsel has gone over the

 8   sort of ground rules that govern these proceedings, so

 9   I'm not going to belabor the points.  What I would say

10   is that it's important that you understand my

11   questions.

12             On occasion I ask awkwardly phrased

13   questions or questions that witnesses may not

14   understand.  I'm not trying to trick or confuse you;

15   but if you don't understand the question, please tell

16   me and I will respond; okay?

17        A    Yes, sir.

18        Q    Otherwise, if you do respond, I'll assume

19   that you understood the question; fair?

20        A    Fair.

21        Q    As I told you off the record, I'm hopeful

22   this deposition will last only the morning and not go

23   too far into the afternoon, if at all.  If, however,

24   you need any breaks during the deposition, just speak

25   up and let me know, and I'm happy to accommodate that.
```

1    The only caveat to that is if a question is pending,

2    I'd like an answer from you before we take that break.

3         A    No problem.

4         Q    Is that fair?

5         A    Yes, sir.

6         Q    You understand that you've been identified

7    as what's called a Rule 30(b)(6) witness?

8         A    Yes, sir.

9         Q    This is Deposition Exhibit 1.  It's an

10   amended notice of taking deposition pursuant to

11   Federal Rule of Civil Procedure 30(b)(6).  Have you

12   seen this document, sir?

13        A    No, I haven't.

14        Q    I will represent to you that my office

15   drafted this and sent it over to Mr. Hemmendinger's

16   office.  You'll see that the document has a number of

17   pages and a number of items.

18        A    I may have seen it.  I apologize.  I may

19   have seen it.

20             THE WITNESS:  Is this the one you provided?

21             MR. HEMMENDINGER:  We did review this

22   document.

23        A    Yeah, I apologize.  After looking through

24   it.

25   BY MR. MORGAN:

```
 1      Q    That's okay.  I appreciate that.  If during

 2   the deposition I ask you a question and you don't

 3   remember something, but then 20 minutes later --

 4      A    No.  I looked at the first page, and it

 5   didn't register.  After looking at it, yes, I have

 6   seen this.

 7      Q    Okay.  But my point is, though, if something

 8   pops into your head after the fact -- if I ask you

 9   something and you don't remember it, but 20 minutes

10   later you bring it up, please bring it to my

11   attention; okay?

12           So as I understand it, you've been

13   identified to talk about a number of the topics in

14   this notice.  Is that your understanding as well?

15      A    That is my understanding, yes.

16      Q    And, specifically, you've been produced to

17   talk about Item No. 1?

18      A    Yes.

19      Q    Item No. 3?

20      A    Yes.

21      Q    Item No. 4?

22      A    Yes.

23      Q    Item No. 5?

24      A    Yes.

25      Q    Item No. 6?
```

STEVEN F. RUTZEBECK 11/19/2010

```
 1        A      Yes.

 2        Q      Item No. 8?

 3        A      Yes.

 4        Q      Item No. 12?

 5        A      Yes.

 6        Q      Item No. 20?

 7        A      Yes.

 8        Q      21?

 9        A      Yes.

10        Q      22?

11        A      Yes.

12        Q      And 23?

13        A      Yes.

14        Q      All right.  And you're able to testify today

15   about all of those items?

16        A      I believe so, yes.

17        Q      Great.  So you have been the director of the

18   security special -- claims security/special

19   investigations unit?

20        A      It's actually two titles.  It's claims

21   security -- director of claims security and, slash,

22   special investigations unit.

23        Q      So there are two titles you hold?

24        A      Yes.  It's the same job, but it's

25   basically -- they describe it two different ways.
```

1        Q     And do you have some understanding why it's

2   described two different ways?

3        A     Actually, when I came there, that was the

4   way it was, when I assumed the position, and that's

5   the way it's been maintained.

6        Q     You understand that this lawsuit has been

7   brought on behalf of what I understand to be security

8   investigators for GEICO?

9        A     Our -- yes -- our SIU investigators.

10       Q     Those are your SIU investigators; right?

11       A     Yes.

12       Q     Is there some other type of investigator

13   position over which you have supervision?

14       A     No.

15       Q     So the security investigators that we're

16   talking about in this lawsuit is the job over which

17   you have supervision?

18       A     Not exactly.  The position that I currently

19   maintain is a decentralized-type position.  I do not

20   have direct supervision of the investigators in the

21   particular regions or their supervisors or managers.

22       Q     Direct supervision meaning what?

23       A     That I don't do their PAs.  I don't hire and

24   fire them.  That's done at the regional level.

25       Q     And what is a PA?

STEVEN F. RUTZEBECK 11/19/2010

1        A     Performance appraisals.

2        Q     How often are those done?

3        A     Yearly.

4        Q     For all special -- if I use the words

5   special investigator, do you understand that to

6   mean --

7        A     Yes, our SIU investigators.

8        Q     So you understand special investigators to

9   be synonymous with security investigators?

10       A     Yes.

11       Q     So I may use either term interchangeably and

12   you'll understand what I'm referring to?

13       A     That's right; to our SIU investigators.

14       Q     So performance appraisals are conducted for

15   GEICO's SIU investigators on an annual basis?

16       A     That's correct.

17       Q     And that's true with regard to all SIU

18   investigators for the company?

19       A     That's correct, sir.

20       Q     Are there any other types of performance

21   evaluations done for the SIU investigators on a formal

22   basis other than the PAs you identified?

23       A     Not to my knowledge.  I mean, they have --

24   obviously, their performance is maintained or the

25   level of their performance is maintained throughout

1    the year, but they only have one appraisal that occurs

2    annually.

3         Q     And could you describe for me what goes into

4    the performance appraisal?

5         A     Well, we have -- at the present time, we

6    have a number of different indicators or measures that

7    we use that we have standardized in SIU.  It would be

8    customer survey results.  It would be the number of --

9    the average number of cases closed in a month, the

10   average number of law enforcement referrals.

11            It would be behavioral issues, such as their

12   enthusiasm and training; those types of issues.  Their

13   case life, the average case life.  Those types would

14   be indicators.  And the regions can also add

15   additional performance measures beyond those.

16        Q     But the ones you described are the

17   indicators you understand go into --

18        A     That is our recommended --

19        Q     Let me -- we have to make sure we're not

20   talking on top of one another.  I know off the record,

21   in the normal course of dialogue, we anticipate each

22   other's questions, but it's important so that we get a

23   clear record that we not jump on top of each other

24   when we're talking; okay?

25        A     Okay.

1        Q     So the indicators that you just identified

2   are those that make up the performance appraisal

3   reviews?

4        A     They are the recommended standard for a

5   performance appraisal at the present time.

6        Q     You identified the number of cases closed --

7        A     Yes.

8        Q     -- as being one of the indicators; right?

9        A     That's correct.  One of the recommended

10   metrics.

11        Q     And what is the company looking for in terms

12   of its evaluation?  I mean, is it better for an

13   investigator if he closes more cases as opposed to

14   less over the course of a year?

15        A     Ideally, you want to be able to close -- the

16   number of cases you're being assigned are closed at

17   the -- are being closed at the same rate, so you don't

18   have a very large -- or standing pending cases.

19        Q     Is there sort of a target number that

20   GEICO --

21        A     No.  We do not have a target.  From my

22   level, we do not provide a number that people are --

23   that's handled regionally, what they set regionally.

24        Q     How about -- you also identified the average

25   number of law enforcement referrals.

 1        A     That's correct.  We specifically --

 2              MR. HEMMENDINGER:  Wait a second.  I'm not

 3    sure what the question was.

 4    BY MR. MORGAN:

 5        Q     You identified that as one of the other --

 6        A     That's correct.

 7              THE REPORTER:  Off the record.

 8              (Discussion off the record.)

 9    BY MR. MORGAN:

10        Q     Okay.  So we have identified the average

11    number of law enforcement referrals as one of the

12    recommended items as part of this performance

13    evaluation?

14        A     Right.

15        Q     Or appraisal?

16        A     That's correct.

17        Q     And what is GEICO looking for in terms of a

18    number of law enforcement referrals?  Is it better for

19    an investigator to have more referrals as opposed to

20    less?

21        A     What we have there is we're looking for the

22    average; in other words, what would be expected.  It's

23    not a specific number per person.  It's more an

24    average what-would-be-expected in your caseload that

25    would be the appropriate referral number.  So in other

1    words, if your peers are all submitting three to four

2    law enforcement referrals in regard to their caseload,

3    you would be looked at to be somewhere in the same

4    average.

5         It's not exactly a number; so we're not

6    looking for "this is the number."  We're looking for

7    what is the average that most people would, just by

8    the normal course of work, be providing a referral to

9    law enforcement.  And law enforcement referrals

10   include a number of things beyond just law

11   enforcement.

12        Q    What do they include?

13        A    Referrals to regulatory boards and referrals

14   to fraud bureaus that might be in a particular state.

15        Q    So the first item on the deposition notice,

16   Exhibit 1, talks about the organizational structure of

17   defendants' claims and investigative unit departments.

18   Do you see that?

19        A    Yes, sir.

20        Q    So if I'm thinking about sort of the

21   hierarchy in terms of the SIU, you're at sort of the

22   top of the pyramid; true?

23        A    I am responsible for the corporate direction

24   of SIU for the performance reviews that are performed

25   from a corporate focus, for corporate technology

1    that's used to identify -- help us identify insurance

2    fraud, and I have a quasi-supervisory responsibility

3    to the individual SIU operations.

4        Q    What do you mean quasi?

5        A    I can meet with the assistant vice

6    presidents of -- or regional vice presidents that are

7    ultimately -- that the SIU managers report to.  I can

8    indicate whether their performance -- you know, in

9    regards to the performance reviews and those types of

10   things could influence -- regarding whether a

11   particular operation was performing at an acceptable

12   level; those kinds of things.

13       Q    So whom do you report to?

14       A    I report to the vice president of claims

15   home office.

16       Q    Who is that?

17       A    Nancy Pierce, at the present time.

18       Q    Do you have folks within the SIU that

19   directly report to you?

20       A    Yes.  I have six individuals.

21       Q    And do they all hold the same title?

22       A    No, they do not.

23       Q    Okay.  Do some of them hold the same title?

24       A    No.  None of them hold the same title.

25       Q    Okay.  Could you tell me who reports

1    directly to you along with their titles, please?

2         A    Michael College.

3         Q    Would you spell his last name?

4         A    C-O-L-L-E-G-E.  He is our SIU operation and

5    training manager.

6         Q    We have Michael Krohn (phonetic), who is our

7    chief analyst.  We have Audra Meyers (phonetic), who

8    is our CHO analyst.  She handles systems, our systems

9    issues.  We have Kendra Sullivan, who is our intake

10   ICE analyst.

11            THE WITNESS:  I-C-E.  It's Intelligence

12   Claims Evaluation.  It's an automated fraud detection

13   system.

14        A    We have Anthony Broadnax, who is our

15   background investigator.

16   BY MR. MORGAN:

17        Q    Could you spell his last name?

18        A    B-R-O-A-D-N-A-X.

19            And we have Maria Waders (phonetic), who is

20   our power sports analyst.

21        Q    And --

22        A    And we have one more.  I have Don Marine

23   (phonetic), who is our SIU performance review officer.

24        Q    And these seven people directly report to

25   you?

1      A      That's correct.

2      Q      You mentioned something about -- are there

3  vice presidents of SIU or regional vice presidents?

4      A      No.  The SIU managers report to a claims

5  assistant vice president, except in the states of New

6  York and New Jersey, where by law they need to report

7  to the regional vice president.

8      Q      So the SIU managers report to a claims

9  assistant vice president?

10      A      Except in the states of New York and New

11  Jersey.

12      Q      Where they report to regional vice

13  presidents?

14      A      That's correct.  They are regional vice

15  presidents.

16      Q      Of claims?

17      A      Of claims, except in the two states.

18      Q      Hold on a second.  I thought you said the

19  SIU managers in New York and New Jersey report to --

20      A      Report to a regional vice president; that's

21  correct.

22      Q      A regional vice president of claims?

23      A      No.  Of the entire -- the regional vice

24  president as the -- they are the head person in a

25  particular region.  So they have not only claims, but

1    they have underwriting and all of the other insurance

2    activities underneath them.

3        Q    Do the special investigators for GEICO --

4    are there direct reports to the SIU managers?

5        A    The SIU -- I'm not quite sure I understand

6    your question.

7        Q    I'm just trying to understand from the

8    ground up the hierarchy.  So at the lowest level is

9    the investigator; right?

10        A    Yes.

11        Q    What position does the investigator report

12    to?

13        A    The SIU investigator reports to an SIU

14    supervisor, and the supervisor reports to an SIU

15    manager.

16        Q    And then the managers, with the exception of

17    New York and New Jersey, report to an assistant -- a

18    claims assistant vice president?

19        A    Yes, sir.

20        Q    And who do the claims assistant vice

21    presidents report to?

22        A    They report to the regional vice presidents.

23        Q    But the regional vice presidents do not

24    report to you directly?

25        A    No, they do not.

STEVEN F. RUTZEBECK 11/19/2010

Page 20

```
 1        Q    Do you have oversight, either direct or

 2   indirect, of the regional vice presidents?

 3        A    No, I do not.

 4        Q    How many SIU managers are there?

 5        A    There are ten, not including Michael

 6   College, who's a manager also.

 7        Q    Not including, did you say?

 8        A    There would be 11 including him.

 9        Q    Okay.  Where does Mr. College reside or

10   where does he work?

11        A    At the Plaza location, which is in Chevy

12   Chase.  At our office in Chevy Chase, the claims home

13   office.

14        Q    Are all of the people you identified that

15   directly report to you -- do they all work out of the

16   Chevy Chase location?

17        A    All except one.  One works out of -- Don

18   Marine works out of our Renton office in Washington,

19   D.C. -- I'm sorry; in Washington state.

20        Q    Is the SIU broken into different regions

21   or --

22        A    Yes.  They align with the existing claims

23   regions.

24        Q    How many regions are there?

25        A    At the present time, there are eight.
```

1        Q     Could you identify those regions?

2        A     Region 1, Fredericksburg; Region 2 is

3    Woodbury in New York; Region 3 has both the Midwest

4    and the Southeast and they are located in Macon;

5    Region 4 has two centers, one in San Diego and one in

6    Tucson; Region 5 is Dallas; Region 6 is Lakeland,

7    Florida; Region 7 is in Virginia Beach; and Region 8

8    is Buffalo, New York.

9        Q     Thank you.  So the investigators in the SIU

10   work -- all of them work in one of these eight

11   regions?

12       A     That is correct.

13       Q     And all of the investigators report to a

14   supervisor?

15       A     That's correct.

16       Q     You mentioned -- I wanted to talk to you a

17   little bit about some of the folks who report directly

18   to you.  You mentioned Don Marine, the SIU performance

19   review officer.

20       A     Yes.

21       Q     Do you have some understanding of what he

22   does?

23       A     Yes.

24       Q     What does he do?

25       A     His responsibility -- the responsibility we

STEVEN F. RUTZEBECK 11/19/2010

1    have in my position is to review each and every

2    operation for certain performance standards, and it's

3    his responsibility to coordinate the conducting of

4    those performance reviews or audits.

5         Q    How often are the audits -- tell me a little

6    bit about what the audits are.

7         A    We review four files from each investigator

8    for a number of standards, particularly focusing

9    primarily on report format.  Then we provide those

10   results to the individual regions.  We also look at

11   their analytical sections, as well as their intake

12   operation.

13        Q    So four files from each investigator; is

14   that what you said?

15        A    That's correct.

16        Q    Is that four files per year?

17        A    Per year.

18        Q    And these are closed file reviews?

19        A    Closed file reviews, yes.

20        Q    And you said that there's -- let me step

21   back.  Is there some sort of written guideline or

22   document by which the folks who do the audits

23   follow --

24        A    Yes.

25        Q    -- in terms of deciding or evaluating an

1    investigator's performance on a particular closed

2    file?

3         A    We have -- every year we send out -- advise

4    the regions in regard to what standards will be

5    measured.  Also, all of the measures that we use are

6    documented either in like our case management's manual

7    or those types of things.

8         Q    So is there a name for those standards that

9    are sent out each year?

10        A    It's our annual performance review

11   standards.  You know, it reviews exactly what we'll be

12   looking at.

13        Q    Right.  I'm looking for a name.  So if I

14   asked GEICO for that information, how would I go about

15   getting it?

16        A    It's our performance review standards.

17        Q    SIU performance review standards?

18        A    Yes.

19        Q    And so I understand it and we're clear,

20   that's the criteria by which the investigator's files

21   are reviewed on closed review files?

22        A    Yes.  We let them know exactly what will be

23   measured.

24        Q    So these standards are distributed to even

25   the investigators on an annual basis so they have some

1    idea?

2        A    I provide them to the managers, and I expect

3    that they are relayed to the supervisors to the

4    investigators.

5        Q    Who creates the standards?

6        A    We -- the claims home office/SIU does.

7        Q    So when you say the claims home office/SIU,

8    who is that?

9        A    That's me and the seven people that...

10       Q    That you identified that report to you?

11       A    Yes.  Primarily it's Don Marine and Mike

12   College and myself.

13       Q    So Don Marine, Mike College, and you

14   primarily create the standards?

15       A    Yeah.  We get feedback from the SIU

16   managers, but primarily the final decision is ours as

17   to what we actually review.

18       Q    So do the investigators receive a score?

19       A    Yes, we do give a score.

20       Q    Can you tell me about how the scoring system

21   works?

22       A    You get a 1 to 5 score.  A 3 is what would

23   be expected from an experience SIU investigator for

24   that particular issue.  And then 4 and 5 is where they

25   have exceeded that standard.  A 1 and 2 is where they

1    haven't met that standard.

2         Q    So does Mr. Marine have a team of folks that

3    do the reviews on a regular basis throughout the year?

4         A    Yes.  We use the SIU supervisors as the

5    review team.  So he identifies the number of reviewers

6    that he needs, he calibrates them, and then they are

7    provided with the files electronically that they'll be

8    reviewing.

9         Q    When do the -- you said the standards are

10   issued on an annual basis?

11        A    Yes, sir.

12        Q    At what point in the year?  I mean, we're

13   coming up on January 1.  Is that the time that new

14   standards are typically issued?

15        A    Yes, sir.  They are usually in December or

16   early January.

17        Q    Have you created the ones for 2011?

18        A    They are working on them now.

19        Q    You identified -- I just wrote last names

20   here -- Sullivan, intake ICE?

21        A    Kendra Sullivan.

22        Q    Kendra Sullivan.  And then I know you

23   defined that acronym ICE.  Could you do so again,

24   please?

25        A    Yes.  It's Intelligence Claims Evaluation.

STEVEN F. RUTZEBECK 11/19/2010

1       Q    What is that?

2       A    It's an automated system, a sophisticated

3  red-flag system, that looks at claims as they are

4  coming in and identifies which ones have certain

5  indicators that would indicate that they may possibly

6  have some fraudulent issues within the claim.

7       Q    What happens if the system detects fraud

8  indicators?  What happens with the file?

9       A    Well, at the present time it's not working

10 properly because we had some issues with data

11 transfer.  But ideally what would happen is if a claim

12 exists with certain incriminating indicators, that

13 claim would be sent to our case management system in

14 the queue and an intake operator would look at that.

15 A human being would look at it and evaluate whether

16 that actual claim did have some indicators that might

17 warrant us investigating it.

18      Q    So in the ideal world, if ICE is working

19 correctly, the computer may identify it; and then that

20 claim is in a system that allows an individual, then,

21 to review it to confirm that indicators exist and that

22 the file warrants investigation?

23      A    That's correct.

24      Q    And what's the title for the employee that

25 reviews the indicators after the ICE system identifies

1    them?

2        A    That's an intake associate.

3        Q    Those aren't the investigators?

4        A    No, they are not.

5        Q    So investigators in the SIU don't decide

6    whether a claim is going to be investigated?

7        A    No, they do not.

8        Q    So let's say the intake associate decides

9    that this is a claim that warrants further

10   investigation, what happens to the claim?

11       A    The claim will then be electronically sent

12   to a supervisor who has responsibility for the area

13   where the issue is at hand.  The supervisor will then

14   distribute that case to whoever on his team he thinks

15   most appropriate.  It might be a caseload issue; it

16   may be expertise.  But we leave it up to the

17   supervisor to determine amongst the resources they

18   have available as investigators where that case should

19   go to for investigation.

20       Q    When you're referring to a supervisor,

21   you're talking about an SIU supervisor?

22       A    An SIU supervisor.

23       Q    So the SIU supervisor decides which

24   investigator in his or her region is going to

25   investigate a particular claim?

STEVEN F. RUTZEBECK 11/19/2010

1        A    Correct.

2        Q    Now, there's also a claims adjuster for

3   GEICO that's assigned to those claims; true?

4        A    Yes.

5        Q    Does the claims adjuster have any

6   decision-making responsibility relative to whether or

7   not a claim is investigated by a special investigator?

8        A    They can, because they have the ability to

9   make a referral themselves.  If they, during the

10  course of their claims handling, determine that they

11  think there's something questionable about the claim,

12  they can make what we term a manual referral.

13  Although it's electronic, we call it manual because it

14  was actually a person who generated the referral.

15       Q    As opposed to ICE?

16       A    As opposed to ICE; that's right.

17       Q    And as I understand it, because of problems

18  with ICE, at least at the present time, are all of the

19  referrals manual referrals to SIU?

20       A    No, they are not.  We have the ability to

21  manually review the ICE results and develop filters

22  and sorts to do -- what would have been done

23  automatically, we have to sort of do manually; but we

24  still get the same results.

25       Q    So the ICE system isn't completely -- I

1    mean, you are able to use it in some capacity?

2        A    That's correct.

3        Q    And when did the problems start occurring?

4        A    With the automated?

5        Q    Yes.

6        A    We had put in a new version of the software,

7    and as a result, our ISD inadvertently broke some of

8    the connections and so the results were coming back in

9    error.  We identified that very quickly and basically

10   now we do the manual, what we call ICE mining process.

11       Q    I'm just trying to get a sense as to when

12   that occurred; when you started --

13       A    It would have been 2008.

14       Q    So sometime in 2008 you started using this

15   ICE mining process?

16       A    That's correct.

17       Q    And at least from 2008 to the present, how

18   you described it in terms of the referrals through

19   ICE, that's how it's conducted, that a person looks at

20   the material that's filtered through ICE and makes the

21   referral manually as opposed to automated?

22       A    That's correct.  They create -- the filters

23   that would have been done automatically are created

24   manually, and we get the same basic results.

25       Q    So it's Kendra Sullivan that supervises the

1    team of intake associates?

2         A    No, she does not.  She has no supervisory

3    responsibility at all.

4         Q    Who supervises the intake associates?

5         A    It's usually an inside SIU supervisor.

6         Q    Mr. College --

7         A    Yes.

8         Q    -- you identified as the SIU training.  He's

9    involved in SIU training; is that right?

10        A    That is correct.

11        Q    And he's also a manager?

12        A    That's correct.

13        Q    Could you tell me a little bit about the

14   training that GEICO provides to the SIU investigators?

15        A    We have an SIU academy that we hold every

16   year.  I think we've done it for the last five to six

17   years.  Primarily, 24 to about 28 people attend that.

18   Normally, we try to get people who have been with the

19   company -- within SIU less than one year.  We also

20   provide yearly training on specific topics of concern.

21        Q    When an SIU investigator is hired, do they

22   go through any specific training relative to SIU?

23        A    Yes, they do.  Primarily, it's on-the-job

24   training.  Each of the regions normally assigns a

25   supervisor to that new person, who mentors them for

1    their first few weeks until they reach an acceptable

2    standard of performance and then they are mentored by

3    their supervisor from then on in regard to any issues

4    that might crop up.

5         Q    And then at some point, presumably, if that

6    investigator is new to the company, they'll attend the

7    SIU academy?

8         A    That is correct.

9         Q    How long is the SIU academy training?

10        A    Right now, it's one week.

11        Q    And where does that occur?

12        A    Virginia Beach.

13        Q    And are there training materials that are

14   provided to the investigators at this academy?

15        A    Yes, there are.

16        Q    How would I obtain -- if I had to ask GEICO

17   for that information, how would I describe it?

18        A    The SIU academy curriculum.

19        Q    The SIU academy curriculum.  Okay.

20             So does Mr. College have a team of folks

21   that do the training?

22        A    We pull on the investigators, the

23   supervisors, and the managers to be primarily our

24   instructors based on their expertise and experience.

25        Q    You identified a person as chief analyst.

```
1        A      That is correct.

2        Q      What was the last name?

3        A      Khorn, K-H-O-R-N (sic).

4        Q      And is that a mister?

5        A      Yes, it is.

6        Q      What does Mr. Khorn do as chief analyst?

7        A      His primary responsibility -- although he

8    has no supervisor responsibility, he mentors the

9    individual SIU analysts that we have in each region.

10   He helps review their work products.  He is also

11   responsible for ICE, for the operation of ICE.

12       Q      So he has his hands full trying to get

13   that --

14       A      That's correct.

15       Q      -- functioning again?

16       A      Yes.

17       Q      What is an SIU analyst?

18       A      The SIU analyst is a criminal analyst, like

19   you would find in law enforcement.  They are

20   responsible for taking data and making sense of it.

21   They can do it from a tactical, which means you

22   basically have a target that you think is committing

23   insurance fraud, and you're trying to expand to find

24   out exactly about that person.

25              They can also be used for operational, where
```

1    you have a problem, where you don't know who the

2    players are.  You can use it for strategic, where you

3    anticipate or you forecast what your next big fraud

4    problem is going to be.

5        Q    And this position is separate from the

6    investigator position?

7        A    That is correct.

8        Q    Are they paid salaries?

9        A    Yes, they are.  They are paid salary.

10       Q    How many SIU analysts are there?

11       A    At the present time, there are 12 -- I'm

12   sorry; 13.

13       Q    Do SIU analysts work with investigators on

14   specific investigations?

15       A    Yes, they do.

16       Q    In other words, are they a resource that an

17   investigator can call on for assistance?

18       A    Absolutely.  That's their primary

19   responsibility.

20       Q    And what would be -- could you give me an

21   example of why an investigator would call on an SIU

22   analyst?

23       A    He's had a number of cases that appear to be

24   staged accidents.  He's trying to determine the nature

25   and extent of the organization that's committing these

1    staged accidents, whether, in fact, it is an

2    organization or not, and who are the players.  Then

3    they would call upon the analyst, who has a lot of

4    technology to be able to bring a lot of information

5    together and to make sense of it.

6            So they would use him to find out -- a lot

7    of times in staged accidents, people are drivers in

8    one circumstance and in another they are a passenger.

9    So you're trying to make connections that these people

10   are trying to hide.

11       Q    So if the investigator has a hunch or a

12   suspicion about a particular ring of fraud, they may

13   reach out to the SIU analyst for further

14   investigation?

15       A    To help them with identifying the size and

16   scope of the problem and who may be the primary, I

17   guess, leaders of that organization.

18       Q    In order to utilize an SIU analyst as a part

19   of an investigator's investigation, does the

20   investigator need approval from management, or can

21   they just directly reach out to the analyst and say, I

22   need your help?

23       A    They can do that.  But primarily we ask them

24   to go through the supervisor, only to be able to

25   manage the workload of the analyst.

1        Q    So primarily, they need the supervisor's

2   okay or blessing before they can use an SIU analyst?

3        A    I don't know if I'd call it a blessing, but

4   they need to involve their supervisor so they know

5   they're making the request.

6        Q    Meaning what; what do you mean involve their

7   supervisors?

8        A    They need to make their supervisor aware

9   that they're making the request.  The supervisor then

10  works in conjunction with the investigator and the

11  analyst and maybe the manager to determine the

12  priorities for the analyst, because he's getting -- he

13  or she is getting requests from a number of different

14  sources.  So someone has to identify which cases are

15  most important, where the analyst's time would be best

16  invested.

17       Q    Because there are a number of investigators

18  that need the analyst's time and attention; right?

19       A    That's correct.

20       Q    And there only 12 (sic) of them?

21       A    That's correct, sir.

22       Q    Okay.  You identified somebody and that name

23  I didn't write down as you were identifying them.  You

24  talked about intelligence claim, one of your direct

25  reports.

STEVEN F. RUTZEBECK 11/19/2010

Page 36

1       A      Anthony Broadnax is a background

2    investigator.

3       Q      The intelligence claim was just me trying to

4    jot down the ICE acronym.  Okay.

5              Who is the individual you just identified

6    who's a background investigator?

7       A      Anthony Broadnax.

8       Q      And what is a background investigator?

9       A      One of the things we do is GEICO has an ERS

10   program, emergency road service, sort of like AAA.  As

11   a result, we have towers, that if your car breaks

12   down, we send a tower out.  We do background

13   investigations on those towers to ensure some level of

14   comfort that when we send the tower out there, that

15   they're legitimate, and for the safety of our

16   customers.

17             We also do backgrounds on our ARX shops,

18   which are preferred body shops.  So we ensure that

19   they are also legitimate businesses.  Anthony's

20   responsibility is primarily the backgrounds on the ARX

21   shops, but he also does ERS background investigations

22   also.

23      Q      Is he the only background investigator the

24   company has?

25      A      Yes, that does that.  Well, we do have a

1    person who is assigned to our ERS operation who does

2    the backgrounds, but they don't -- they are not --

3    they do not report directly to SIU; but they do do

4    backgrounds.

5        Q    But Anthony's primary duty is to conduct

6    these background investigations?

7        A    That's correct.

8        Q    Do you know if he's paid a salary?

9        A    Yes, he is.

10       Q    As opposed to an hourly employee?

11       A    Yes, that's correct.

12       Q    What's the power sports analyst position?

13       A    Power sports is our section of GEICO that

14   deals with everything pretty much other than

15   commercial and vehicle.  It would be boats -- I should

16   say water crafts, motorcycles, RVs, those types of

17   things, ATVs.  They are all grouped under the title

18   power sports.  So the power sports analyst supports

19   the power sports operation within GEICO, looking

20   specifically for motorcycle fraud, RV fraud, those

21   kinds of things.

22       Q    How many power sports analysts are there?

23       A    One.

24       Q    Do investigators, similar to the other

25   analysts that we've talked about, would they reach out

1    then to the power sports analysts if they needed

2    assistance on a claim?

3         A    Yes, they could.

4         Q    Because the investigators investigate those

5    claims -- suspicious claims relative to the power

6    sports policies, too; right?

7         A    That's correct.  Also, each region has a

8    subject matter expert in power sports assigned to the

9    region, as an investigator who has some expertise in

10   power sports.  So they have that resource available to

11   them also.

12        Q    That's the SIU investigator you're talking

13   about?

14        A    That's correct.

15        Q    You've been in the position of claims

16   security/special investigations unit director since

17   2000?

18        A    June of 2000.

19        Q    What did you do before that?

20        A    Well, I was the operational training manager

21   at GEICO.  Prior to that, 25 years with the Maryland

22   State Police.

23        Q    With what?

24        A    The Maryland State Police.

25        Q    How long were you in the operational

1   training position?

2        A    Six months.

3        Q    At GEICO?

4        A    Yes.

5        Q    So that's where all of your experience is

6   from testifying in courtrooms?

7        A    Yes, sir.

8        Q    You have some understanding of what GEICO

9   insurance company's business purpose is?

10            MR. HEMMENDINGER:  Objection.  I think

11   that's beyond the scope of a corporate designee's

12   deposition.

13            MR. MORGAN:  Are you directing him not to

14   answer?

15            MR. HEMMENDINGER:  I haven't said that, but

16   I would say that his answer to that question would be

17   his personal answer and not a corporate designee

18   answer.

19            MR. MORGAN:  That's fair.

20        A    Could you rephrase it?  I'm sorry.

21   BY MR. MORGAN:

22        Q    I just asked you if you had some

23   understanding as to GEICO's insurance company's

24   business purpose.

25        A    To provide insurance, auto insurance

STEVEN F. RUTZEBECK 11/19/2010

1    primarily and, obviously, power sports-related

2    insurance, for our customers.

3        Q    Customers, meaning the policyholders?

4        A    That's correct, sir.

5        Q    How does the SIU department assist in

6    providing insurance for GEICO's customers?

7        A    We assist GEICO by -- and our customers by

8    identifying those claims that are fraudulent in nature

9    so that GEICO does not pay for fraudulent claims;

10   hence, the cost of our insurance can be less for our

11   customers.

12       Q    And that's the benefit that the customers of

13   GEICO get; right?

14       A    Obviously, yes.

15       Q    The more fraud is reduced within the

16   company, the lower the premiums are going to be, at

17   least in part; is that the theory?

18       A    That's the theory, yes.

19            MR. HEMMENDINGER:  Can we go off the record,

20   for just a second?

21            MR. MORGAN:  Sure.

22            (Off the record.)

23            (With Mr. Robinson present, the following

24   proceedings were had.)

25   BY MR. MORGAN:

1       Q     I've placed before you what's been marked

2    Exhibit 2.

3             MR. MORGAN:  Eric, I provided a copy for you

4    as well.

5    BY MR. MORGAN:

6       Q     Do you recognize this document, sir?

7       A     Yes, I do.

8       Q     And it's entitled Affidavit of Steven

9    Rutzebeck?

10      A     Rutzebeck.

11      Q     And if you turn to the seventh page, there's

12   a signature.  Is that your signature?

13      A     Yes, it is.

14      Q     You reviewed this before you signed it?

15      A     Yes, sir.

16      Q     Did you draft the document?

17      A     No, I did not.

18      Q     All right.  Before we get to this, a couple

19   more questions just generally about the SIU -- what do

20   you call it, department, division, company?

21      A     I guess we call it SIU.  They don't really

22   designate within GEICO departments.

23      Q     Then I'll just say SIU.  Are you aware of

24   any payroll function the SIU has?

25      A     Payroll function?

1        Q    Yes.

2        A    No, I don't believe so.

3        Q    Are you aware of any advertising or

4    marketing function the SIU has?

5        A    No.

6        Q    Any type of employee benefit function?

7        A    No.

8        Q    Any type of human resource function?

9        A    No.

10       Q    Any type of accounting or budgeting or

11   auditing function?

12       A    Do you mean for SIU?

13       Q    For the company.

14       A    For the company, no.

15       Q    Does it have its own profit and loss

16   responsibility?

17       A    No.

18       Q    Does it have any legal or regulatory

19   compliance responsibility?

20       A    We have certain responsibilities in state

21   that require a fraud plan by the insurance commission.

22       Q    Could you tell me about that?

23       A    Certain states require a fraud plan be

24   submitted, in some cases, annually and in some cases a

25   year -- you have a set period.  Our SIU managers

1    regionally are responsible for ensuring that they are

2    drafted and submitted.

3         Q    What states; do you know?

4         A    Off the top of my head, there are a number

5    of them that require it:  New Jersey, New York,

6    Delaware, Colorado.  There's a number of them.  That's

7    just off the top of my head.  Massachusetts.

8         Q    A number of states on the East Coast.

9         A    Yes.  As well as, there are some across the

10   country that require fraud plans.

11        Q    Does SIU have any tax or finance function or

12   responsibility?

13        A    No.

14        Q    Does it have any public government relations

15   responsibility?

16        A    No.

17             If you turn to Paragraph 2 of your

18   affidavit -- it's actually on the first page -- the

19   first sentence reads:  GEICO employs approximately 250

20   investigators in the exempt classifications of senior

21   security investigator or lead security investigator.

22             Is that right?

23        A    That is correct.

24        Q    Where did you obtain that figure,

25   approximately 250 investigators?

1        A     We take it from current SIU staffing levels.

2        Q     What is that?  I mean, do you look at a

3    computer screen that spits out the number of

4    investigators?

5        A     It would be the investigators that are

6    currently logged into our case management system.

7        Q     And those are investigators in every single

8    state that GEICO does business and has investigators,

9    other than California?

10       A     They are not in every single state, but yes.

11       Q     In the states that GEICO does business?

12       A     That's correct.

13       Q     Do you know how many investigators are in

14   California?

15       A     I believe -- off the top of my head, I would

16   say about 24.

17       Q     The next sentence of your affidavit reads:

18   The 250 figure does not include California, where the

19   investigators are non-exempt due to state law.  Do you

20   see that?

21       A     That's correct.

22       Q     Do you have any understanding of the reason

23   why they are non-exempt due to state law?

24       A     It was a company decision as far as I know.

25       Q     Right.  But do you have any understanding as

STEVEN F. RUTZEBECK 11/19/2010

1    to why the company made that decision?

2         A    No, I do not.

3         Q    Were you involved in it?

4         A    No, I was not.

5         Q    Was it made while you were in the director

6    position?

7         A    Yes, it was.

8         Q    When was it made?

9         A    It was a number of years ago, but I don't

10   know the exact year.

11        Q    A number of years ago, you think?

12        A    Yeah, a few years ago.

13             MR. HEMMENDINGER:  Matt, this is getting

14   into an area which has been designated for another

15   witness.

16             MR. MORGAN:  I understand that, but he made

17   the representation in the affidavit that the

18   investigators are non-exempt due to state law, so I'm

19   just following up on that.

20             MR. HEMMENDINGER:  Yes.  It just was

21   understood that this would not be a part of the

22   corporate designation.

23             MR. MORGAN:  That's fair.

24   BY MR. MORGAN:

25        Q    So you think a few years ago?

```
 1        A    Yes.

 2        Q    If you turn to paragraph -- if you stay on

 3   the first page, focusing on Paragraph 3, the first

 4   sentence states:  The primary duty of SIU

 5   investigators is to prevent fraud by investigating

 6   claims suspected of being fraudulent, educating GEICO

 7   adjusters about fraud and serving as liaison to law

 8   enforcement and regulatory agencies.  Do you see that?

 9        A    Yes, sir.

10        Q    And is this the primary duty of all 250

11   investigators?

12        A    That is correct.

13        Q    They all have the same primary duty?

14        A    Yes.

15        Q    And then the next sentence reads:  They

16   spent the majority of their time on investigations.

17   Do you see that?

18        A    Yes, sir.

19        Q    What do you mean by majority of their time?

20        A    That their primary responsibility is doing

21   investigations.

22        Q    Something greater than 50 percent?

23        A    Absolutely, yes.  That includes drive time

24   to and from their investigative activities.

25        Q    Right.  I mean, they work out of their
```

1    homes?

2         A    Not all of the 250 do.

3         Q    Most do?

4         A    The majority of them do, yes.

5         Q    So they have administrative functions that

6    they have to do at their homes; right?

7         A    That's correct.

8         Q    And then they work out in the field and

9    conduct the investigations?

10        A    Yes.

11        Q    So there's drive time involved?

12        A    Yes, sir.

13        Q    I used the figure greater than 50 percent

14   with regard to conducting -- spending time on

15   investigations, and you agreed that it was greater

16   than 50 percent.

17        A    Yes.

18        Q    Could you give me a ballpark estimate of the

19   percentage of time investigators spend conducting

20   investigations as their primary duty as opposed to

21   something else?

22        A    I would say probably -- in my opinion, it

23   would be 90 percent of their time is spent on

24   investigations.

25        Q    You also said, as part of their primary

1    duty, educating GEICO adjusters about fraud.

2        A    Yes.  One of the -- obviously, they are the

3    front line in regards to talking to our customers and

4    meeting our customers.  So educating the adjusters in

5    regard to fraud issues is of primary importance, as

6    they are a source of referrals also.

7        Q    Is there any requirement with regard to --

8    strike that.

9            Do investigators on occasion train

10   adjusters?

11       A    Yes.

12       Q    On topics such as detecting fraud

13   indicators?

14       A    Yes.

15       Q    Any other topics, or is that the primary

16   one?

17       A    No.  They would train them on different

18   scenarios that they may see in their claims, whether

19   it's medical or, for an example, what to look for in

20   staged accidents, those types of things.  So it's not

21   just specifically targeting indicators.  It's

22   explaining how the fraud occurs and what they should

23   be looking for.

24       Q    Is there any expectation that GEICO has

25   relative to the amount of training an investigator

```
 1   should do for an adjuster?

 2        A    No.

 3        Q    Generally speaking, the investigator spends

 4   about 90 percent of his or her time doing

 5   investigations.  How much of their time do they spend

 6   educating adjusters?

 7        A    It would be small percentage, and it may

 8   vary by a particular investigator.

 9        Q    The same with regard to serving as liaison

10   to law enforcement; a small percentage of their time?

11        A    I would include that as part of their

12   investigative responsibilities.  So included in their

13   actual activities of investigating would be liaisoning

14   with law enforcement, the National Insurance Crime

15   Bureau.

16        Q    What do you mean serving as liaison to law

17   enforcement and regulatory agencies?

18        A    They work hand in hand.  When criminal

19   activity is uncovered, we provide that information to

20   law enforcement and to regulatory agencies, and we

21   provide any assistance they may need when they

22   initiate investigations.

23        Q    Is there some sort of standard or guideline

24   that the investigators have to follow with regard to

25   when referrals are made to law enforcement or
```

1    regulatory agencies?

2         A    No.  They have it within their power to make

3    a referral to law enforcement based on their

4    experience and knowledge.

5         Q    So it's entirely up to them?

6         A    That's correct.

7         Q    Do they need prior approval before they

8    refer a claim to law enforcement or a regulatory

9    agency?

10        A    No, they do not.

11        Q    Are you aware of anything in any of the

12   training materials or the manuals that govern what

13   these investigators do on a day-to-day basis that

14   talks about when to refer a claim to law enforcement

15   or a regulatory agency?

16        A    No, I do not.

17        Q    We started talking about this a little bit

18   in connection with our discussion about ICE, but the

19   next sentence of Paragraph 3 talks about the steps

20   involved in an investigation.  Do you see that?

21        A    Yes.

22        Q    It starts on the first page and continues on

23   to the next.  It indicates that an investigation

24   involves a number of steps, including receiving the

25   assignment, making a plan of action, gathering

STEVEN F. RUTZEBECK 11/19/2010

1    evidence and then writing a report on the results.  Do

2    you see that?

3         A    Yes.

4         Q    Are those sort of the four major categories

5    of an investigation, if you will?

6         A    What were the four that you mentioned?

7         Q    Receiving the assignment being one; making a

8    plan of action, two; gathering evidence, three;

9    writing a report on the results.

10        A    Yes.

11        Q    Any other -- I mean, obviously, there are

12   tasks and activities that are done within those four

13   kind of categories, but any other category that's

14   missing from this description of the investigation

15   process?

16        A    No.

17        Q    With regard to receiving the assignment,

18   have we already talked about the process by which an

19   investigator receives a claim assignment?

20        A    I believe we did.

21        Q    And so as I understood it, after the claim

22   goes through ICE and then is manually reviewed by an

23   analyst, it's sent on to a manager or supervisor?

24        A    Supervisor.

25        Q    Supervisor.  And the supervisor then

1    determines which investigator is going to be assigned

2    the claim?

3         A    Not exactly.

4         Q    Tell me about that.

5         A    The referral can come from two sources, our

6    automated system or from a manual system, which is the

7    adjuster making the referral.  That goes into a queue.

8    Then the intake associate reviews that and then

9    determines what resources should be applied to it.  If

10   they feel that an investigation should be initiated,

11   that's sent to the supervisor and then the supervisor

12   basically makes the assignment to the individual

13   investigator.

14        Q    So what happens then?  What's the first

15   thing an investigator does after he or she receives an

16   assignment?

17        A    Normally, what they would do would be review

18   the claim and any attachments that came with that

19   referral, public records, those types of things.

20   Usually, it's sort of like prework to actually going

21   out and doing any investigative activities.

22        Q    Is there a particular amount of time that

23   the investigator has to perform the preliminary

24   activities upon receipt of the assignment?

25        A    It's entirely up to them.

1       Q     Excuse me?

2       A     It's entirely up to them in regards to the

3   circumstances within the claim as to what degree of

4   prework they need before actually going out and

5   investigating.

6       Q     So they've reviewed the file, reviewed the

7   attachments, done all of the preliminary workup.   Then

8   what happens?

9       A     They basically set their plan of action

10  together as to what they're going to do to investigate

11  this particular case.

12      Q     Do they have to comment that they received

13  the file or received the assignment?   Do they have to

14  make a notation somewhere?

15      A     It's within our case management system, so

16  it's not -- I mean, to my knowledge, there's no

17  requirement that they have to let their supervisor

18  know that they received it.   It's just electronically

19  received.   So it's --

20      Q     That case management system, is it the

21  acronym SICM?

22      A     That's correct.

23      Q     And is there either through the training

24  materials that the investigators receive or the best

25  practices or some type of guideline that's provided to

1    the investigator that explains sort of the

2    investigation process that we're talking about?

3         A    Yes.  We have a reporting document, manual

4    in regards to the writing of your reports.

5         Q    What's that called?

6         A    It would be the SIU report writing manual.

7         Q    Is that different from the operational

8    manual?

9         A    Yes.

10        Q    So there's a report writing manual?

11        A    Yes.

12        Q    And do you know the formal title or name for

13   that manual?

14        A    It would be report writing manual, as best I

15   remember the exact title.

16        Q    And then there's an SIU operational manual

17   as well?

18        A    That's correct.

19        Q    Is that still in place today?

20        A    Yes.

21        Q    And what is the SIU operational manual?

22        A    It's actually an administrative and

23   operational manual.  It's a document that outlines

24   certain requirements -- I guess it would be

25   requirements as part of your SIU -- the SIU function;

1    how to do pretext policies and how to do other things.

2    So it's a general outline of how we go about doing our

3    business.

4        Q    Are there any other manuals that govern what

5    the investigators do on a daily basis, other than the

6    report writing manual and the SIU operational manual?

7        A    No.  Not that I, off the top of my head, can

8    think of.

9        Q    For the last several years, anyway, dating

10   back to the '07-'08 time frame, are those the two

11   manuals that were in place?

12       A    That's correct.

13       Q    No others that you're aware of?

14       A    No, not that I'm aware of.

15       Q    So we were talking about the investigative

16   process, and I think where we left off was that the

17   investigator, after doing the preliminary activities,

18   sets their action plan.

19       A    Yes, sir.

20       Q    How is that done?

21       A    They basically determine what activities

22   they need to perform in order to investigate the

23   particular circumstances of that particular case.

24       Q    Do they speak to the claims adjuster while

25   formulating the action plan?

 1       A     They may.  That's our customer, so we ask

 2    them that they contact the claims adjuster to

 3    determine exactly what issues they believe are

 4    involved in the claim.  But ultimately, once it gets

 5    to SIU, the SIU investigator is responsible for

 6    investigating from a fraud perspective that claim.

 7       Q     I understand that, but is the policy of the

 8    company that the investigator try to contact the

 9    adjuster prior to drafting the action plan and

10    submitting it in SICM?

11       A     No.  There is no written that they have to.

12    It is a recommended course of action, but there is

13    no mandate.

14       Q     Best practices?

15       A     That's right.

16       Q     And the action plan is placed in SICM?

17       A     Yes.

18       Q     And then once the action plan is in place,

19    the investigator starts his or her investigation?

20       A     Yes.

21       Q     And that can include a number of different

22    things, such as interviewing witnesses?

23       A     Yes.

24       Q     Taking photographs?

25       A     Yes.

```
 1        Q    Reviewing property damage?

 2        A    Yes.

 3        Q    I know I'm missing a whole host of other

 4   activities, and we'll maybe get into some more of the

 5   specifics, but I'm just trying to understand generally

 6   the process right now.

 7             Then at some point -- well, during the

 8   investigation process, are the investigators required

 9   to provide update reports through SICM?

10        A    Yes, they are.

11        Q    How often are they required to do that?

12        A    We currently have a 10-, 20-day, 20-day

13   report --

14             (Reporter requests clarification.)

15        A    10, 20, 20 reporting cycle, which means

16   there's a 10 day initial report and 20 days --

17   supplements 20 days after until the case is closed.

18   BY MR. MORGAN:

19        Q    Is there an average life cycle to a claim,

20   generally speaking?

21        A    We usually average a little over 30 days to

22   investigate.

23        Q    Is there a goal that GEICO establishes with

24   regard to ending a -- beginning and ending a claim in

25   terms of time?
```

```
 1        A     No.   We don't have any standard for that.

 2   We do look at average case life, but no particular

 3   time for any particular case.

 4        Q     Right.   The average case life is part of the

 5   performance appraisal at the end of the year?

 6        A     That's correct.

 7        Q     So the 10-day initial report is something

 8   different than the initial action plan?

 9        A     Yes, it is.

10        Q     And these reports are submitted into SICM?

11        A     That's correct.

12        Q     And outside of the reports -- let's say, for

13   instance, an investigator interviews a policyholder on

14   Day 3 and then takes photographs on Day 7, does the

15   investigator in that scenario have to document the

16   interview after Day 3 in SICM and the photographs

17   after Day 7 in SICM and then create an interim report

18   at Day 10?

19        A     It is recommended that when the

20   investigative activity occurs, that you document it in

21   SICM.   There is no mandated requirement to do so.   The

22   only requirement is the 10-day initial report.

23        Q     There was some discussion in your affidavit

24   about -- I think in Paragraph 11 -- when the

25   investigation is complete, the investigator completes
```

1    his report on his computer, the investigator's

2    supervisor reads the completed report on his computer

3    and grades it for purposes of evaluating the quality

4    of the investigator's work.

5         A    That's correct, on closure.

6         Q    Do the supervisors review interim reports

7    before the reports are submitted in SICM?

8         A    Yes.  No.  Some of them do; some of them

9    don't, because there are self-approvals.

10             (Reporter requests clarification.)

11        A    Some have self-approval ability.

12   BY MR. MORGAN:

13        Q    So some of the investigators have their

14   interim reports reviewed by supervisors before it's

15   submitted through SICM, other's don't?

16        A    That is correct.

17        Q    And those that don't, you said have

18   self-approval?

19        A    Authority, yes.

20        Q    Meaning what?

21        A    Meaning that they can approve their reports

22   without supervisory approval.

23        Q    How does one get self-approval authority?

24        A    By having a demonstrated ability to write

25   the reports in an acceptable fashion.

1        Q     But those who maintain self-approval

2    authority still must have their final reports reviewed

3    and graded by the supervisor before it's submitted in

4    SICM?

5        A     No.

6        Q     They can just submit their final reports

7    without a review or grading?

8        A     That's correct.

9        Q     Do you know how many investigators have

10   self-approval authority?

11       A     Of the field people, I'm going to say -- I'm

12   not exactly sure, because that's a varying thing.

13       Q     Sure.

14       A     But I would think at the present time there

15   are probably about 40 to 50 that have that authority

16   that's been granted by their managers.

17       Q     Out of the 250 or so?

18       A     Yes.

19       Q     For those who don't have the self-approval

20   authority, can you describe for me just sort of the

21   logistics of how an interim report is approved by a

22   supervisor?

23       A     You would submit your report; the supervisor

24   would get that in his pending; and the supervisor

25   would review it and approve it.  That's pretty much --

1  that interim report has been approved.

2      Q    What's the purpose of having the supervisors

3  review and grade -- well, do the supervisors grade

4  interim reports?

5      A    No, they do not.

6      Q    They just grade the final reports?

7      A    That's correct.

8      Q    What's the purpose of having the supervisors

9  review the interim reports before they are submitted

10  in SICM?

11      A    Primarily to ensure that they are -- they

12  are complying with format requirements and also to be

13  able to allow the supervisor to provide any input he

14  may feel appropriate because of his expertise.

15      Q    Okay.  So the investigation part of the

16  process is done, all of the interviews were taken, all

17  of the photos were taken, the evidence was observed,

18  and the investigator determines his or her

19  investigation is over.  What happens then?

20      A    They will close the report.  The report will

21  be forwarded to a supervisor for final approval, if

22  they don't have self-approval capability.  Their

23  supervisor will at that time basically, most of the

24  time, score the overall report on a 1-to-5 scale and

25  the report is approved.

```
 1        Q     In Paragraph 11 on Page 4 -- are you there?

 2        A     Uh-huh.

 3        Q     About halfway down, you say:  Supervisors

 4   rarely make changes in the reports.

 5        A     They do, rarely.

 6        Q     How do you know that?

 7        A     Because we look at the -- when we do the

 8   performance reviews and stuff, we have the ability to

 9   look at the notes that are provided by the

10   supervisors.

11        Q     What does rare mean?

12        A     It means that it occurs more often with new

13   SIU employees that are learning the process and very

14   rarely with those that have the experience and know

15   how to write it.  The more experienced the particular

16   investigator, the less review is actually done by the

17   supervisor.

18        Q     Are the grades maintained?

19        A     Yes, they are.

20        Q     Where are they maintained?

21        A     Within the case management system.

22        Q     Is that something different than the SICM

23   system, or is it in SICM?

24        A     It's SICM.

25        Q     So for a particular file -- say my claim,
```

1    Matt Morgan's claim, is being investigated, so it goes

2    through the SICM system, if I were to pull up my file

3    on the SICM system, could I see the grade the

4    investigator got on the interim report or on the final

5    report?

6        A    If the supervisor wanted to see what score

7    he had given them or if someone who has access to the

8    system, is --

9        Q    Right.  Is the grade in the system?

10       A    The grade is maintained in the system, yes.

11       Q    So if I looked at the system on a particular

12   file, I could tell what Mr. Calderon did in terms of

13   grades on his final report?

14       A    If he was provided a score, it would be

15   maintained.

16       Q    If you don't have self-approval authority,

17   aren't you supposed to get a grade for every final

18   report?

19       A    The supervisor could decide not to give a

20   grade or grade particularly one.  That's entirely up

21   to them.  The ability to grade exists.

22       Q    Who decides when the investigation has

23   ended?

24       A    The investigator.

25       Q    So an investigator can end it without any

1    approval by a supervisor or a claims adjuster?

2        A     That's correct.

3        Q     What if the claims adjuster wanted

4    additional investigation done?

5        A     We do occasionally reopen cases if there's

6    some valid reason to do so.

7        Q     So the investigator decides that his or her

8    investigation is done, prepares the final report and

9    sends it off to the supervisor, and the supervisor, if

10   the investigator doesn't have self-approval authority,

11   reviews it, grades it and then it's submitted into the

12   SICM system?

13       A     Yes.

14       Q     Anything else done from an investigator's

15   standpoint after that final report is submitted?

16       A     No.   Unless additional information becomes

17   available, and that case may, in fact, be reopened.

18       Q     And what would prompt reopening of a file?

19       A     Well, the claims handlers obviously are

20   continuing the handling of the claim, so additional

21   information, certain documents might become available

22   that had not been available at the time of the

23   original investigation which may warrant the case

24   being reopened.

25       Q     Is there some guideline or best practices

1    that the investigators are asked to follow relative to

2    speaking with the claims adjuster assigned to the file

3    before the investigator prepares his or her final

4    report?

5        A    We recommend constant and ongoing

6    communication with the adjuster who has that file.  We

7    ask that from Day 1 to the closing, that that

8    communication -- independent of the formal reports

9    that are required to be had, that the investigator

10   maintain an open line of communication with the file

11   owner, the adjuster.

12       Q    And the adjuster has access to SICM, too;

13   right?

14       A    No, they do not.

15       Q    They don't?

16       A    No.

17       Q    So they can't see what's documented in terms

18   of investigative activities?

19       A    The only thing they can see is the final

20   report, unless the individual investigator provides

21   them with the interval reports.

22            (Reporter requests clarification.)

23   BY MR. MORGAN:

24       Q    Interim reports?

25       A    Interim reports.

1      Q    Why is that?  Do you know why claims

2   adjusters don't have access to the SICM system?

3      A    We've just always maintained a sense of

4   security and confidentiality in regard to the

5   investigation.

6      Q    Right.  Do you know the reason for it?

7      A    Just that the claims adjuster -- we want

8   them to be -- to basically be able to make their

9   claims decision independent of things what we're

10   working on until we have come up with a final

11   conclusion to the case.

12      Q    And the adjuster decides whether a claim

13   that's being investigated gets paid or denied; right?

14      A    They have the final authority.

15      Q    Investigators don't make that decision, do

16   they?

17      A    No, they do not.

18      Q    Paragraph 12 of your affidavit reads:

19   Unlike some other insurance companies, GEICO does not

20   require its SIU investigators to refrain from

21   expressing their opinions concerning the existence of

22   fraud when discussing cases with adjusters and writing

23   their reports.  Do you see that?

24      A    Yes, sir.

25      Q    What insurance companies are you referring

1   to?

2       A    All I know is what we do in our insurance

3   company.  I'm sure others have certain rules that

4   refrain --

5       Q    Well, do you know of any?

6       A    Not specifically.

7       Q    So you're not certain what other insurance

8   companies do relative to expressing opinions, are you?

9       A    I mean, I've read some things where they

10  have, in fact, said that they were more specific about

11  expressing their opinions and those kinds of things,

12  but we don't have anything like that in ours.

13      Q    What have you read?

14      A    I read some cases where there has been --

15  where the insurance company advised that they had

16  their investigators refrain from having any opinion in

17  their findings.

18      Q    What cases?

19      A    Some case studies in regards to dealing with

20  exempt and non-exempt issues.

21      Q    Right.  And I'm asking you what cases.

22      A    I can't remember off the top of my head.

23      Q    What insurance companies?

24      A    I cannot remember the exact name of the

25  insurance companies.

```
 1      Q    Is this a recent review of the case studies

 2   that you're talking about?

 3      A    Yes.

 4      Q    How recent?

 5      A    It would be a couple of weeks ago, and then

 6   I've done it in the past also.

 7      Q    How many case studies of insurance companies

 8   did you review?

 9      A    Two or three.

10      Q    So two or three different insurance

11   companies?

12           MR. HEMMENDINGER:  I don't want to step all

13   over the deposition, but I do want to clarify

14   something.  It wasn't case studies; he was looking at

15   court cases.

16           MR. MORGAN:  That's fair.

17           MR. HEMMENDINGER:  Decisions.

18      A    That's absolutely right.  I wasn't actually

19   looking at the case, per se.  I was looking at the

20   reviews.

21   BY MR. MORGAN:

22      Q    The case law?

23           MR. HEMMENDINGER:  No.  You were looking at

24   the decision issued by the court.

25   BY MR. MORGAN:
```

STEVEN F. RUTZEBECK 11/19/2010

```
 1        Q     And what I want to know is what other

 2   insurance companies.  You don't know?

 3        A     I don't remember exactly; no, I do not.

 4        Q     So it's your testimony that investigators

 5   can express their opinions in final written reports?

 6        A     Yes.  The only thing is we ask them to

 7   actually draw conclusions from the evidence.  We don't

 8   ask them just to collect evidence.  We ask them to

 9   make sense of the evidence, to draw conclusions from

10   that evidence.

11        Q     And where is that written, in the operating

12   (sic) manual?

13        A     I don't know exactly how it's written there

14   or not, but that's our course of action.

15        Q     Are you aware of anything in writing that

16   says that investigators at GEICO can express their

17   opinions in the reports they issue?

18        A     In those exact words, no.

19        Q     Can investigators use -- or come to the

20   conclusion that fraud exists on a particular claim in

21   the report they submit?

22        A     Yes.

23        Q     They can use that word "fraud"?

24        A     They can say that, in fact, this was a

25   fraudulent activity, yes.  If they have the evidence
```

1    to support that conclusion.

2         Q    Is that in writing anywhere in any of the

3    SIU manuals or policies?

4         A    Not specifically, no; to my knowledge.

5         Q    Do you know who Bob DeMartino is?

6         A    Yes, I do.

7         Q    Mr. DeMartino was a supervisor and an

8    investigator; right?

9         A    Yes, he was.

10        Q    How long was he an investigator; do you

11   know?

12        A    I know he was an investigator for

13   approximately a year before he left.  He was a

14   supervisor before that.

15        Q    If you could, turn back to Page 3, please.

16   The first sentence of Paragraph 9 reads:  If a claim

17   of disability is suspected to be fraudulent, the

18   investigator may recommend what a private security

19   firm conduct videotape surveillance.  Do you see that?

20        A    Yes.

21        Q    Who do the investigators make the

22   recommendation to?

23        A    To claims.

24        Q    The adjuster assigned to the file?

25        A    Assigned to the file, yes.

1        Q     To make the final decision?

2        A     Yes.  Because there's expense associated

3    with that.

4        Q     Can investigators incur any expense in the

5    course of their investigation absent preapproval from

6    a supervisor or a claims adjuster?

7        A     Yes, they can.

8        Q     What can they incur --

9        A     Court costs --

10       Q     Let me finish my question.

11       A     I apologize.  I thought you were done.

12       Q     I'm sure you know what I'm going to ask.

13       A     No.  I just thought you were done.

14       Q     What expenses can be incurred by an

15   investigator without preapproval from a claims

16   adjuster or a supervisor during the course of an

17   investigation?

18       A     Costs associated with getting documents from

19   the court, expenses associated with the investigation

20   themselves, which would be parking issues, things like

21   that.

22       Q     Parking in a parking ramp downtown to get

23   copies of a police report?

24       A     Or meet someone.

25       Q     The investigator doesn't need to call the

1    supervisor first?

2         A     No, they do not.

3         Q     Anything else, other than those expenses?

4         A     There could be a number of them that I can't

5    think of off the top of my head, but they have the

6    flexibility to be able to incur expenses associated

7    with their investigation in a routine -- what would be

8    considered a routine investigative activity.

9         Q     Right.  I'm just trying to get a sense of

10   what those expenses are.  We talked about certain

11   ones.  Can you think of any others, without

12   preapproval?

13        A     Without preapproval?

14        Q     Yes.

15        A     I am trying to think of an example where

16   they may have an expense.  Right off the top of my

17   head, I can't think of an example.

18        Q     If you look at Paragraph 7 of your

19   affidavit, that first sentence reads:  If a

20   policyholder, or occupant covered by the

21   policyholder's policy, does not consent to an

22   interview, the investigator asks staff counsel to

23   schedule an EUO taken at a court reporter's office; is

24   that right?

25        A     That is correct.

STEVEN F. RUTZEBECK 11/19/2010

1        Q     Then you say:  Starting in 2008, GEICO has

2     permitted SIU investigators to take examinations

3     without a GEICO attorney.  Do you see that?

4        A     Yes, sir.

5        Q     Are examinations under oath still taken by

6     attorneys on occasion?

7        A     Yes, they are.

8        Q     There are just certain investigators that

9     take EUOs and others that don't?

10       A     We have a process to certify our SIU

11    investigators to be able to take EUOs.

12       Q     Is an EUO like an interview?

13       A     It is a more formalized process.

14       Q     Formalized in the sense that it's under

15    oath?

16       A     That's correct.

17       Q     Any other difference?

18       A     There are rules of -- I mean, there are

19    exhibits and things like that, which is more

20    formalized.  But other than that, it's a formalized

21    face-to-face interview.

22       Q     Right.  As you say in Paragraph 7, if the

23    policyholder doesn't consent or voluntarily agree to

24    submit to an interview, then an EUO may be taken;

25    right?

1      A    One of the requirements of submitting a

2   claim is that you have to submit to an EUO if we feel

3   it appropriate to find the facts associated with that

4   claim.

5      Q    In terms of what is sought in an EUO versus

6   an interview, is there any real difference?

7      A    No.  We're still trying to find the facts or

8   the evidence.

9      Q    The investigators are trying to find the

10   facts relative to the particular claim they're

11   assigned to investigate?

12      A    That's correct.

13      Q    In Paragraph 8, about halfway down, you have

14   a sentence that reads:  Obtaining a withdrawal, with

15   or without a confession, requires judgment on the part

16   of the investigator.  Do you see that?

17      A    Yes.

18      Q    What do you mean by that?

19      A    The investigator needs to determine if a

20   withdrawal is appropriate based on the circumstances

21   and when and if to offer that opportunity to withdraw

22   and whether to accept a withdrawal.

23      Q    Why wouldn't the investigator not (sic)

24   accept a withdrawal?

25      A    It may be a case where the fraud is so

1    horrendous that we may not want the claim to be

2    withdrawn; we literally would prefer that we attempt

3    to prosecute that person for committing that fraud.

4              MR. HEMMENDINGER:  Can we go off the record?

5              (Off the record.)

6    BY MR. MORGAN:

7        Q    Are there any words or phrases that

8    investigators are precluded from using or writing in

9    the written reports?

10       A    No specific words that I know of.

11       Q    Is there some policy that you're aware of

12   that describes the reason why supervisors review the

13   interim and final reports for investigators?

14       A    No.  I think it was just a stated -- it was

15   just a verbal.  I don't believe there's any, per se,

16   written documentation that addresses that.

17       Q    Was it a decision you made as the director

18   of the unit?

19       A    Yeah.  Actually, we did it initially,

20   primarily, because when I came to GEICO there were

21   seven different case management systems that didn't

22   talk to each other and the reports all looked

23   different, just the style of the reports.  So you

24   could have ones that were basically in our diary;

25   there were others in Word documents.

```
 1              So to get to a point where we had some -- at

 2      least when you looked at a report there would be some

 3      standard of professionalism in regards to how the

 4      report looked, we instituted the review process.  And

 5      since then we've lessened -- we've started to remove

 6      that and mandate it.

 7              (Reporter requests clarification.)

 8      A      To remove that -- mandate it to 100 percent

 9      supervisory review.

10      BY MR. MORGAN:

11      Q      You started to remove it, did you say?

12      A      Yes.  Now we have self-approvals.

13      Q      Do you know what a bad faith insurance claim

14      is?

15      A      Yes.

16      Q      What is it?

17      A      It's where the insurance company did

18      something inappropriate and as a result was held

19      responsible for not handling that claim in good faith.

20      Q      Does that concept affect the way you

21      understand the investigators write their written

22      reports?

23      A      I'm not quite sure I understand your

24      question.

25      Q      Let me ask you a different one.  That was a
```

1    poorly phrased question.

2         Are investigators trained on what is known

3    as bad faith claims?

4    A    Yes.  We do give training on bad faith.

5    Q    What's the reason for giving training on bad

6    faith?

7    A    Primarily, we don't want the investigators

8    to do anything unethical in regards to investigating

9    the claim.  We don't want them to use unacceptable

10   investigative techniques, trickery, those kinds of

11   things in investigating the claim.  So we talk to them

12   about being ethical in regards to how they go about

13   doing their investigation.

14   Q    As part of the training, are they taught how

15   to write reports?

16   A    Yes.  We have report writing training that

17   we offer.

18   Q    Why is it important that the investigators

19   get trained on how to write reports?

20   A    Because we have a number of required formats

21   for us to be able to use our technology to the

22   fullest.

23   Q    Can you explain what you mean by that?

24   A    For example, one of the things that we

25   require is the capitalization of the primary

1   principals in the claim they are investigating.  The

2   reason we do that is because we have technology called

3   Memex that is a Boolean logic search.

4          (Reporter requests clarification.)

5      A    It's a Boolean logic software, where we can

6   search and see if we've ever had this particular

7   individual or group before in an investigation.  When

8   you do the search, it brings back a number -- it could

9   bring five or six reports where this particular person

10  or business was named, and your ability to be able to

11  scan those reports is greatly enhanced with the

12  capitalization.

13          So you can look through the reports, see if

14  it has any practicality to the case you're working

15  now, and either use it or not use it.  Otherwise, if

16  it's not capitalized, it takes a lot longer to review

17  and to be able to use the technology effectively, in

18  an effective manner.

19  BY MR. MORGAN:

20     Q    In Paragraph 5 on Page 2 of your affidavit,

21  the last sentence reads:  The investigator may also

22  recommend a forensic examination of the vehicle by an

23  expert.

24     A    That's correct.

25     Q    Who is the recommendation made to?

STEVEN F. RUTZEBECK 11/19/2010

Page 79

```
 1        A     To the file owner or the adjuster.  The
 2    adjuster who is responsibile for that claim.
 3        Q     And then the adjuster decides whether to
 4    follow that recommendation or not?
 5        A     Yes; correct.  Because of the expense
 6    associated with the expert.
 7        Q     So in terms of the expenses that are
 8    incurred on a file that's referred to SIU, the claims
 9    adjuster decides what expenses are incurred and what
10    aren't; is that fair?
11        A     Not exactly.
12        Q     How is that --
13        A     Some of the major expenses that would be as
14    a result of that investigation, such as surveillance,
15    such as retaining an expert, a forensic person, those
16    are -- approval from the claims handler is our normal
17    course of action.
18        Q     And so --
19        A     Other expenses associated with the
20    investigation that are of a more routine nature are
21    determined as part of the investigation.
22        Q     Copying costs, parking?
23        A     All of those kinds of things; yes.
24        Q     We may have said this:  The adjuster decides
25    whether to follow the recommendation of the
```

STEVEN F. RUTZEBECK 11/19/2010

1    investigator regarding an EUO; is that right?

2         A    No, not necessarily.  An EUO could be

3    something that the investigator could approve or

4    initiate independent of the adjuster.  Normally that

5    would be a codecision, but I could think of an

6    occasion where the SIU investigator could take that

7    initiative and set that up.

8         Q    What's the best practice for the

9    investigator, to get the approval of the adjuster

10   first?

11        A    Yeah.  Obviously, it's a joint effort.  So

12   obviously, informing the adjuster that an EUO is

13   appropriate and this would be a good case for an EUO

14   to be performed, you would hope they would agree on

15   that course of action.

16        Q    In Paragraph 6, you talk about the central

17   part of most investigations is interviewing the

18   policyholders, their third-party claimants, and

19   witnesses; do you see that?

20        A    Yes, sir.

21        Q    You say the investigator locates the

22   individuals and interviews them in person; do you see

23   that?

24        A    That's correct.

25        Q    Is that what the investigators are

1    instructed or trained to do?

2        A    What we do is have face-to-face interviews

3    as one of the things that makes a field

4    investigator -- why we have them.  As a result, where

5    appropriate, we expect the investigator as part of the

6    investigation to do the face-to-face interviews

7    because as a result of the face-to-face interviews,

8    you get to see their body language and other things

9    that a number of our investigators are very good at.

10       Q    What's the expectation with regard to the

11   number of hours an investigator works per week?

12       A    There is no set number.  They're a salaried

13   employee, and there is no standard of exactly what

14   hours they are supposed to work a day.

15       Q    Is there some understanding when they get

16   hired as to the number of hours they are going to be

17   working?

18       A    To my knowledge, they know that their

19   workday is kind of flexible in regards to when they do

20   their activities and that they -- that we'll try to

21   have a manageable workload for them.

22       Q    Do they have to record a certain number of

23   hours per week on some type of time card or report?

24       A    Yes.  We do have a -- we call it ETAS,

25   E-T-A-S.

1        Q     What does that stand for?

2        A     I have no idea.

3        Q     Who would know?

4              MR. HEMMENDINGER:  I know.  It's Electronic

5     Time and Attendance System.

6              MR. MORGAN:  There you go.

7              THE WITNESS:  Thank you, sir.

8     BY MR. MORGAN:

9        Q     And they have to report a certain number of

10    hours per week?

11       A     That's correct.  They do -- for the purposes

12    of ETAS, there is a 7.75-hour designation, but we have

13    never said that's their workday.

14       Q     But that's what they report every week;

15    right?

16       A     That's what the ETAS standard is; yes.

17       Q     7.75 hours a day?

18       A     That's correct.

19       Q     So even if an investigator is working 45

20    hours in a week, they're going to report 37.75 (sic)?

21       A     I don't know if that's the case, but that's

22    the default in the system.

23       Q     The 7.75 a day?

24       A     (Witness nods.)

25       Q     Is that right?

 1        A     That's correct.

 2        Q     Do you have some understanding of whether

 3   investigators work over 40 hours in workweek on

 4   occasion?

 5        A     I would assume some do and some probably

 6   work less, because we manage more to workload than we

 7   do to --

 8             (Reporter requests clarification.)

 9        A     To workload versus a set hourly performance.

10   BY MR. MORGAN:

11        Q     Is there any other way, other than the 7.75

12   reporting through ETAS, that the company tracks the

13   hours of the investigators?

14        A     No.  We don't have another system.

15        Q     So if an investigator was working 42 hours

16   in a particular week, but reported 7.75 hours through

17   ETAS each day, the ETAS system wouldn't accurately

18   reflect the number of hours the investigator worked?

19        A     Not unless he --

20        Q     Is that right?

21        A     Unless he put it into the ETAS system.

22        Q     What are they trained to do relative to

23   entering their time into --

24        A     I don't know exactly what the regions have

25   them do, but that's -- we've always -- you do your

1    ETAS and you fill it out.  I would assume that they

2    should put the hours that they actually are

3    performing.

4         Q    Really, you think that's what they should be

5    doing?

6         A    I don't know.  I don't know exactly what

7    they're doing.  They may be using the 7.75 hours; they

8    may be putting actually what they work.  I don't have

9    access to their individual ETAS.

10        Q    You don't know?

11        A    I don't know.

12        Q    We talked about a number of people with whom

13   the investigator deals on a day-to-day or weekly basis

14   during the course of an investigation.  We talked

15   about claims adjusters; right?

16        A    (Witness nods.)

17        Q    You have to answer out loud.

18        A    Yes.

19        Q    Supervisors?

20        A    Yes.

21        Q    The analysts?

22        A    On a day-to-day basis?

23        Q    Or weekly, just in the course of an

24   investigation.

25        A    Yes.

1       Q     Adjusters, supervisors; right?

2       A     Yes.

3       Q     Analysts, perhaps?

4       A     Perhaps.

5       Q     Are there any -- and law enforcement or

6    regulatory agency officials; right?

7       A     Yes.

8       Q     Any other employee type of GEICO with whom

9    an investigator would work during the course of an

10   investigation?

11      A     It might be including the AD adjusters as

12   adjusters, the automobile damage person who determines

13   the -- who looks at the damage to the vehicles and

14   those types of thing.  So there may be an opportunity

15   where other people are assisting with the handling of

16   the claim beyond the primary adjuster who's assigned

17   to that case and there may be interaction with them.

18      Q     In the case of an auto damage adjuster's

19   involvement, is there an auto damage adjuster and an

20   additional claims adjuster assigned to a claim?

21      A     In most every case, yes.

22      Q     How about underwriting?  Would the

23   investigators have the occasion to deal with

24   underwriting?

25      A     They do make underwriting referrals.  So if

1    in the course of their investigation they uncover an

2    underwriting issue, they have the ability through our

3    case management system to make a direct referral to --

4         Q    Is there -- I'm sorry.

5         A    To make a direct referral to underwriting.

6         Q    Is there a particular type of experience or

7    background GEICO is looking for in an investigator?

8    In other words, are you looking for people who have

9    claims adjusting experience in the insurance industry

10   or law enforcement experience, such as yourself, or

11   both or neither?

12        A    The best is to have someone who has both

13   claims experience and some kind of investigative

14   experience also, but you don't normally get a person

15   who has both of those skills.  Normally, you get one

16   or the other.  We like to have a blend in SIU.

17             We feel that having people with claims

18   experience, coupled with some investigators who have

19   law enforcement experience, gives you the opportunity

20   to leverage both of those skills and to -- you know,

21   we can train to whichever one, the area where they

22   need additional expertise or knowledge.

23        Q    Okay.  Any other positions at GEICO that

24   would be involved in the investigative process that we

25   haven't talked about or who an investigator would

1    reach out or consult with, an employee at GEICO,

2    during the course of an investigation that we haven't

3    already talked about?

4        A    There may be someone who has a particular

5    expertise in a particular issue, where they may reach

6    out in regards to assistance, but primarily you

7    touched on most of the ones they would be dealing

8    with.

9        Q    Outside of that rarity, any others that we

10   haven't talked about at all?

11       A    Not that I can think of.

12       Q    If you could turn to Page 6, please.  In

13   Paragraph 18, and we talked a little bit about this,

14   your first sentence reads:  Because they are

15   classified as exempt, GEICO does not keep track of the

16   SIU investigators' hours.

17       A    I do not keep track of their specific hours.

18       Q    GEICO doesn't?

19       A    No.  The hours in a day, what they work, we

20   do not keep track of the exact hours.

21       Q    So why is it a requirement to have them

22   report the 7.75 hours a day through the ETAS system?

23       A    I believe it's just an accounting process.

24   That's my belief.

25       Q    It's not for purposes of tracking actual

STEVEN F. RUTZEBECK 11/19/2010

1   work hours, is it?

2        A     Not to my knowledge.  That would be my

3   personal opinion.

4        Q     But you're the head of SIU?

5        A     Right, but it's not -- that is from an HR

6   issue.  It has nothing -- our investigators understand

7   that our workday is not an 8:30-to-4:30 type of job.

8        Q     And the next sentence reads:  The

9   investigators work out of their homes.

10       A     Yes.  The majority of those 250

11   investigators.

12       Q     So a majority of them do.  Others work out

13   of where?

14       A     Out of the offices, the regional offices.

15   We call them -- they're inside investigators.  They do

16   desktop investigations.

17       Q     Is that a different position than what Mr.

18   Calderon did for --

19       A     He was a field investigator.  Inside

20   investigators use -- work desktop investigations.

21   Field investigators do field activities, face-to-face,

22   those types of things.

23       Q     You don't have to page back if you don't

24   want to, but on the first page you identify about 250

25   investigators in the exempt classification.

```
 1        A     Correct.

 2        Q     Outside of California?

 3        A     Yes.

 4        Q     And you identify them as senior security

 5   investigators or lead security investigators?

 6        A     Yes, sir.

 7        Q     Do those desktop investigators fall into one

 8   of those two categories?

 9        A     Yes, they do.

10        Q     And they are paid salaries, too?

11        A     Yes, they are.

12        Q     And they don't do field work?

13        A     No.  Well, they could occasionally.  If the

14   field work was close to a particular office, they

15   might have an opportunity to do field work; yes.

16        Q     Are they bound by the same policies and

17   procedures relative to conducting investigations as

18   the field investigator?

19        A     Yes, they are.

20        Q     How many -- I guess you used the phrase --

21   is it desktop investigator?

22        A     Desktop investigators.

23        Q     How many desktop investigators are there out

24   of the 250?

25        A     There are probably -- roughly, in the area
```

1    of 60 or 70 of those are inside investigators, of

2    those 250.

3        Q    So you say they are supplied with a company

4    car, computer and telephone; right?

5        A    Yes, sir.

6        Q    All of the investigators?

7        A    All of the field people.  The others have

8    that available to them in the office.

9        Q    They receive their assignments

10   electronically?

11       A    Yes, they do.

12       Q    All of them do?

13       A    All of them do, yes.

14       Q    Their workday consists of desk work, using

15   their computers and field work?

16       A    That's correct.

17       Q    And that's for all of the investigators,

18   potentially?

19       A    Right.  Well, the field work wouldn't be

20   done by the inside people, primarily.  It would be

21   occasional field work.

22       Q    And then it says:  As discussed above, the

23   field work includes locating witnesses, interviewing

24   witnesses, taking examinations under oath, clinic

25   visits, taking photographs, meeting with law

1    enforcement and driving.  Do you see that?

2        A    Yes.

3        Q    And that's true with regard to all of the

4    investigators that do field work?

5        A    That's correct, yes.

6        Q    Would you say their duties are similar to

7    one another?

8        A    One investigator from another investigator?

9        Q    Yes.

10       A    Yes.  In most cases they are similar.

11       Q    We've talked about this topic a little bit

12   in terms of how an investigator's work is reviewed by

13   GEICO.  One way is through the file reviews that are

14   conducted; right?

15       A    Yes.

16       Q    And we talked about the file reviews; right?

17       A    Yes.

18       Q    Another way is by reviewing -- for those who

19   don't have self-approval authority, review of the

20   interim and final reports; right?

21       A    Yes.

22       Q    Are there any other ways in which an

23   investigator's work is reviewed by GEICO?

24       A    I know the supervisors on occasion do file

25   reviews of the investigators under their

1   responsibility.  They also do ride-alongs.

2        Q    Is there any sort of requirement or at least

3   best practices relative to informal file reviews being

4   conducted by supervisors of their investigators?

5        A    They are recommended, but there is no

6   standard number or anything like that.

7        Q    Do supervisors get performance appraisals?

8        A    Yes, they do.

9        Q    On an annual basis just like the

10  investigators?

11       A    Yes, they do.

12       Q    Do any of their review -- is any of their --

13  strike that.

14            How about with regard to ride-alongs?  Is

15  there a requirement or best practices with regard to

16  supervisors doing ride-alongs with their

17  investigators?

18       A    There are no formal standards.  It's just a

19  recommended practice.

20       Q    How many is recommended that they do?

21       A    There is no specific number, just that they

22  occur, that ride-alongs are good with the associate

23  under your responsibility.

24       Q    Who at GEICO do you believe would have the

25  most knowledge with regard to how many hours an

1    investigator works in a given week?

2         A    Probably the supervisor that has that

3    particular investigator would be the best person to be

4    able to determine how many hours for that particular

5    person.

6         Q    Do you think the supervisor would have a

7    better idea than the actual investigator?

8         A    No.  I would say the investigator would have

9    the best knowledge of how much time he's put into his

10   investigations.  The next person would be the

11   supervisor.

12        Q    We mentioned -- when I was asking you

13   questions about reviewing the investigators' work, you

14   talked about more informal file reviews that are

15   conducted by the supervisors, like ride-alongs; right?

16        A    Right.

17        Q    Anything else?

18        A    No.  I think that's pretty much what's

19   reviewed.

20        Q    Have you heard of the phrase "SIU ultimate

21   graphs"?

22        A    Yes.

23        Q    What's an SIU ultimate graph?

24        A    They are a number of metrics that we put out

25   monthly from my unit in regards to tracking the

1    performance of the SIU operations.

2        Q    So what metrics specifically are there?

3        A    We provide feedback on impact ratio, which

4    is the number of cases where you had some degree of

5    influence in regard -- you had findings that

6    ultimately affected the claims decision.  We have

7    training numbers.

8            We have -- I'm trying to remember all of

9    them.  We have one for law enforcement referrals.

10   There's only about five or six in total that we put

11   out on a regular basis.  There's performance review

12   results.

13       Q    Are they done -- are the graphs broken down

14   by region or --

15       A    By region, yes.  The lowest denominator is

16   region.

17       Q    Are you familiar with a CALG study that was

18   conducted in 2009?

19       A    CALG?

20       Q    CALG.

21       A    Yes, I am.

22       Q    What was the CALG study?

23       A    They were looking at workload issues for the

24   SIU investigator.

25       Q    Meaning what?

```
 1        A     Meaning they were looking to see what -- to

 2   try to establish an appropriate workload for our SIU

 3   investigators.

 4        Q     Was there some determination of the

 5   approximate number of hours investigators were working

 6   as part of the study?

 7        A     Yes.  I believe there was.

 8        Q     Did you have some understanding of what that

 9   number was?

10        A     The number that I saw, and I can't speak to

11   it specifically, was 8.5 hours, I believe.

12        Q     Per day?

13        A     Per day, on average.

14        Q     How many days a week?

15        A     I don't know the answer to that.  The only

16   number I saw was the 8.5.

17        Q     Have you seen -- is the CALG study a written

18   study?

19        A     I've seen a PowerPoint that highlights some

20   of the results, but I have not personally seen the

21   data or the analysis that was done by them.

22        Q     When you they conducted the study, who is

23   they?

24        A     The CALG process review team that did this.

25        Q     Are they -- is this team, are they GEICO
```

1    employees?

2        A    Yes, they are.  Competitive Advantage

3    Leadership Group.

4        Q    Is there a process underway to eliminate the

5    SICM system?

6        A    Yes.  We're looking at a new case management

7    system.

8        Q    Why?

9        A    Because our case management system is

10   incredibly inefficient.  It takes a lot of IT

11   resources for us to make enhancements, and we want to

12   go to a system where we have the ability to make minor

13   changes without involving IT resources.

14       Q    Was that a decision that was made following

15   the CALG study?

16       A    Yes.  One of the recommendations in the CALG

17   study is to have a more efficient system.

18       Q    Do you recall any of the other

19   recommendations from the CALG study?

20       A    I don't think that -- I'm trying to think

21   what the exact recommendations were.  I don't know if

22   there were really a whole lot of recommendations.  We

23   are looking at trying to establish some kind of

24   process in regards to caseload.

25       Q    Have you heard about complaints of

1    investigators working too much; they are overworked or

2    too many cases?

3         A    I've heard some say that they are very busy.

4         Q    Is that what prompted, at least in part, the

5    CALG study, based on your knowledge?

6         A    No.  It was more a direct response to the

7    claims AVPs and RVPs --

8              (Reporter requests clarification.)

9         A    Assistant vice presidents and the regional

10   vice presidents wanting to know what an appropriate

11   workload was for their people.  And our prior

12   caseloads were based on less than scientific results.

13   BY MR. MORGAN:

14        Q    Have you ever heard any complaints by

15   investigators that they say something along the lines

16   of:  Hey, the investigators in California are paid by

17   the hour; they get overtime and we don't; there's a

18   problem?

19        A    No.  I've never actually heard that

20   complaint.

21        Q    How often do you have interaction with

22   investigators?

23        A    I wouldn't say almost daily, but it's pretty

24   close to that.

25        Q    Really?

 1       A    Yes.

 2       Q    Why is that?

 3       A    They call for whatever reason, for

 4  assistance or a problem.  I talk to, obviously,

 5  managers to a greater degree than I do to the

 6  individual investigators.  I have a very open-door

 7  policy, so they may call about a training issue or

 8  whatever.

 9            And when I'm out in the regions, I make it a

10  point to meet with the individual investigators as

11  best I can.  Since they work from home, they don't

12  quite get the contact that other in-house people do.

13       Q    Are there different levels of claims

14  adjusters at GEICO?

15       A    Yes, there are.

16       Q    Do you know what those levels are?

17       A    Primarily that's the CSR, a customer service

18  representative, which is the adjuster who handles

19  claims where there's really not a dispute as to the

20  facts of the accident, there's no injuries.  It's more

21  simplistic.  Then we have --

22       Q    Is that the lowest level?

23       A    That's the -- well, there are call telephone

24  reporters; but they don't do anything other than take

25  the information, and there's not a lot of them.  But

1    CSR is primarily our lowest level.

2        Q    Okay.

3        A    We have TA1s and TA2s, telephone adjusters.

4    As the claim becomes more complicated, there's a

5    dispute about who's at fault, there are injuries

6    involved, they are more experienced.  And as it

7    escalates, the top level is a CU, which is a

8    continuing unit.  They do the more complex claims.

9        Q    So which adjuster levels would investigators

10   be working with?

11       A    It could be -- any one of those could

12   provide referrals to SIU.

13       Q    Even the CSRs?

14       A    Yes.  Even the CSRs could, because they are

15   taking the first call.  It could be something that's a

16   single accident but circumstances are suspect, like

17   very short policy inception.  You've only had the

18   policy for three days and all of a sudden you have an

19   accident.

20       Q    Are CSRs paid hourly or salary; do you know?

21       A    I do not know the answer to that question.

22       Q    How about TA1s?

23       A    I do not know the answer to that question.

24       Q    You don't know with regard to TA2s and CUs

25   either, do you?

STEVEN F. RUTZEBECK 11/19/2010

Page 100

```
1        A     No.  I don't know anything about their
2    salary, how their salary is handled.
3        Q     Is there a difference between a claims
4    examiner and a claims adjuster at GEICO?
5        A     No.  Just two different terms for the
6    same...
7        Q     Okay.  I just heard it used.
8        A     Yes.  It's used --
9        Q     Interchangeably?
10       A     Interchangeably.  It's the same person.
11       Q     If you look at Deposition Exhibit 1 on the
12   second page, Item No. 4, it lists security
13   investigators' job duties and responsibilities and the
14   manner of performing them since July of 2007.  We've
15   talked about their duties and responsibilities today,
16   haven't we?
17       A     Yes, we have.
18       Q     Have there been any changes, at least
19   significant in the sense that they just completely
20   eliminated a duty or a responsibility or added
21   something, in the last three or four years that you
22   can think of?
23       A     No.  Pretty much no major changes.
24       Q     Since July of 2007, investigators outside of
25   California have been paid a salary; right?
```

 1      A     That's correct.

 2      Q     Classified as exempt for purposes of

 3   compensation?

 4      A     That is correct.

 5      Q     Item No. 8, which you've been identified to

 6   talk about, says describe any changes in defendants'

 7   manner of --

 8      A     Exhibit 1?

 9      Q     Yes, Page 2.  It talks about any changes in

10   defendants' manner of compensating its security

11   investigators during the last 10 years.  Do you see

12   that?

13      A     Yes, I do.

14      Q     You've been there about 10 years as the

15   director; right?

16      A     Yes, sir.

17      Q     Are you aware of any changes?

18      A     No.  No major substantial changes.

19      Q     How about with regard to the folks in

20   California?

21      A     They were designated as being non-exempt a

22   couple of years ago.

23      Q     Right.  So there's been that --

24      A     There's been that change, but other than

25   that there really hasn't been any that I know of.

 1              MR. HEMMENDINGER:  So we have an accurate

 2     record -- time flies -- he said a couple years ago,

 3     but it was in 2001.

 4              MR. MORGAN:  Okay.  He said --

 5              MR. HEMMENDINGER:  I know.  I don't want to

 6     muddle --

 7              MR. MORGAN:  I appreciate it.

 8              MR. HEMMENDINGER:  They were converted to

 9     non-exempt in 2001 in California.

10              MR. MORGAN:  Okay.

11     BY MR. MORGAN:

12          Q    Other than that change?

13          A    Not to my knowledge, no.

14          Q    With regard to Item No. 12, we wanted to

15     know about the defendants' method of recording hours

16     worked by security investigators.  We've talked about

17     that; right?

18          A    Yes.

19          Q    And any record maintenance system pertaining

20     to time since July 2007.  Other than the ETAS system,

21     has there been any other system that you're aware of?

22          A    No, sir.

23          Q    Item No. 20, we wanted to know about any

24     auditing systems, guidelines, best practices, or other

25     procedures which security investigators are required

1    to follow, including but not limited to how such

2    systems are used in the normal course of business by

3    investigators and the reasons for such use.

4            We talked about the report writing manual;

5    right?

6        A    Yes, sir.

7        Q    And we talked about the SIU operational

8    manual?

9        A    Operations -- it's the A&O manual, the

10   Administrative & Operational manual.

11       Q    Right.  Any other manuals or guidelines that

12   you're aware of; best practices?

13       A    No.  I can't think of anything.

14       Q    How about with regard to the closed file

15   reviews that are conducted?

16       A    By our performance review?

17       Q    That's right.  There are some sort of

18   guidelines or criteria by which the investigators are

19   judged.

20       A    That is correct.

21       Q    What's the name of that?

22       A    We have that as a standard operating

23   procedure that's done every year that outlines what we

24   are going to be reviewing.  That has changed very

25   minor over the years, so that you can -- so there's

STEVEN F. RUTZEBECK 11/19/2010

Page 104

1    really not a whole lot of changes.

2        Q    And we talked about that earlier on today?

3        A    Yeah.

4        Q    The thing that you and two others are part

5    of that get updated on an annual basis?

6        A    That is correct.

7        Q    Any other guidelines or policies by which

8    investigators are judged?

9        A    No, not to my knowledge.

10       Q    Item No. 21, the manner in which claims are

11   assigned to security investigators from July '07 to

12   the present.  We've talked about that today; right?

13       A    That's correct.

14       Q    Any changes at all since '07 that you're

15   aware of?

16       A    Absolutely none, other than the ICE

17   referrals.  The automated process is broken, so we had

18   to go to the mining process.  But other than that, no

19   changes.

20       Q    How about with regard to Item No. 22, the

21   manner in which claims assigned to security

22   investigators are closed from July '07 to the present?

23       A    Other than we have opened up allowing for

24   self-approval.

25       Q    When did that take place?  You may have

1   mentioned it, but I just don't recall.

2       A    I'm going to say early 2009, if not late

3   2008.

4       Q    Was that a decision you made?

5       A    That's a decision -- yes.  I made the

6   ultimate decision, but it was one in consultation with

7   the SIU managers.

8       Q    How about Item No. 23, production quotas?

9   Are there any production quotas that exist?

10      A    Not to my knowledge.  There's no quotas.

11  Are you -- I guess I need you to describe what you

12  mean by quota.

13      Q    Just the number of files that should be

14  closed in a particular month.

15      A    There are no particular corporate standards

16  for that.  There may be a regional goal set, but

17  there's no corporate goal for setting.

18      Q    Earlier you had talked about -- when we were

19  talking about the performance appraisals, the average

20  number of closed files, I thought, was one of the

21  criteria.

22      A    That's correct.

23      Q    And I think what you said is what you look

24  for is the same number of open files get closed.

25      A    That would be the ideal situation, where

```
 1   you're ending would be literally zero.  You would not

 2   be from month to month carrying over a pending

 3   caseload; but obviously, that fluctuates.

 4       Q    So if an investigator was assigned 10 files

 5   in the month of November, the hope or expectation is

 6   that all 10 get closed in that month as well?

 7       A    The ideal circumstance is they had the

 8   ability to close them within 10 days.

 9       Q    That obviously doesn't happen?

10            (Reporter requests clarification.)

11       A    I'm sorry.  The 10 for the month.

12   BY MR. MORGAN:

13       Q    That obviously doesn't happen?

14       A    It probably does in some circumstances, and

15   in some circumstances it doesn't.  It's all predicated

16   on the complexity of the cases you're working.

17       Q    And when the claims are assigned; right?

18       A    And when the cases are assigned.

19            MR. MORGAN:  Why don't we take a few-minute

20   break and go off the record?

21            (Off the record.)

22            (Exhibit 3 was marked for identification and

23   was attached to the deposition transcript.)

24   BY MR. MORGAN:

25       Q    I'm showing you what's been marked as
```

1    Exhibit 3.  I'll represent to you that this was

2    enclosed as an exhibit in connection with a motion

3    that we have before the court.  It was enclosed as an

4    exhibit by GEICO.  The first page reads:  SIU Case

5    Management System User's Manual.  Do you see that?

6        A    Yes, sir.

7        Q    Is this something different than what we've

8    talked about today in terms of manuals and policies

9    and such?

10       A    It's part of the reporting document that I

11   had talked to you about earlier.

12       Q    It's part of the report writing manual?

13       A    Yes.

14       Q    The user's manual?

15       A    Yes.

16       Q    Is the user's manual --

17       A    No.  I believe there are two parts.  This is

18   how to use the system and then there's one for how to

19   write your reports.  These are actually sort of a

20   combination; they work interchangeably because you

21   write your reports in the system.

22       Q    So if you look the third page, but there's a

23   24 on the bottom --

24       A    Yes.

25       Q    -- at the very top, it says:  It is

STEVEN F. RUTZEBECK  11/19/2010

1    imperative that if you include any conclusions or

2    recommendations, that they be totally substantiated by

3    the information you listed in the body of the report.

4    Do you see that?

5        A    Yes, sir.

6        Q    What's meant by that?

7        A    It means that your speculations and things

8    like that are not appropriate, that your conclusions

9    and your recommendations need to be based on the facts

10   and evidence that allows to you make those

11   conclusions.

12       Q    So the facts that are gathered during the

13   course of the investigation have to be laid out in the

14   report and have to substantiate or justify any

15   conclusion or recommendation made?

16       A    Yes.  There has to be some evidence or facts

17   that substantiate your conclusion and your opinion.

18       Q    So is this Page 24 part of the user's manual

19   or the report writing manual or --

20       A    I believe it's probably part of the report

21   writing manual.

22       Q    Do you know?

23            MR. HEMMENDINGER:  It's part of whatever it

24   is on the front page.

25       A    Yeah.  It's probably part of this document,

STEVEN F. RUTZEBECK  11/19/2010

1    the SIU Case Management System manual.

2    BY MR. MORGAN:

3         Q    The user's manual?

4         A    Yes.

5         Q    I'm just having difficulty, and I want to

6    make sure I understand.  Is there a separate report

7    writing manual?

8         A    There's a format report manual.

9         Q    Is that part of the user's manual?

10        A    It should be, yes.

11        Q    I only got a couple of pages as part of the

12   exhibit that was included.  This is all I have right

13   now.

14        A    Okay.

15             MR. MORGAN:  Would you mark this as an

16   exhibit, please?

17             (Exhibit 4 was marked for identification and

18   was attached to the deposition transcript.)

19   BY MR. MORGAN:

20        Q    The court reporter is handing you what's

21   been marked as Exhibit 4.

22             MR. HEMMENDINGER:  This would be outside his

23   designation.  I'm sure he doesn't have anything to do

24   with this.

25             MR. MORGAN:  Do you want me to renotice him

STEVEN F. RUTZEBECK  11/19/2010

1   so I can ask him about it personally?

2           MR. HEMMENDINGER:  No.  You can ask him

3   personally.

4   BY MR. MORGAN:

5       Q    Do you recognize Exhibit 4?

6       A    Yes.  I've seen it before.

7       Q    Did you have any input with regard to what

8   is written here?

9       A    No, I did not.

10      Q    Do you know the reason why it was prepared?

11      A    I guess it's in response --

12          MR. HEMMENDINGER:  Don't guess.  If you

13   know.

14      A    I don't know.

15  BY MR. MORGAN:

16      Q    Did you have any communication with anyone

17  internally at GEICO outside of counsel for GEICO about

18  this memo?

19      A    No.  It was generated without my

20  involvement.

21      Q    Did you review it before it was distributed?

22      A    No, I did not.

23      Q    So you didn't even have any involvement in

24  terms of what's written on this document?

25      A    None at all.

```
 1       Q    Do you know if anyone from SIU did?

 2       A    To my knowledge, no.

 3       Q    Do you see at the top it says, to SIU

 4  investigators?

 5       A    Yes.

 6       Q    Whom do you understand that to mean?

 7       A    Our SIU -- the investigators within SIU.

 8       Q    All of the 250 investigators outside of

 9  California?

10       A    That would be my belief.

11       Q    I understand you didn't write it, but in

12  terms of what you understand that term to mean, that's

13  your belief?

14       A    That's my belief, yes.

15       Q    Nancy Pierce, is she whom you report to?  Is

16  that who you identified?

17       A    Yes.  She's vice president of claims home

18  office.

19       Q    Did you review any materials or documents to

20  prepare yourself for the deposition today?

21       A    I looked over some of our reports, some of

22  our documents; but other than that, no.

23       Q    What reports and documents did you look

24  over?

25       A    I looked over our SICM manual.  Other than
```

1    that, I didn't really look at a whole lot of

2    documents.

3         Q     When you say the SICM manual, are you

4    referring to the one we --

5         A     Yes, the partial --

6         Q     Let me finish my question.

7         A     Okay.

8         Q     When you refer to the SICM manual, are you

9    referring to what Exhibit 3 is, at least in part?

10        A     Yes, sir.

11        Q     And that's all you looked at to prepare

12   yourself?

13        A     Yeah.  I didn't really look at anything

14   else, no.

15        Q     You said, I didn't really.

16        A     No.  I didn't look at anything else that I

17   can think of.

18        Q     Other than counsel, either in-house or

19   anyone from Mr. Hemmendinger's office, have you talked

20   to anybody about this lawsuit?

21        A     No.  Other than my boss.

22        Q     Ms. Pierce?

23        A     Ms. Pierce.

24        Q     What did you talk with her about?

25        A     I just provided her with the names of the

```
 1   people who were part of the class action.

 2       Q    Did she ask for them?

 3       A    Yes, she did.

 4       Q    Do you know why she asked for them?

 5       A    No, I do not.

 6       Q    That was the extent of your conversation

 7   with Ms. Pierce about the lawsuit?

 8       A    Yes, it was.

 9       Q    You haven't had any conversations outside of

10   counsel with anyone else?

11       A    No.  I talked to Michael College as our SIU

12   and operations manager.

13       Q    When did you talk with him?

14       A    A couple -- on a routine basis since the

15   suit began.

16       Q    Right, but I'm talking about specific

17   conversations you had about the lawsuit.

18       A    About the lawsuit?  No.

19       Q    Did you speak with him about the lawsuit?

20       A    Yeah.  He's familiar with it.  I made him

21   aware of the lawsuit.

22       Q    What do you recall from those discussions?

23       A    We've just been providing information to our

24   counsel.

25       Q    Have you talked with anyone else?
```

```
 1        A     No, not really.

 2        Q     What does not really mean?

 3        A     No, I have not.  I make a point of not

 4   talking about it.

 5        Q     Why is that?

 6        A     Because I don't know enough about the

 7   circumstances to adequately describe the issues and

 8   things, so basically it's better not to say anything.

 9        Q     Have you ever been asked by anyone

10   associated with the human resources department to

11   describe the duties and responsibilities of an

12   investigator?

13        A     Other than counsel?

14        Q     I'm not talking about lawyers.  I'm talking

15   about anyone from the human resources department.

16        A     No.

17        Q     And I'm not talking about since the lawsuit

18   started.  I'm talking about in the last 10 years, have

19   you ever --

20        A     For specific job titles, we assist them in

21   regards to the job responsibilities for the job, for

22   the particular jobs; but other than that, no.

23        Q     I just want to make sure I'm clear and that

24   you understand my question.  During your time as

25   director, have you ever been asked by human resources
```

1    to either describe in writing or to comment and

2    explain the day-to-day duties or responsibilities of

3    an investigator?

4         A    No, I have not.

5         Q    Are you aware of anyone from your -- from

6    SIU who's been asked to do that by --

7         A    Not to my knowledge, other than what I said

8    on the individual job codes, describing what those

9    responsibilities and duties are.

10        Q    On the individual job codes, did you say?

11        A    Yeah.  Job duties, yes.

12        Q    When did you do that?

13        A    We do that on a regular basis.  In my

14   tenure, it's occurred at least three or four times.

15   We reviewed the job responsibilities to ensure they

16   are current and appropriate.

17        Q    And how does that work?  What do you have to

18   do to get that done?

19        A    We take all of the different job codes, we

20   review them to see if they are still applicable, if

21   the job has changed in any manner, shape or form, and

22   we will provide that to HR.  In most cases, the

23   changes are minor, if any at all, except on new --

24   when we establish a new position.  And then,

25   obviously, for new positions, the job code -- the job

1    description is completely redone -- created.

2         Q    What's the difference, if any, between a

3    senior security investigator and a lead security

4    investigator?

5         A    A lead is a more experienced person.  He's a

6    higher grade, one grade higher than a senior

7    investigator.  He does primarily -- it would be large

8    groups.  He serves in lieu of the supervisor if the

9    supervisor is off, sort of a supervisor-in-training

10   type position.

11        Q    And when you say one grade higher, you're

12   talking about in terms of compensation?

13        A    That's correct.

14        Q    The more experienced the investigator, the

15   more likely they are a lead investigator?

16        A    That's correct.

17        Q    They still conduct investigations as their

18   primary duty?

19        A    Most of them do, yes.

20        Q    Are there lead investigators that don't

21   conduct investigations as their main duty?

22        A    I can't think of any.  They are given other

23   responsibilities, but they still investigate.  I would

24   still say that the primary part of their job is still

25   doing investigations; they are just more complex

1    investigations.

2            MR. MORGAN:  I don't have anything else for

3    you, sir.  Thanks for showing up today and answering

4    some of the questions that I did have.  Mr.

5    Hemmendinger might have questions.

6            MR. HEMMENDINGER:  Actually, if you don't

7    mind sticking around for a second, I need to clarify

8    with the witness and I may have something to put on

9    the record.  I'm not sure.  Just bear with me for five

10   minutes.

11           MR. MORGAN:  We'll go off the record.

12           (Off the record.)

13           MR. HEMMENDINGER:  We're not going to do

14   anything.  I'm not going to ask any questions, so

15   we're done.

16           We better do reading and signing.

17           THE REPORTER:  Can I get your orders?

18           MR. HEMMENDINGER:  Full, mini, and E-tran.

19           (Signature having not been waived, the

20   deposition of STEVEN F. RUTZEBECK was concluded at

21   12:12 p.m.)

22

23

24

25

1                 ACKNOWLEDGEMENT OF DEPONENT

2            I, STEVEN F. RUTZEBECK, do hereby

3    acknowledge I have read and examined the foregoing

4    pages of testimony, and the same is a true, correct,

5    and complete transcription of the testimony given by

6    me, and any changes and/or corrections, if any, appear

7    in the attached errata sheet signed by me.

8

9

10   _____          _____

11   Date                    STEVEN F. RUTZEBECK

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      CERTIFICATE OF SHORTHAND REPORTER-NOTARY PUBLIC

2            I, Linda H. Cole, the officer before whom

3   the foregoing deposition was taken, do hereby certify

4   that the foregoing transcript is a true and correct

5   record of the testimony given; that said testimony was

6   taken by me stenographically and thereafter reduced to

7   typewriting under my supervision; and that I am

8   neither counsel for, related to, nor employed by any

9   of the parties to this case and have no interest,

10  financial or otherwise, in its outcome.

11           IN WITNESS WHEREOF, I have hereunto set my

12  hand and affixed my notarial seal this 24th day of

13  November, 2010.

14                      My commission expires July 19, 2014

15

16

17

18            _____

19                      NOTARY PUBLIC IN AND FOR

20                        STATE OF MARYLAND

21

22

23

24

25

STEVEN F. RUTZEBECK 11/19/2010

Page 120

```
1                      ERRATA SHEET

2   IN RE:    CALDERON V. GEICO GENERAL INSURANCE COMPANY,

3            ET AL.

4   RETURNED BY:  STEVEN F. RUTZEBECK

5   Page No.  Line No.       Correction and Reason

6   _____   _____    _____

7   _____   _____    _____

8   _____   _____    _____

9   _____   _____    _____

10  _____   _____    _____

11  _____   _____    _____

12  _____   _____    _____

13  _____   _____    _____

14  _____   _____    _____

15  _____   _____    _____

16  _____   _____    _____

17  _____   _____    _____

18  _____   _____    _____

19  _____   _____    _____

20  _____   _____    _____

21  _____   _____    _____

22  _____   _____    _____

23  _____   _____    _____

24  _____    _____

25  Date              Signature
```

```
 1                  ERRATA SHEET cont'd

 2    IN RE:    CALDERON V. GEICO GENERAL INSURANCE COMPANY,

 3              ET AL.

 4    RETURNED BY:   STEVEN F. RUTZEBECK

 5    Page No.  Line No.      Correction and Reason

 6    _____  _____    _____

 7    _____  _____    _____

 8    _____  _____    _____

 9    _____  _____    _____

10    _____  _____    _____

11    _____  _____    _____

12    _____  _____    _____

13    _____  _____    _____

14    _____  _____    _____

15    _____  _____    _____

16    _____  _____    _____

17    _____  _____    _____

18    _____  _____    _____

19    _____  _____    _____

20    _____  _____    _____

21    _____  _____    _____

22    _____  _____    _____

23    _____  _____    _____

24    _____    _____

25    Date              Signature
```

1                  ACKNOWLEDGEMENT OF DEPONENT

2            I, STEVEN F. RUTZEBECK, do hereby

3    acknowledge I have read and examined the foregoing

4    pages of testimony, and the same is a true, correct,

5    and complete transcription of the testimony given by

6    me, and any changes and/or corrections, if any, appear

7    in the attached errata sheet signed by me.

8

9

10   _12/20/10_                    _Steven F. Rutzebeck_

11   Date                         STEVEN F. RUTZEBECK

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                      ERRATA SHEET

 2   IN RE:    CALDERON V. GEICO GENERAL INSURANCE COMPANY,

 3             ET AL.

 4   RETURNED BY:   STEVEN F. RUTZEBECK

 5   Page No.  Line No.        Correction and Reason

 6    17         7          MYERS ( SPELLING )

 7    17        19          WATIERS ( SPELLING )

 8    32         3          KROHN ( SPELLING )

 9    _____   _____     _____

10    _____   _____     _____

11    _____   _____     _____

12    _____   _____     _____

13    _____   _____     _____

14    _____   _____     _____

15    _____   _____     _____

16    _____   _____     _____

17    _____   _____     _____

18    _____   _____     _____

19    _____   _____     _____

20    _____   _____     _____

21    _____   _____     _____

22    _____   _____     _____

23    _____   _____     _____

24    _____   _____     _____

25   Date                   Signature

     12/20/10               Steven F. Rutzebeck
```