IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

SAMUEL CALDERON,                    *
Individually and on behalf of other  *
Similarly situated individuals,      *
                                     *
            Plaintiffs,              *
                                     *
    v.                              *        Civil Action No. 2010-cv-01958RWT
                                     *
GOVERNMENT EMPLOYEES                 *
INSURANCE COMPANY                    *
& GEICO GENERAL                      *
INSURANCE COMPANY,                   *
                                     *
            Defendants               *
                                     *
_____/

**MEMORANDUM IN SUPPORT OF
DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL
SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT**

July 16, 2012

Bruce S. Harrison, Esq., Bar No. 00887
Eric Hemmendinger, Bar No. 02050
SHAWE & ROSENTHAL, LLP
20 S. Charles St., 11th Floor
Baltimore, MD 21201
Telephone:  (410) 752-1040
Facsimile:  (410) 752-8861
bsh@shawe.com
eh@shawe.com

*Attorneys for Defendant*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ iv

INTRODUCTION…. ....................................................................................................... 1

STATEMENT OF UNDISPUTED FACTS ........................................................................ 1

    The purpose of the SIU unit .................................................................................... 1

    The duties of the SIU investigators .......................................................................... 2

    Background of investigators ..................................................................................... 2

    Home offices… ....................................................................................................... 2

    Receiving referrals ................................................................................................... 3

    Planning the investigation ....................................................................................... 3

    Gathering evidence .................................................................................................. 4

    Interviews…… ......................................................................................................... 5

    EUOs………… ........................................................................................................ 7

    Reporting result of EUOs ......................................................................................... 9

    Other investigation choices .................................................................................... 10

    Generating withdrawals ......................................................................................... 12

    Pending reports ...................................................................................................... 13

    Closing reports are supposed to contain findings .................................................. 13

    Findings concerning fraud ...................................................................................... 15

    Claiming impact ..................................................................................................... 16

    Reviewing the closing report .................................................................................. 16

    Transmitting the closing report to the adjuster ....................................................... 17

    NICB and law enforcement referrals ...................................................................... 18

Underwriting referrals................................................................................ 20

Manuals, policies, and procedures ........................................................... 21

Training…….…......................................................................................... 21

Supervision……… .................................................................................. 22

Audits…………….................................................................................... 23

100 file example ....................................................................................... 23

Sample week…. ........................................................................................ 28

ARGUMENT ……………........................................................................... 28

I.      THE REGULATION ..................................................................... 28

II.     STANDARD OF PROOF.............................................................. 29

III.    THE INVESTIGATORS PERFORM ADMINISTRATIVE WORK ........... 30

        A.      The regulatory test .......................................................... 30

        B.      The investigators support the claims function ................... 32

        C.      Precedent supports GEICO's position ............................... 33

        D.      The authorities cited by Plaintiffs are distinguishable and/or
                unpersuasive.................................................................... 34

                (1) The "first responder" provision ................................... 34

                (2) Public sector opinion letters and decisions ................. 36

                (3) Private sector court decisions..................................... 36

IV.     THE INVESTIGATORS EXERCISE DISCRETION AND
        INDEPENDENT JUDGMENT AS TO MATTERS OF SIGNIFICANCE .. 37

        A.      The regulatory definition of discretion and independent
                judgment ......................................................................... 37

        B.      The investigators exercise discretion and independent judgment...... 38

C.      The investigators exercise their discretion and independent
        judgment with respect to matters of significance .............................. 42

D.      Investigating fraudulent insurance claims is not a skill, as that
        term is used by the DOL .................................................................... 43

E.      The investigators are not closely supervised .................................... 43

F.      The court decisions cited by Plaintiffs concerning discretion and
        independent judgment are distinguishable and unpersuasive ............ 44

G.      The DOL Opinion Letter concerning background investigators
        is distinguishable and unpersuasive .................................................. 46

CONCLUSION…………...................................................................................................... 48

# TABLE OF AUTHORITIES

| CASE(S) | PAGE(S) |
|---|---|

*Adams v. United States,*
26 Cl. Ct. 782 (1992) ..........................................................................................36

*Adams v. United States,*
78 Fed. Cl. 536 (2007) ........................................................................................36

*Ahearn v. New York,*
807 F. Supp. 919 (N.D.N.Y. 1992) .....................................................................36

*Ahle v. Veracity Research,*
738 F. Supp.2d 896, 902 (D. Minn. 2010) ...........................................33, 44, 45, 46

*Arnold v. Ben Kanowsky, Inc.,*
361 U.S. 388, 392 (1960) .....................................................................................29

*Auer v. Robbins,*
519 U.S. 452, 462-63 (1977) ........................................................................29, 44, 45

*Benshoff v. City of Virginia Beach,*
180 F.3d 136 (4th Cir. 1999). ...............................................................................45

*Blinston v. Hartford Accident and Indemnity Co.,*
441 F.2d 1365 (8th Cir. 1971) ..............................................................................31

*Cheatham v. Allstate Ins. Co.,*
465 F.3d 578 (5th Cir. 2006) ........................................................................31, 33, 39

*Christensen v. Harris County,*
529 U.S. 576 (2000) ..............................................................................................45

*Christopher v. SmithKline Beecham,*
2012 WL 2196779 (June 18, 2012) ......................................................................45

*Clark v. J.M. Benson,*
789 F.2d 282 (4th Cir. 1986) ................................................................................47

*Counts v. South Carolina Electric and Gas Co.,*
317 F.3d 453, 457 (4th Cir. 2003) ........................................................................37

*Davis v. J.P. Morgan Chase & Co.,*
587 F.3d 529, 535 (2d Cir. 2009) .........................................................................31

*Desmond v. PNGI Charles Town Gaming*,
564 F.3d 688 (4th Cir. 2009) ............................................................29, 31

*Dymond v. United States Postal Service*,
670 F.2d 93 (8th Cir. 1982) ..............................................................41

In re *Farmers Ins. Exchange*,
481 F.3d 1119 (9th Cir. 2007) ..................................................31, 33, 39

*Fenton v. Farmers Ins. Exch.*,
663 F. Supp.2d 718 (D. Minn. 2009)..................................33, 44, 45, 46

*Fleming v. Carpenters/Contractors Cooperation Committee*,
834 F. Supp. 323 (S.D. Cal. 1993)....................................................36

*Foster v. Nationwide Mutual Ins. Co.*,
695 F. Supp.2d 748, 758 (S.D. Ohio. 2010),
2012 WL 407442 (Jan. 5, 2012) ................................32, 33, 35, 40, 41, 44, 45, 48

*Gusdonovich v. Business Information Company*,
705 F. Supp. 262 (W.D. Pa. 1987)....................................................36 , 44

*Harris v. District of Columbia*,
741 F. Supp. 254 (D.D.C. 1990)........................................................36, 48

*Haywood v. North American Van Lines*,
121 F.3d 1066, 1072 (7th Cir. 1997) ................................................43

*Holsey v. Armour & Co.*,
743 F.2d 199 (4th Cir. 1984) ............................................................45

*Hoyt v. General Ins. Co. of America*,
249 F.2d 589 (9th Cir. 1957) ............................................................35

*Icicle Seafoods Inc. v. Worthington*,
475 U.S. 709, 714 (1986)..................................................................29

*Jastremski v. Safeco Insurance Cos.*,
243 F. Supp.2d 743, 756 (N.D. Ohio 2003)("..................................39

*McAllister v. Transamerica Occidental Life Ins. Co.*,
325 F.3d 997, 1001 (8th Cir. 2003) ..................................31, 39, 43

*Marting v. Crawford & Company*,
2006 WL 681060 (N.D. Ill. 2006) ....................................................33, 39

*Microsoft v. I4I Limited Partnership,*
131 S. Ct. 2238, 2253 (2011).................................................................29

*Mullins v. City of New York,*
653 F.3d 104 (2d Cir. 2011)..................................................................35

*Mullins v. Target Corp,*
2011 WL 1399262 (N.D. Ill. 2011.........................................33, 35, 40, 41

*Munizza v. State Farm Mut. Auto Ins. Co.,*
103 F.3d 139 (table), 1996 WL 711563 (9th Cir. 1996).............................31

*Purdom v. Fairfax County School Bd.,*
637 F.3d 421, 432 (4th Cir. 2011) ........................................................45

*Reich v. American Int'l Adjustment Co.,*
902 F. Supp. 321, 325 (D. Conn. 1994).................................................36

*Reich v. John Alden Life Insurance Co.,*
126 F.3d 1, 13 (1st Cir. 1997)...............................................................47

*Robinson-Smith v. GEICO,*
590 F.3d 886, 894 (D.C. Cir. 2010)....................30, 31, 33, 37, 39, 46, 47

*Robinson-Smith v. GEICO,*
323 F. Supp. 2d 12, 26 (D.D.C. 2004) ..................................................46

*Roe-Midgett v. CC Services, Inc.,*
512 F.3d 865 (7th Cir. 2008) .....................................................31, 33, 39

*Roney v. United States,*
790 F. Supp. 23 (D.D.C. 1992)............................................................36

*Schaefer-LaRose v. Eli Lilly &Company,*
2012 WL 1592552 (7th Cir. 2012) .......................................................47

*Shockley v. City of Newport News,*
997 F.2d 18 (4th Cir. 1993) ..........................................................35, 40

*Stevens v. Tillman,*
855 F.2d 394, 398 (7th Cir. 1988) ........................................................45

*Stout v. Smolar,*
2007 WL 2765519 (N.D. Ga. 2007) ...............................................33, 45

*Withrow v. Sedgwick Claims Mgmt. Svc.*,
2012 WL 242773 (S.D. W.Va. 2012) ................................................................39, 42

*Yi v. Sterling Collision Center*,
480 F.3d 505 (7th Cir. 2007 .................................................................................29

## **REGULATIONS**

29 C.F.R. § 541.2 ...................................................................................................31
29 C.F.R. § 541.200 ...............................................................................................29
29 C.F.R. § 541.200(a)(1) .......................................................................................28
29 C.F.R. § 541.200(a)(2) .......................................................................................36
29 C.F.R. § 541.200(a)(3) .......................................................................................37
29 C.F.R. § 541.201(a) ...........................................................................................30
29 C.F.R. § 541.201(b) ...........................................................................................31
29 C.F.R. § 541.202(a) .......................................................................................37, 47
29 C.F.R. § 541.202(b) ...........................................................................................37
29 C.F.R. § 541.202(c) ...................................................................................37, 43, 44
29 C.F.R. § 541.202(e) .......................................................................................38, 43
29 C.F.R. § 541.202(f) ...........................................................................................42
29 C.F.R. § 541.203(a) ...........................................................................................38
29 C.F.R. § 541.203(b) ...........................................................................................31
29 C.F.R. § 541.203(j) ...........................................................................................43
29 C.F.R. § 541.205(c)(2)(2003) .............................................................................35
29 C.F.R. § 541.3(b) ...............................................................................................35
29 C.F.R. § 541.3(b)(1) ......................................................................................34, 35
29 C.F.R. § 541.3(b)(3) ...........................................................................................34

69 Fed. Reg. 22125-6 .............................................................................................30
69 Fed. Reg. 22128-30 ...........................................................................................34
60 Fed. Reg. 22129 ................................................................................................35
69 Fed. Reg. 22138 ................................................................................................32
69 Fed. Reg. 22143 ................................................................................................30
69 Fed. Reg. 22172 ................................................................................................28

12 N.Y.C.C.R.R. § 142-2.2 .....................................................................................29

## **OPINION LETTERS**

Opinion Letter, 1997 WL 971811 ........................................................................36, 48
Opinion Letter, 1998 WL 852783 .............................................................................36
Opinion Letter, 1998 WL 852752 ........................................................................36, 48
Opinion Letter FLSA 2005-21, 2005 WL 3308592 ..............................................36, 46, 47
Opinion Letter FLSA 2006-30, 2006 WL 2792444 ...................................31, 34, 40, 41, 48

## INTRODUCTION

The Department of Labor regulation defining the administrative exemption from overtime provides that investigating insurance claims is exempt work when performed by adjusters.  When that work is assigned to Special Investigations Unit (SIU) investigators, many of whom are former adjusters, it does not change in nature, require less discretion and independent judgment, or concern less significant matters.  Indeed, undisputed evidence shows that GEICO's SIU investigators use discretion and independent judgment in, among other things, planning investigations, questioning witnesses in interviews or examinations under oath, inspecting clinics and property damage, reporting findings that claims are or are not fraudulent, generating withdrawals of claims and referring claims to law enforcement and GEICO's underwriting department.  For these reasons, they qualify for the administrative exemption as matter of law.

## STATEMENT OF UNDISPUTED FACTS

### The purpose of the SIU unit

GEICO is in the business of selling insurance policies to customers.  PX 26 Calderon 53.[1]  When GEICO receives a claim, it is assigned to an adjuster for handling. PX 1.  Fraud is a major problem in the insurance industry.  If a claim is suspected of being fraudulent, it is assigned to GEICO's Special Investigations Unit (SIU) to resolve the indicia of fraud.  GEICO's regional SIU units are part of the Claims Department.  The SIU unit is an important part of GEICO's claims function.  DX 1 Rutzebeck Aff. § 2.

---

[1] The reference is to Plaintiffs' Exhibit 26, Calderon's deposition, at 53.

**The duties of the SIU investigators**

An SIU investigator investigates suspicious claims, reports his findings to the adjuster and makes law enforcement and underwriting referrals if warranted.  In some investigations, investigators obtain withdrawals from claimants.  An investigator handles approximately 165 investigations per year on the average.  DX 1 Rutzebeck Aff. § 3.

Investigators attend meetings with law enforcement agencies and other insurance companies to exchange intelligence concerning organized fraud rings.  PX 26 Calderon 56-57.  They also receive intelligence reports from the National Insurance Crime Bureau (NICB).  PX 26 Calderon 60.  They meet with auto damage and liability adjusters to make them aware of different types of fraud they are seeing in their investigations and to suggest preventive methods.  PX 29 Fitzgerald 29-31.[2]

**Background of investigators**

About half of the investigators are former law enforcement officers.  The balance are former GEICO adjusters.  DX 1 Rutzebeck Aff. § 4.

It is not correct to say that Plaintiffs occupy the lowest rung within the SIU Department.  ECF No. 80-1 at 6.  There are lower rated non-exempt positions, such as clerical workers, in the department.  Moreover, many of the investigators worked in lower rated claims positions before becoming investigators.  DX 1 Rutzebeck Aff. § 5.

**Home offices**

Investigators typically work out of their homes.  PX 26 Calderon 36, PX 29 Fitzgerald 23. They work irregular hours, depending on when they can locate and talk to witnesses.  PX 29 Fitzgerald 31-32.  There is no typical workday.  PX 26 Calderon 38.

---

[2] Calderon is the lead plaintiff.  Fitzgerald is the named plaintiff for the New York class.

**Receiving referrals**

The investigators receive referrals electronically.  PX 26 Calderon 65, PX 29 Fitzgerald 33.

Investigators can initiate an investigation through a "self-referral."  DX 1 Rutzebeck Aff. § 6.  For example, Calderon informed his supervisor about a lead he received from another insurance company.  PX 26 Calderon 110-113.  His supervisor said whether to work the case was "your call."  PX 26 Calderon 113-114.  Calderon sent an email to the assignment coordinator stating, "I think this would be a good case to work proactively can you assign this to me."  PX 26 Calderon 111.

Plaintiffs' contention that the "investigators' discretion and independent judgment is so limited, in fact, that Defendant does not even allow them to reject a referral that they believe was mistakenly flagged" is unsupported by the record.  ECF No. 80-1 at 8.  The testimony cited for that proposition was that if an investigator wished to reject a referral, he would usually give the reason to his supervisor.  PX 31 Marine 18.

**Planning the investigation**

After receiving a referral, the investigator formulates a plan, depending on the nature of the suspected fraud.  PX 26 Calderon 70, PX 29 Fitzgerald 57-58.  The investigator records the plan in a computer system used exclusively by the SIU unit, called SICM.  PX 29 Fitzgerald 58.

Forms of insurance fraud are many and varied.  They include staged accidents, excessive medical treatment, excessive billing for medical treatment, billing for medical treatment not provided, arson, false reports of theft, falsely reporting the cause of an accident, falsely reporting the date of an accident, body shop's enhancing damage or

overbilling, false claims of injury, false claims of lost wages, false claims for paying household help and falsely reporting property damage.  PX 26 Calderon 61, 85, 92-94, 160-161, 195; PX 29 Fitzgerald 46; DX 1 Rutzebeck Aff. § 7.  Organized fraud rings are often involved in staged accidents and fraudulent medical billing.  DX 1 Rutzebeck Aff. § 7.

    As an investigation progresses, the investigator is free to adjust the investigation plan.  PX 26 Calderon 68, PX 29 Fitzgerald 128-129.  He can expand the scope of the investigation to follow up leads.  PX 26 Calderon 68, PX 29 Fitzgerald 129-130.  "If I interview a person and they tell me that this other person's involved who is not part of the plan of action, I may go and follow-up with that person and so on."  PX 26 Calderon 68.  Fitzgerald made similar adjustments to his investigation plans.

> If there was maybe an accident, four people in the car, and only three are claiming injuries, I would want to find out why the fourth wasn't, or where the fourth person was seated in the vehicle.  Even though the examiner didn't ask me to find out, I want to find out why they are not claiming injuries, of if they can shed some light on what happened at the time of the loss.

PX 29 Fitzgerald 129.

    **Gathering evidence**

    Gathering evidence includes review of the claim history, background checks, telephone interviews, face-to-face interviews, examinations under oath (EUOs), clinic visits, medical file reviews, inspecting vehicles, conferring with auto damage adjusters, taking photographs and conferring with law enforcement officers.  PX 26 Calderon 39-41, 75, 84, 105, 211, PX 29 Fitzgerald 30-31, 36, 48-49, 70-71, 109, 149, 152-153.

**Interviews**

A central part of investigations is interviewing policyholders, claimants and other witnesses.  The investigator locates the individuals and if possible interviews them in person.  PX 26 Calderon 40-41, PX 29 Fitzgerald 149.

An interview of a policyholder or other claimant suspected of fraud requires tactical decisions by the investigator.  PX 26 Calderon 157.  "There are a lot of ways of proving fraud."  PX 26 Calderon 02-93.  For example, Calderon believed "in your face and quick interviewing" promotes success.  PX 26 Calderon 105.

> I think the success comes from as soon as you get the referral, to run out there and get the interviews in as quickly as you can.  It's still fresh in their head, they haven't had an opportunity to discuss any of the fraud that they've committed with organizers, you know, you're catching them off guard and they're going to say stuff that's going to be inconsistent.

PX 26 Calderon 105-106.

If there were multiple witnesses to an accident, Calderon would attempt to identify the "weak link" and interview that person first.  PX 26 Calderon 158-159. Fitzgerald chose to interview the passengers first.  PX 29 Fitzgerald 81, 134.  He would then use the information obtained from them when he interviewed the driver.  PX 29 Fitzgerald 135.  The investigator must decide when and where to approach each person to be interviewed.  PX 26 Calderon 40-41.

GEICO has issued lists of suggested interview questions for certain types of suspected fraud "but sometimes you get cases where you really can't have a format."  PX 29 Fitzgerald 62-63.  As Calderon testified, "Every interview is different."  PX 26 Calderon 47-48.  Likewise, Fitzgerald observed, "Each case is kind of individual."  PX

29 Fitzgerald 63.  And, "Everyone's got different investigative skills."  PX 26 Calderon
105.

The investigator's demeanor is important and changes based on who he is
interviewing.  PX 29 Fitzgerald 137-138.  For example, the investigator must decide
whether to appear friendly or stern.  PX 29 Fitzgerald 138.  "I might come across as Mr.
Nice Guy, or maybe there is a time you do an interview you can't be too nice asking
questions.  You know, be up front, lay the cards out on the table."  PX 29 Fitzgerald 138.

The investigator must decide whether to ask open ended or leading questions and
whether or not to disclose what he has learned already.  PX 29 Fitzgerald 135.  Fitzgerald
used both open-ended and leading questions depending on the witnesses' "demeanor,
how they come across when I first meet them.  If they get their back up, become
aggressive, or if they are very forthcoming."  PX 29 Fitzgerald 136.

The investigator formulates follow-up questions based on the answers to initial
inquiries.  PX 26 Calderon 35, PX 29 Fitzgerald 76.  The follow-up questions probe
inconsistencies in the earlier answers.  PX 26 Calderon 77.  The investigator must choose
whether to ask follow-up questions immediately after the inconsistent answer, or save
them until the end of the questioning.  PX 26 Calderon 79.

The investigator observes body language to see if the witness is being deceptive.
PX 26 Calderon 106, 154, PX 29 Fitzgerald 78.   Fitzgerald testified,

> Usually I like to face them head on.  A lot of times they want to sit on the
> side.  They won't face you when they are answering, they mumble their
> answers.  They are not sure of what their response is.  Sometimes it will
> raise up, you know suspicions as far as the claim, and I might have to dig a
> little further into their version of events.

PX 29 Fitzgerald 78.  Calderon testified,

> You watch their eyes, if their eyes go in one direction as opposed to another direction, I'm not going to reveal all of the investigative techniques, but it's typical of a person that's being deceptive, including their fidgeting, their moving back and forth in their seat, their complaining that its warm in here when it's cold, all these things tend to heighten your awareness that they're being deceptive.

PX 26 Calderon 106-107.

PX 26 Calderon's approach to evasive witnesses was "I let them bury themselves."  PX 26 Calderon 49.  After they were locked in, "I may show them my cards, so to speak and say, hey, this is what I have here, are you sure you want to stay with this story."  PX 26 Calderon 49.  Fitzgerald likewise "like[d] to get them in the hole first… [b]ecause they are locking themselves into a story, and it's going to be hard for them to change, come out of that hole."  PX 29 Fitzgerald 136.

The investigator can choose to re-interview a witness after further investigation. PX 26 Calderon 82, PX 29 Fitzgerald 136.

**EUOs**

If a policyholder (or vehicle occupant covered by the policyholder's policy) does not consent to an interview, the investigator submits a request for an examination under oath ("EUO").  PX 26 Calderon 164-165, PX 29 Fitzgerald 109. The investigator determines the appropriate time in the investigation to request the EUO.  PX 26 Calderon 164, PX 29 Fitzgerald 109.  Starting in 2008, GEICO has permitted investigators to take EUOs without a GEICO attorney present.  DX 1 Rutzebeck Aff. § 8.  Since 2010, an investigator can order an EUO without needing to obtain approval.  PX 29 Fitzgerald 108.

An investigator taking an EUO must make the same kind of tactical decisions that he would make in an interview.  DX 1 Rutzebeck Aff. § 9.  Calderon described the mental effort involved in his self-evaluation for 2009:

> This past year I have had a total of 90 scheduled EUO(S).  Although most do not show up, the ones that do show engage the investigator in a detailed question and answer session that takes a mental toll on the investigator all the while maintaining a professional demeanor and achieving 25 total denials.  DX 8 Calderon Dep. Ex. 5.

Taking an EOU also requires that the investigator maintain a professional demeanor, even when dealing with people who are agitated, confrontational and insulting.  PX 26 Calderon 103, PX 29 Fitzgerald 138.  The investigator cannot be so aggressive as to risk a bad faith claim against GEICO.  PX 26 Calderon 103.

Even when a GEICO attorney performs the EUO, the investigator is still involved in formulating the line of questioning of the witness.  PX 26 Calderon 74.

> I'd listen to the answers and if it didn't make any sense from the facts that I'd uncovered, I would relay that to the attorney or I would write myself a note and ask that question for clarification.  It didn't necessarily mean that I thought they were lying, but there was an answer that needed to be clarified.

PX 26 Calderon 74-75.

The record does not support Plaintiffs' argument that investigators "primarily" ask questions from scripts prepared by GEICO.  ECF No. 80-1 at 11.  Fitzgerald testified that he had formats or guidelines but formulated follow up questions based on the response to his format questions.  PX 29 Fitzgerald 111-113.  Calderon testified, "I would stay with the script and add my follow up questions if they were warranted."  PX 26 Calderon 76.  A memorandum containing lists of questions for certain types of investigations identifies them as "suggested guidelines."  PX 7 at GEICO.433.

The follow-up questions are at least as important as the initial inquiries.  Asked about investigating excessive treatment or causing an accident, Fitzgerald testified, "I would have to see what their responses were to the question I'm going to give them.  So you really couldn't have a format for something like that.  You don't know what they are going to come up with, what they are going to say."  PX 29 Fitzgerald 64.  Calderon described a three hour EUO in which "They kept offering these answers that demanded follow-up questions that were inconsistent and each follow-up question demanded another follow-up question, because every answer that I was getting was more vague than the previous one."  PX 26 Calderon 48.

**Reporting results of EUOs**

The investigators call the adjusters after EUOs.  PX 29 Fitzgerald 141.  Fitzgerald described a typical post-EUO conversation with an adjuster as follows:

> Q.     And you talk to the examiner.  Do you tell the examiner, "Well I took the EUO, I found the person to be believable in the EUO"?
>
> A.     Correct.  They will ask me, you know, "What do you think, how did they come across?"
>
> Q.     And you will say, "They seemed like they were telling the truth to me"?
>
> A.     Yes.  Partial truth.
>
> Q.     Partial truth or --
>
> A.     Complete liar.

PX 29 Fitzgerald 142.

Calderon and Fitzgerald assumed that the adjusters later received copies of the transcripts but admitted they did not know whether GEICO orders the transcript.  PX 26

Calderon 102, 136, PX 29 Fitzgerald 141.  In fact, most of the time, GEICO does not order a transcript of the EUO.  DX 1 Rutzebeck Aff. § 10.

After EUOs, investigators make notes in a section of SICM reserved for that purpose.  DX 1 Rutzebeck Aff. § 11.  A presentation, viewed by some investigators, instructs them to include only facts in their SICM notes concerning the EUO and to exclude recommendations and conclusions.  PX 6 at GEICO.430.  The section of SICM containing these notes is not accessible to adjusters.  DX 1 Rutzebeck Aff. § 11.

In addition to their oral reports, investigators describe the results of EUOs in their written reports to adjusters.  PX 26 Calderon 102, PX 29 Fitzgerald 141.  As examples, Calderon's reports contain the following statements.

> I conducted the EUO and found _____less than candid in his responses and had to keep reminding him that I was only interested in the truth.  It was quite evident that _____was unable to provide a more reasonable reason for his injuries.  DX 11 Case No. 676740.

> _____was asked numerous questions about this accident and was not able to answer satisfactorily.  She appeared to delay the answering of questions by repeating the questions.  She clearly did not need an interpreter and appeared to be hiding something.  DX 11 Case No. 646462.

> Fitzgerald's reports contain the following statements.

> This case was referred to the Special Investigations Unit to conduct an Examination Under Oath (EUO) of claimant_____.   Investigation revealed that I did not find the claimant to be credible and he appeared to be receiving excessive treatment if in fact he is receiving it at all.  DX 12 Case No. 629281

> Investigation revealed that fraud indicators were found during this investigation. The insured and the last driver of the vehicle were found NOT credible during the EUO's that were conducted by me.  DX 12 Case No. 621751

**Other investigation choices**

As part of the investigation, the investigator may choose to inspect the damaged vehicle or vehicles.  PX 26 Calderon 211, PX 29 Fitzgerald 152-153.  The investigator may choose to look at photographs of the vehicle taken by the auto damage adjuster or take his own photographs.  PX 29 Fitzgerald 36, 153.  The investigator may also choose to recommend a forensic examination of the vehicle by an expert.  PX 26 Calderon 213-214.

If surveillance has been conducted on an individual, the investigator reviews the surveillance and reports to the adjuster whether the claimant's activities are consistent with his claimed injury.  PX 26 Calderon 89.

In states where GEICO's insurance policies require it to pay for its policyholders' medical treatments, GEICO has the right to inspect the clinic's treatment records.  PX 26 Calderon 84.  For example, "a clinic billing for ten modalities a day, five days a week, and interviewing the insured he says he's gotten one modality once a week, that's suspicious."  PX 26 Calderon 62.  While at the clinic, the investigator attempts to detect other evidence that the clinic is engaged in fraudulent billing, for example, whether it has the equipment to provide the service for which it is billing.  PX 26 Calderon 85, PX 29 Fitzgerald 149.  Fitzgerald chose to conduct clinic surveillance to see if the time patients spent at clinics was consistent with their treatment records.  PX 29 Fitzgerald 150.  In addition, the investigator judges whether a clinic should be reported to the National Insurance Crime Bureau (NICB).  PX 26 Calderon 61-62.  In Florida, some clinics are owned by organized crime and the investigation may involve identifying who controls the clinic's operations.  DX 1 Rutzebeck Aff. § 12.

11

**Generating withdrawals**

In some cases, the investigator is able to generate a withdrawal of the claim during the interview or EUO.  PX 26 Calderon 50, 72  "I keep a folder of claims withdrawal forms in my vehicle and if I'm investigating a case where the person I'm interviewing has provided inconsistent facts, then I would present them with the claims withdrawal form at the completion of their interview."  PX 26 Calderon 133.  Fitzgerald likewise kept claims withdrawal forms with him.  PX 29 Fitzgerald 154.

Calderon's reports describe how he generated withdrawals.

Upon completion of the EUO'S I presented each of them with the facts as uncovered in the investigation.  At first they tried to appear as being outraged that I did not believe their story and left the building.  They returned ten minutes later and asked how they could make this claim go away.  I explained to them that they could withdraw their claim but in light of their outrage I was not inclined to accept their withdrawal.  They both sat down and began to try and explain how they were coerced into participating in this staged loss.  They refused to go on the record or have their statements recorded.  Upon explaining to them that they would be responsible for all damages and claims under this claim number if they withdrew their claim, they each decided to withdraw their claim.  I presented each of them with a blank Claims Withdrawal form which they signed in my presence before leaving.  They both understood that GEICO will no longer give any consideration to this claim.  They both understand that I must still make the appropriate referrals as required by law and can not promise them anything.  They both acknowledge their understanding.   DX 13 Case No. 644304.

After the first EUOs with_____, _____I asked them if I could speak candidly with them.  They agreed to speak with me off the record.  I explained to them that there were so many inconsistencies in their version of events about the alleged accident that the EUO of _____may not be necessary, but if they wished to go forward I would be happy to continue. _____then confessed that he was lured into participating in this accident and has been reluctant to continue with this deception from the beginning but was scared for himself and his family.  He refused to go on tape but admitted to participation in the staging of this accident along with a person he described as affiliated with the clinic but who was not a direct employee.  He further stated that the clinic personnel were totally aware the accident was staged. I provided all three of them with Claims Withdrawal forms and explain that they would be responsible for all

12

charges by the clinic.  They all understood and agreed to sign citing that the clinic won't try to bill them since they all know the accident was staged.  DX 13 Case No. 659282.

I spoke with the attorney prior to the EUO and presented him with the evidence and some details of this claim.  I presented a claims withdrawal form to the attorney who stated he would recommend to his client that she withdraw her claim.  DX 13 Case No. 659832.

Calderon claimed credit for 13 withdrawals in 2009.  DX 8 Calderon Dep. Ex. 5.

**Pending reports**

During the investigation, the investigator prepares pending reports in SICM.  PX 26 Calderon 127.  The first report, due after 10 days, states the reason for referral, plan of action and the details of the investigation thus far.  *Id.*  Subsequent reports, recording additional results of investigation, are due every 20 days.  DX 1 Rutzebeck Aff. § 13.

Some investigators electronically submit pending reports for their supervisor to review.  Other investigators are granted "self-approval," meaning that their reports, including closing reports, are not reviewed by the supervisor.  PX 13.

**Closing reports are supposed to contain findings**

When the investigator believes the investigation is complete, he writes a closing report, adding, at the top, a summary of the results of the investigation.  PX 26 Calderon 67.  Before submitting the report, the investigator speaks with the adjuster and tells "him if I verified the facts of the loss, or the facts of the loss don't add up."  PX 29 Fitzgerald 90.

A presentation for investigators concerning report writing states that "fact is something that can be proven.  An opinion is a personal belief or judgment shared by many.  It is not something that can be used to prove certainty."  PX 5 at GEICO.576.  According to GEICO's former Operations and Training Manager (whose testimony was

13

cited by Plaintiffs in ECF No. 80-1 at 19), "They're asked to judge the person's credibility during the interview.  That could be expressed in a report.  That's an opinion." PX 27 College 87-88.  What GEICO seeks to prevent is unsubstantiated opinions, i.e., opinions "if they don't have something to base it on."  *Id.*

The SIU Administrative & Operations Manual states the report should be "non-accusatory" and "free of innuendos, opinions or rumors."  PX 4 at GEICO.00483. However, neither Calderon nor Fitzgerald were familiar with that manual.  PX 26 Calderon 215, PX 29 Fitzgerald 178.

The SICM Manual instructs investigators that an investigation shall include, "Writing a concise and complete summary of the investigation, including the investigators findings regarding the suspected insurance fraud and the basis for their findings."  PX 3 at GEICO 000588.  It provides models for writing a conclusion that a vehicle was intentionally burned, that a claim occurred as reported and should be settled on its merits, and that a clinic was illegally operated.  PX 3 at GEICO.000596, 609.

> The SIU Manager for New York (Fitzgerald's manager) testified,
>
> I want them to express to me what they found, not just the facts of what they found, but what is, you know, what their impression of the insured or the fraud that took place, what they believe actually took place.  Not just the facts that they found.

PX 28 Derenthal 62.

> The SIU Supervisor for the Tampa area (Calderon's supervisor) testified,
>
> Their main job is to investigate suspicious or fraudulent claims.  Their job is not just to gather information, but is to analyze it, interpret the data, use their investigative skills independently, fact-find this information, and report the facts and their judgments to the claims adjuster.

PX 30 Hodge 51.

14

**Findings concerning fraud**

In practice, investigators make findings concerning fraud or the lack thereof, which is equally important.  Thus, in his self-appraisal, Calderon wrote, "I've handled difficult to very difficult cases, detected the fraud and was able to prove the fraud."  PX 26 Calderon 99.  And Fitzgerald testified, the "only thing I can put down, I found fraud or I didn't find fraud."  PX 29 Fitzgerald 96.  Fitzgerald defined fraud as "when someone is trying to obtain a benefit which they are not legally entitled to."  PX 29 Fitzgerald 170.

Fitzgerald's reports confirm his testimony:

Investigation revealed that fraud was found in this investigation in that the supplies GEICO was billed for were not received by the claimant.  DX 14 Case No. 575554, Fitzgerald Dep. Ex. 2.

Investigation revealed that the insured was not truthful in this investigation and fraud indicators have been found.  DX 14 Case No. 582057, Fitzgerald Dep. Ex. 3

Investigation revealed that at this time no fraud indicators have been found and the insured appeared credible.  DX 14 Case No. 602033, Fitzgerald Dep. Ex. 4.

Investigation revealed there are fraud indicators present and this is a caused accident.  DX 14 Case No. 583655, Fitzgerald Dep. Ex. 5.

Calderon's reports also show that he communicated his conclusions to adjusters.

I contacted claims adjuster Frauenfeld and we discussed the claim.  After careful consideration we agreed that this claim does not meet the elements of being a fraudulent claim and that there was no further need for SIU involvement at this time.  DX 15 Case No. 674524.

_____'s description of his daily treatments do not appear to be normal flow of treatments.  His time frame is also excessive which does not appear to be reasonable.  DX 15 Case No. 663529

Each were asked to describe the events prior to and leading up to the accident.  Each provided different details of the accident and their interaction with the other

15

driver.  They were each asked numerous questions about how they found the clinic and the treatments they received.  Again their answers were inconsistent and evasive.  The alleged time they spend in treatments daily far exceeds what a normal person would do in the same situation.  DX 15 Case No. 647743.

I contacted Claims Adjuster Tummond and we discussed the case.  Tummond stated that the PIP benefits have been almost exhausted.  I explained that the description of the other vehicle prior to the accident did not seem right but the rest of the descriptions appeared to be somewhat consistent and no verifiable proof of fraud.  The two Daughters of_____appear to be too young to have intentionally put themselves in harms way but may have been coerced into treating at the clinic.  DX 15 Case No. 618336.

**Claiming impact**

The SIU Department takes credit for its successes in preventing losses due to fraud.  If the investigation has generated evidence sufficient to deny the claim, the investigators claim "impact" in the SICM system.  PX 28 Derenthal 50.  Impact is a measurement of how much money the investigation has saved the Company.  When they claim impact, the investigators enters into SICM a "disposition that most accurately reflects what they investigator believes will occur as a result of their investigative findings."  DX 3 GEICO.000076-77.  The possible dispositions include total denial, partial denial, withdrawal, and recovery.  *Id.*

**Reviewing the closing report**

The supervisors review the closing reports for investigators not on self-approval.[3] If they feel that a change needs to be made, they hit a button on the computer screen that allows them to return the report to the investigator with the supervisor's comment.  The comments almost always suggest changes in the format of the report or the data entries in SICM concerning the investigation.  Suggestions concerning the conduct of the

---

[3] Plaintiffs' brief calls these reviews "open-file audits" (ECF No. 81-1 at 3) but that terminology is not used at GEICO.  PX 30 Hodge 83.

investigation or the investigator's conclusions are rare.  DX 1, Rutzebeck Aff. § 14.

Calderon testified that only three or four percent of his reports were returned for

additional investigation.  PX 26 Calderon 67.

GEICO produced in discovery 157 closing reports submitted by Calderon during

the period July 2009 to June 2010.  DX 1 Rutzebeck Aff. § 16.  Consistent with

Calderon's testimony, only five were returned with a substantive suggestion.  DX 5

Calderon Dep. Ex. 21.

GEICO produced in discovery 138 closing reports submitted by Fitzgerald during

the period July 2009 to June 2010.  DX 1 Rutzebeck Aff. § 15.  Only three were returned

with a substantive suggestion, which was in all three instances to request an EOU.  DX 4

Fitzgerald Dep. Ex 7.

Once the report is complete, the investigator's supervisor may give it an overall

score, on a scale of 1-5, for purposes of evaluating the quality of the investigator's work.

The scoring procedure is not required.  DX 1 Rutzebeck Aff. § 17.

**Transmitting the closing report to the adjuster**

Once the completed report has been self-approved or approved by the supervisor,

it is electronically transmitted to the referring adjuster.  The adjuster does not have access

to SICM.  He sees only the report.  DX 1 Rutzebeck Aff. § 18.  The investigators speak

with the adjuster concerning the investigation.  PX 29 Fitzgerald 90, DX 28 Derenthal

58-59.

Typically, the adjusters do not look at the whole report, and rely on the oral report

and summary.  PX 28 Derenthal 60.  Thus, Calderon wrote that the adjusters do not "read

our detailed reports only the summaries."  DX 6 Calderon Dep. Ex. 9 at GEICO.000810.

Indeed, the reports are designed to allow the adjusters to rely on the investigator's summaries.   A memorandum on report writing states,

> The summary is designed to allow the reader an opportunity to quickly evaluate the investigator's findings without having to review the entire document.  Because of examiner case loads, time may not ordinarily allow for a thorough examination of the report.  As such, information in the summary should provide the reader with sufficient information on which to base a decision.  PX 8 at GEICO.615.

The adjusters' decision on a claim is "based on essentially what the investigator tells them."  PX 28 Derenthal 74.

**NICB and law enforcement referrals**

If the investigator concludes there is evidence of fraud, he refers the claim to the NICB using a website operated by the Insurance Services Organization.  PX 26 Calderon 87, PX 29 Fitzgerald 67.  On the screen, the investigator selects from a menu the reasons for the referral, such as "faked damage" or "faked/exaggerated injury."  PX 26 Calderon 168, DX 7 Calderon Dep. Ex. 20.  The screen contains a box to choose whether to make a law enforcement referral, in addition to an NICB referral.  PX 26 Calderon 169.  The investigator selects from a menu the type of evidence available to support the referral. PX 26 Calderon 169-170.  The investigator then types into a box or cuts and pastes from his report the reasons for the referral.  PX 26 Calderon 170.  Fitzgerald testified that in 80 percent of his referrals, he would receive a call from an NICB agent and would explain his findings to the agency.  PX 29 Fitzgerald 68.

In addition to making the computerized referrals, investigators decide whether to call law enforcement officials to discuss and develop particular investigations.  PX 26 Calderon 94-95, 116-117.  Fitzgerald referred fraudulent cases to law enforcement in person "probably eight to ten times a year."  PX 29 Fitzgerald 72.  "I would go over,

explain, lay out the facts of what my investigation had shown, and a lot of the times they would take a case on."  PX 29 Fitzgerald 70-71.

Although law enforcement referrals expose GEICO to potential claims for bad faith, GEICO does not require that NICB or law enforcement referrals, via the computer or in person, be approved by the investigators' supervisors.  GEICO instructs investigators to use the phrase "appropriate referrals were made" in their reports to prevent adjusters from inadvertently disclosing a law enforcement investigation to a claimant.   DX 1 Rutzebeck Aff. § 19

In 2009, Calderon made 77 NICB and law enforcement referrals.  DX 8, Calderon Dep. Ex. 53.  They include such statements as:

> _____described in apparently rehearsed detail the events leading to and including the accident.  DX 16 Calderon Dep. Ex. 26.

> _____appeared to almost dare us to prove the claim was not true while slightly smiling at us.  She reacted as if she was well experienced in the staging of accidents.  DX 16 Calderon Dep Ex. 27.

> EUOs for _____-_____were conducted and showed many inconsistencies between them.  It was quite evident that none of them were telling the truth.  DX 16 Calderon Ex. 28.

During the period July 2009 to June 2010, Fitzgerald made 44 NICB and 40 law enforcement referrals.   DX 1 Rutzebeck Aff. § 20.  They include such statements as:

> Fraudulent billing for medical supplies not received by claimant.  DX 17 GEICO.002431, Fitzgerald Dep. Ex. 11.

> Jump in claimant.  DX 17 GEICO.002414, Fitzgerald Dep Ex. 12.  (A jump-in is someone who gets in a vehicle after it has been in an accident.)

> Submitted fraudulent NF 2.  DX 17 GEICO.002417, Fitzgerald Dep. Ex. 12.  (A NF 2 is a claim under a no-fault policy.)

> Claimants receiving excessive treatment.  DX 17 GEICO.002418, Fitzgerald Dep. Ex. 12.

Fraudulent property damage claim.  DX 17 GEICO.002395, Fitzgerald Dep. Ex. 12.

**Underwriting referrals**

The investigator also notifies GEICO's underwriting department if the investigation reveals a problem with the policyholder.  PX 26 Calderon 87-88, PX 29 Fitzgerald 87.

Calderon made 70 underwriting referrals in 2009.  DX 8 Calderon Dep. Ex. 5.  His referrals included statements such as,

There would be no way her chest could hit the steering wheel.  Both appeared to be unresponsive with their answers and unable to remember simple facts.  DX 18 Case No. 673120.

_____appeared to be less than honest in her answers.  DX 18 Case No. 667234.

I conducted the EUO and found _____ less than candid in his responses and I had to keep reminding him that I was only interested in the truth.  DX 18 Case No. 676740 .

It appears that the policy was continued by _____ under false pretenses. DX 18 Case No. 658511.

There are discrepancies in the police report as this was a low impact/minor damages accident, night time loss, multiple passengers, all parties are treating at questionable clinics, aggressive treatments and all are represented by counsel.  DX 18 Case No. 664421.

In the period July 2009 to June 2010, Fitzgerald made 48 underwriting referrals. DX 9 Fitzgerald Dep. Ex. 8.  His referrals included statements such as,

Insured was found NOT credible during investigation.  EUO has been recommended. DX 19 Case No. 582057.

Insured submitted fraudulent claim and is part of a property damage ring with other false claims.  DX 19 Case No. 600068.

20

Insured did submit a FALSE claim to GEICO and after an interview has withdrawn the claim.  DX 19 Case No. 610497.

Rate beater.  DX 19 Case No. 615883.  (A rate beater misleads the insurer concerning the location of the vehicle to obtain a lower rate).

Claim by insured was found to contain fraud.  DX 19 Case No. 641524

Insured claims to have suffered an injury during an ERS call but per witness it never happened.  DX 19 Case No. 636529.  (ERS means emergency road service)

Possible enhanced damages to insured vehicle. DX 19  Case No. 678492.

**Manuals, policies, and procedures**

GEICO has issued manuals and standard operating procedures to its investigators. Many of the documents contain instructions on how to use SICM, a database program used solely by the SIU Department, and concerning the format for reports filed in SICM. The purposes of using a standardized format for reports are to allow the investigation reports to be searched, to ensure that the reports cover the required elements and to allow adjusters to locate quickly essential information.  SICM does not contain automated investigation software.  It is a filing system.  DX 1 Rutzebeck Aff. § 21.

There is no place in any of the documents where an investigator can look up what investigative steps should be taken given the facts of any particular claim, the order in witnesses should be interviewed, how to formulate follow up questions, how to question an evasive witness, how to obtain a withdrawal or what finding to make in any given situation.  DX 1 Rutzebeck Aff. § 22.

**Training**

GEICO selects experienced law enforcement officers and claims adjusters to be investigators.  DX 1 Rutzebeck Aff. § 23.  Their additional training is primarily on the job.  PX 26 Calderon 33, PX 29 Fitzgerald 27.  GEICO conducts a one week long

21

training academy for investigators.  New investigators are sent to the program at the regional SIU manager's discretion.  Many of the experienced investigators have not attended it.  DX 1 Rutzebeck Aff. § 23.  Fitzgerald did not attend it.  PX 29 Fitzgerald 27.  PX 26 Calderon was sent to the academy a year after his hire.  PX 26 Calderon 31-32.

### Supervision

The investigators work in the presence of their supervisor only a few days a year when the supervisors conduct "ride-alongs."   DX 1 Rutzebeck Aff. § 24.  Calderon's supervisor did quarterly ride-alongs.  PX 30 Hodge 124.  Fitzgerald's did them once or twice a month.  PX 29 Fitzgerald 20.  Plaintiffs' statement that "Throughout the life of an investigation, SIU Supervisors monitor Investigators' activities, *by among other things*, accessing their Microsoft Outlook calendars to see the amount and type of work they have scheduled," contains an unsupported implication that there were other things.  ECF No. 80-1 at 9.  The actual testimony was,

> Q.     And what sorts of things do you do as a supervisor, at least with respect to Sam Calderon, in terms of checking his work progress?  How did you go about doing that, Mr. Hodge?
>
> A.     Would review his reports that he submitted, check his Outlook calendar see what kind of work he had, for the day and the week.
>
> Q.     Anything else.
>
> A.     That's about it.

PX 30 Hodge 36-37.

Fitzgerald admitted that he worked independently:

> Q.     Would you thinks it's fair to say that for the most part you did this work on your own, without needing to take instruction or advice from your supervisors?
>
> A.     Majority of the time, yes.

***

Q.      Do you ever call [your supervisor] and say "I don't know what to do next, tell me what to do"?

A.      No.  If I did that, it's time I hang it up.

Q.      Did you ever call and say, "I don't know what questions to ask this person, tell me what to ask him"?

A.      No.

Q.      Did you ever call him and say, "I'm having trouble figuring out what conclusions to come to in this report, help me figure this out"?

A.      No.

 PX 29 Fitzgerald 100-102.

**Audits**

The SIU Department at GEICO conducts a yearly audit of the investigators.  The audits are conducted by audit teams of SIU supervisors.  They inspect four closed files per investigator.  They do not observe the investigators at work or question them about their work.  DX 1 Rutzebeck Aff. § 25.  The reports are graded on four criteria: plan of action, thoroughness, readability, and communication.  PX 14 at GEICO.000634.  There is no evidence that the investigators take notice of the audits.  Fitzgerald, for example, did not know the audit process or criteria.  PX 29 Fitzgerald 124.

**100 file sample**

GEICO produced a random sample of 4,000 closing reports submitted by the opt-in Plaintiffs.  DX 1 Rutzebeck Aff. § 26.  It then randomly selected 100 of those reports

for review.  DX 10 Wager Aff.  The 100 report sample includes the following.[4]

|   | Investigator | Case no. | Quotation |
|---|---|---|---|
| 1 | Thomas Davidson | 374176 | An in person recorded statement of the insured while incarcerated was obtained and his facts of loss are not consistent with the physical evidence. |
| 2 | Teresa Hartey-Adametz | 437249 | I informed the Claims Examiner that I found both of them to be credible and they were honestly unsure of how the damages occurred to their vehicle on the hood or bumper. |
| 3 | Shannon Boyd | 476742 | SIU has found no fraud in this claim. |
| 4 | Aaron Kulsic | 477946 | The insured should be held responsible due to the fact he did not sure his vehicle's key adequately during the time he [left] his house unlocked. |
| 5 | Mike Creamer | 482014 | Appropriate referrals were made in this claim based on the investigation findings that Insureds _____originally had a $1000 deductible and filed a collision claim in which their 2003 Mazda Tribute had rear bumper damage that was less than their original deductible.  Fifteen (15) days later, the insureds lowered their deductible to $150.  Twenty-two (22) days after lowering their deductible, the insureds filed this loss claim in which there was additional rear bumper damage. |
| 6 | Phillip Rondello | 492706 | The second claim, 0348401340101022, being adjusted by Sally Drum appears to have been the result of an actual robbery, most likely also during an attempt to make a drug purchase, although _____adamantly denies that when he met a man at a gas station and they exchanged phone numbers, it was for any purpose other than to meet up and just hang out. |
| 7 | Tom Lowe | 501509 | Conclusion: Recommend, collision, claim be processed as normal as, IVD, _____, did have insured's permission to use IV. |

---

[4] GEICO offers this summary pursuant to Fed. R. Ev. 1006.  The reports were produced in discovery.

| 8 | Hamilton, Leah | 519544 | I got the insured to confess and admit that she was not the driver, nor was she in the vehicle at the time of the accident.  She admitted being afraid of what she thought would happen as a result of her Fiancé wrecking the vehicle.  As a result of the findings, there will be no uninsured motorist settlement for injuries, or medical payments. |
|---|---|---|---|
| 9 | Randy Gibson | 530457 | This case was the result of a self-referral after I learned from a source in late December 2008 that Chiropractor _____was affiliated with several clinics that were secretly owned and operated by _____and "_____" and that these groups of clinics are claiming to treat people who have staged their motor vehicle accidents. |
| 10 | Stewart, Ben | 535036 | In summary, it is apparent the policy was established _____to provide coverage for her relatives that reside at various locations |
| 11 | Shane Brown | 542722 | When I advised him how early he would have had to arrive_____'s house to go "riding" prior to going to work, he changed his story and advised that he was not going to ride but to discuss joining a motorcycle club. He also initially claimed to have reported this loss to GEICO when it occurred.  He would later advise that he called GEICO that afternoon while at work. |
| 12 | Anita Singh | 549030 | This investigation concluded there was no evidence other than circumstantial to support that _____had falsely reported his vehicle being stolen. |
| 13 | Jerry Dexter | 575937 | It is recommended that normal procedures be resumed to settle this claim to repair the damage to the door lock and the ignition. |
| 14 | Thomas Davidson | 582599 | _____has now been caught in several lies concerning this claim.  He had motive in his financial situation and it is clear that he continues to hide facts concerning the loss. |
| 15 | William Dolinsky | 611130 | After interviewing the insured it appears the loss occurred as reported by the insured. |
| 16 | Shane Brown | 616255 | During this investigation I did not find any evidence the theft of the insured vehicle did not occur as described by the insured…. _____subsequently signed a claims withdrawal form regarding the customized |

| | | | |
|---|---|---|---|
| | | | wheels and tires and I notified Adjuster Jeri Chastain and faxed it to the Electronic Claims File. |
| 17 | Anita Singh | 621354 | A MySpace page believed to be _____ was found that showed photos of her at a Las Vegas football game in awkward positions and holding a person her size and weight that would suggest she was not injured… This case was referred to National Insurance Crime Bureau and the Utah Insurance Fraud Division who picked up the case and formally requested a copy of GEICO'S file to include copies of the referred to photos. |
| 18 | Kelly McEnry | 621653 | Based on the fact _____ insurance company stopped her PIP benefits sometime in May 2009, I recommend that no reimbursements for PIP be considered after that date to _____ insurance carrier and that any settlement offers be based on treatment only to May 2009 when _____ carrier cut off her PIP benefits as it had been determined that she did not need to treat any longer by them after and IME. |
| 19 | Dana Ferrin | 629753 | Based on the information collected to date, it would appear that the insured lost control of the insured vehicle AFTER the alleged phantom vehicle and the resulting crash caused the insureds' injuries.  Thus, UM would not apply.  An underwriting referral was made and this policy has been cancelled. |
| 20 | McCracken, Rick | 669070 | The billing records from _____ Chiropractic have evidence of up-coding and overcharging. |
| 21 | Phillip Rondello | 676870 | My investigation revealed the following facts:  The vehicle that _____ obtained a GEICO policy on in 2009 was never in her possession. … She called after receiving notice and still held to her story that she had a Bentley and it was stolen.  I advised her that it was possible that she purchased a stolen Bentley with a false VIN, but GEICO does not insure stolen vehicles and she needed to take up the issue with the person whom she bought the car from. |

| 22 | Bob Merry | 684845 | Although there is no proof of preexisting damage it does not appear that based on the damage to our insured vehicle that our vehicle could have caused the damage to the claimant vehicle. |
| 23 | John Ghetti | 702467 | The investigation was negative for any evidence of motive or involvement in the theft of the 1997 Volvo by the policyholder. The claim should be handled on its own merits. |
| 24 | Stewart, Ben | 724184 | SIU conducted face to face recorded interviews with _____and _____that resulted in the withdrawal of their pending bodily injury claims.  Both parties willingly signed claim withdrawal forms and were advised no further consideration would be provided by GEICO for their accrued medical expenses following this alleged loss.  The investigation was referred to Officer Theiss of the Clayton County Police Department for the possible criminal prosecution of the involved parties. Lastly, this claim was additionally referred to the Underwriting Department in the Macon Claims Office for review of _____GEICO policy and the appropriate state and insurance bureaus for reporting purposes. |
| 25 | John Ghetti | 759005 | I confronted the policyholder with the evidence developed and he confessed and withdrew his claim. He signed a withdrawal form and stated he understood no consideration would be given his claim. I have made the appropriate referrals |
| 26 | Aaron Kulsic | 761172 | This case (4203352119) was referred to Special Investigation Unit the focus of this investigation is a need to verify any hidden drivers, garaging issues or business use of the vehicles.  Investigation revealed there were no hidden drivers of the insured's vehicles |
| 27 | Phillip Rondello | 796184 | I believe the facts of the loss may have been manufactured to solicit funds to repair a mechanical breakdown issue. |
| 28 | James Hanson | 809327 | There is coverage for this reported loss. |

| 39 | Anita Singh | 809789 | Either way, I believe _____ should be required to promptly submit to an IME in order to mitigate this loss as I have observed him once at his attorney's office and once while interviewing _____ and he appears to be a malingerer. |
| --- | --- | --- | --- |

**Sample week.**

GEICO voluntarily produced the closing reports in all investigations closed during the week July 13-19, 2009.  The sample was not limited to Plaintiffs—it included all investigators.  The week was chosen because it was one year before the filing of the lawsuit, and thus in the middle of the two year limitations period, based on the named Plaintiff's filing.   There were 676 reports in the sample.  DX 1 Rutzebeck Aff. § 27.  Of them, at least 167 reports contain a written evidence of discretion and independent judgment, in addition to whatever discretion and independent judgment was exercised by investigators but not recorded.  Quotations from the 167 reports are too bulky to include here, but are attached as DX 20.[5]

## ARGUMENT

### I.    THE REGULATION

The administrative exemption requires (1) that the employee be paid on a salary basis at least $455 per week,[6] (2) that the employee's "primary duty is the performance of office or non-manual work directly related to the management or general business

---

[5] GEICO offers DX 20 pursuant to Fed. R. Ev. 1006.  The reports were produced in discovery.

[6] It is undisputed that the investigators satisfied the salary basis test.  29 C.F.R. § 541.200(a)(1).  The salary is informative with respect to the level of discretion expected of an exempt employee.  Considering that employees making as little as $23,660 per year satisfy the salary test, it would be inconsistent to interpret the discretion and independent judgment test to require management level decision-making.  The salary is the "best single test" of exempt status.  69 Fed. Reg. 22172.

operations of the employer," and (3) that the employee's "primary duty includes the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200.  New York regulations incorporate by reference the federal administrative exemption.  12 N.Y.C.C.R.R. § 142-2.2.

## II.    THE STANDARD OF PROOF

The Fourth Circuit has held that an employer must prove that an employee falls within an exemption by clear and convincing evidence.  *Desmond v. PNGI Charles Town Gaming*, 564 F.3d 688 (4th Cir. 2009).  GEICO submits that the correct standard is preponderance of the evidence, for the reasons stated in *Yi v. Sterling Collision Center*, 480 F.3d 505 (7th Cir. 2007)(Posner, J.) but understands that the conflict among circuits cannot be resolved here.  In any event, the clear and convincing standard applies only to questions of fact and not to conclusions of law.  *Microsoft v. I4I Limited Partnership*, 131 S. Ct. 2238, 2253 (2011) (Breyer, J., concurring).  Determining employees' duties is a question of fact; determining whether those duties satisfy the test for the exemption is a question of law.  *Icicle Seafoods Inc. v. Worthington*, 475 U.S. 709, 714 (1986).

The Supreme Court has held that "exemptions are to be narrowly construed against the employers seeking to assert them and their application limited to those establishments plainly and unmistakably within their terms and spirit."  *Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392 (1960).  The narrowly construed adage does not apply to the Department of Labor (DOL) which is free to write the exemptions as broadly as it wishes.  *Auer v. Robbins*, 519 U.S. 452, 462-63 (1977); 69 Fed. Reg. 22125-6.  The prior version of the administrative exemption contained a narrow test applicable to employees making less than $250 per week (the long test) and a lenient test applicable to employees

29

making that amount or more (the short test).  In 2004, the DOL eliminated the long test and retained the short test as the sole test for the exemption.  69 Fed. Reg. 22143.

Two aspects of the regulation shed light on the burden of proof.  One, the first part of the duties test refers solely to the type of work performed.  29 C.F.R. § 541.201(a).  In this case, there is no factual dispute about the nature of the work performed by the SIU investigators.

Two, under the second part of the duties test, discretion and independent judgment need not be the employee's primary duty, comprise a majority of the employee's work or even be regular and customary.  The occasional exercise of discretion and independent judgment is sufficient.  *Robinson-Smith v. GEICO*, 590 F.3d 886, 894 (D.C. Cir. 2010)(auto damage adjusters are exempt), *reversing* 323 F. Supp.2d 12 (D.D.C. 2004).  Thus, once an employer has offered *any* undisputed evidence that the employees' primary duty includes *some* exercise of discretion and independent judgment, the second part of the test is satisfied.  In this case, among other evidence, GEICO relies on actual reports written by investigators, which document their exercise of discretion and independent judgment.  That evidence cannot be gainsaid.

## III.   THE INVESTIGATORS PERFORM ADMINSTRATIVE WORK

### A.     The regulatory test

As mentioned above, the first part of the duties tests examines the type of work performed by the employees.  29 C.F.R. § 541.201(a).  Under an "imperfect" but still

used analysis called the administrative-production dichotomy, it also considers the functional relationship of the position to the generation of the product or service that the business offers to the public. *Desmond*, 564 F.3d at 694. As a result, the same job may be exempt in one industry and non-exempt in another. *Davis v. J.P. Morgan Chase & Co.*, 587 F.3d 529, 535 (2d Cir. 2009)("the context of a job matters"). Thus, for purposes of determining whether GEICO's investigators' work is administrative in type, decisions and opinion letters concerning public sector investigators are not instructive. Likewise, job titles are insufficient to classify jobs. 29 C.F.R. § 541.2.

The regulation contains a non-exhaustive list of administrative "functional areas" which include "insurance," "legal and regulatory compliance" and "similar activities." 29 C.F.R. § 541.201(b). It goes on to specifically state that insurance adjusters are generally exempt. 29 C.F.R. § 541.203(b). It lists, as among the administrative tasks performed by insurance adjusters, "interviewing insureds, witnesses and physicians; inspecting property damage." *Id.* Consistent with the regulation, courts regularly find insurance adjusters to be exempt. *See e.g. Robinson-Smith v. GEICO,* 590 F.3d at 895.[7] Loss prevention is an administrative function, according to a DOL opinion letter. Opinion Letter FLSA2006-30, 2006 WL 2792444 (Sept. 8, 2006)(loss prevention managers for department stores are covered by administrative exemption). "Representing

---

[7] *For additional appellate rulings see Roe-Midgett v. CC Services, Inc.*, 512 F.3d 865 (7th Cir. 2008); *In re Farmers Ins. Exchange*, 481 F.3d 1119 (9th Cir. 2007); *Cheatham v. Allstate Ins. Co.*, 465 F.3d 578 (5th Cir. 2006); *McAllister v. Transamerica Occidental Life Ins. Co.*, 325 F.3d 997, 1001 (8th Cir. 2003); *Munizza v. State Farm Mut. Auto Ins. Co.*, 103 F.3d 139 (table), 1996 WL 711563 (9th Cir. 1996); *Blinston v. Hartford Accident and Indemnity Co.*, 441 F.2d 1365 (8th Cir. 1971).

the company" is administrative work, according to the preamble to the regulation. 69

Fed. Reg. 22138.

### B.       The investigators support the claims function.

GEICO's SIU investigators perform administrative-type work. They do not

produce insurance policies. Rather, they support the claims function by investigating

suspicious claims and preventing losses due to fraud. They perform a subset of the work

specifically listed as exempt when performed by adjusters. The nature of the work, and

its relationship to GEICO's overall business purpose, does not change when it is assigned

to investigators instead of adjusters. Thus, the conclusion reached in *Foster v.*

*Nationwide Mutual Ins. Co.*, 695 F. Supp.2d 748, 758 (S.D. Ohio. 2010)[8] is equally

applicable here:

> The Court concludes that the primary duty of Nationwide's Special Investigators
> is directly related to Nationwide's general business operations. Nationwide's SIU
> works in partnership with Nationwide's Claims Department. By investigating
> potentially fraudulent insurance claims, Special Investigators assist Nationwide's
> Claims Department in adjusting such claims. A finding of fraud will certainly
> bear on a Claims Representative's decisions and recommendations regarding
> coverage, settlement and litigation. Because the DOL regulations and case law
> deem claims adjusting to be administrative work, it follows that investigative
> services performed in direct furtherance of claims adjusting efforts is
> administrative work as well.

The investigators' work is administrative in other respects. They are engaged in

loss prevention. The investigation and reporting of fraudulent claims to law enforcement

---

[8] The cited decision granted partial summary judgment to the employer on the
administrative work test. After a bench trial, the court found for Nationwide on the
discretion and independent judgment test as well. *Foster v. Nationwide Mutual Ins. Co.*
2012 WL 407442 (S.D. Ohio Jan. 5, 2012).

is a legal and regulatory compliance function.[9]  The investigators represent GEICO with respect to policyholders and claimants involved in claims under investigation.

### C.       Precedent supports GEICO's position.

Appellate decisions consistently recognize investigating suspicious insurance claims as administrative work.  *Robinson-Smith,* 590 F.3d at 897 ("evaluate and make recommendations regarding evidence of preexisting damage and indicia of fraud"); *Roe-Midgett*, 512 F.3d at 874 ("must also be on the lookout for fraud"); *In re Farmers*, 481 F.3d at 1129 ("advise FIE regarding any fraud indicators or the potential for subrogation and underwriting risk"); *Cheatham,* 465 F.3d at 585 ("identifying potentially fraudulent claims").

District courts generally hold that insurance investigators perform administrative-type work.  *Foster,* 695 F. Supp. at 748 (quoted above); *Ahle v. Veracity Research*, 738 F. Supp.2d 896, 902 (D. Minn. 2010)("The duty of conducting claims investigation is merely ancillary to producing and settling insurance policies, and thus falls on the administrative side of the 'administrative-production dichotomy.'"); *Marting v. Crawford & Company,* 2006 WL 681060 (N.D. Ill. 2006) (investigator/adjuster for independent adjustment company).  *See also*, *Mullins v. Target Corp*, 2011 WL 1399262 (N.D. Ill. 2011)(investigator for retailer); *Stout v. Smolar,* 2007 WL 2765519 (N.D. Ga. 2007)(accident investigator for law firm).[10]

---

[9] According to the Insurance Information Institute, 22 states require insurers to implement a fraud prevention plan.  They include California, Florida, Maryland, New Jersey, New York, Ohio, Pennsylvania, Texas and Virginia. http://www.iii.org/issues_updates/insurance-fraud.html

[10] *Fenton v. Farmers Ins. Exch*., 663 F. Supp.2d 718 (D. Minn. 2009) reached no conclusion on the issue.

Additional support for the conclusion that investigators perform administrative work is found in the DOL opinion letter holding that loss prevention is administrative in nature.  Opinion Letter FLSA2006-30, 2006 WL at 2792444.  The opinion letter considered department store loss prevention managers who were responsible for preventing inventory shrinkage and cash register shortages.  Similarly, GEICO's investigators protect it from losses due to insurance fraud.

**D.      The authorities cited by Plaintiffs are distinguishable and/or unpersuasive.**

Plaintiffs' main argument is that GEICO's investigators are analogous to public sector investigators found to be non-exempt in the regulation, opinion letters and case law.  These authorities are all distinguishable for the same reason.  In the public sector, investigators are considered to be their agencies' "production workers."

**(1)      The "first responder" provision**

The "first responder" provision contained in the 2004 revisions to the regulation explains that police officers and other first responders, including "investigators," are not covered by overtime exemptions in general.  29 C.F.R. § 541.3(b)(1).  It further states that they do not qualify for the administrative exemption in particular because their work is not considered administrative in type.  29 C.F.R. § 541.3(b)(3).  It does not address whether they exercise discretion and independent judgment.  The preamble to the 2004 regulation explains that this section was included to codify "established case law" holding that police, fire and rescue employees generally do not perform administrative work unless they are performing the administrative work of their own agency.  69 Fed. Reg. 22128-30.  All of the cases cited in this section of the preamble deal with public sector employers.

34

> When this reference to "investigators" is read in the context of the entire regulation, it is clear that the regulation pertains to law enforcement and safety personnel-not those who perform investigative duties in the private sector.  See 69 Fed. Reg. 22129 (stating that the purpose of 29 C.F.R. § 541.3(b)(1) was to clarify that "police officers, fire fighters, paramedics, EMTs *and other first responders* are entitled to overtime pay" (emphasis added).  Because of the missions of their respective governmental agencies and departments, the individual delineated in this regulation are most accurately characterized as "production" workers.

*Foster*, 695 F. Supp. at 757-58; *Mullins*, 2011 at WL 1399262 *5 (quoting *Foster*).

Moreover, even in the public sector, the first responder regulation does not preclude all first responders, including investigators, from being exempt.  The DOL stated, in an *amicus* brief, "Section 541.3(b), however, does not purport to make all police officers non-exempt; the determining factor remains their primary duty."[11]  Thus, officers who perform the managerial or administrative work of their departments still qualify for the executive or administrative exemptions.  *See Mullins v. City of New York*, 653 F.3d 104 (2d Cir. 2011)(adopting DOL views expressed in *amicus* brief).  This result is consistent with the holding of *Shockley v. City of Newport News*, 997 F.2d 18 (4th Cir. 1993)(police department ethics and standards officer covered by administrative exemption).  In short, the first responder regulation does not preclude investigators from being covered by the administrative exemption.[12]

---

[11] http://www.dol.gov/sol/media/briefs/mullins(A)-3-17-2011.htm.

[12] Also inapplicable is a section of the pre-2004 regulation, cited by Plaintiffs, stating that "an inspector for an insurance company" is not involved in administrative work.  29 C.F.R. § 541.205(c)(2)(2003).  This section referred not to fraud investigators, but to insurance inspectors, such as boiler inspectors, who are typically involved in the underwriting process.  Nevertheless, such inspectors have been found exempt.  *Hoyt v. General Ins. Co. of America*, 249 F.2d 589 (9th Cir. 1957).

### (2)     Public sector opinion letters and decisions

The opinion letters[13]  and court decisions[14] cited by Plaintiffs also deal with

investigators who were found to produce their employer's product, either directly for or

under contract to, government agencies.

### (3)     Private sector court decisions

The only decision cited by Plaintiffs that found an insurance investigator did not

perform administrative work is *Gusdonovich v. Business Information Company*, 705 F.

Supp. 262 (W.D. Pa. 1987).  The court found that the defendant's business was producing

information for its clients, including insurance companies, and that the plaintiff's duties

"consisted almost entirely of gathering that 'product.'"  *Id.* at 265.  The court continued,

"Thus, it appears to the court that he was engaged in 'production' within the meaning of

the regulation."  *Id.*  In addition to being distinguishable, *Gusdonovich* is unpersuasive

because it fails to recognize that the exemption covers performing administrative work

for the employer's customers.  29 C.F.R. § 541.200(a)(2).  Equally distinguishable are

*Reich v. American Int'l Adjustment Co.*, 902 F. Supp. 321, 325 (D. Conn.

1994)(appraisers for independent adjustment firm are production workers) and *Fleming v.*

---

[13] Opinion Letter FLSA 2005-21, 2005 WL 3308592 (Aug. 19, 2005)(background investigators were production workers);  Opinion Letter, 1998 WL 852783 (April 17, 1998)(liquor board investigator was production worker); Opinion Letter, 1998 WL 852752 (Jan. 23, 1998)(medical legal investigator for pathology service servicing counties was production worker); Opinion Letter, 1997 WL 971811 (Sept. 12, 1997)(background investigator was production worker).

[14] *Adams v. United States*, 26 Cl. Ct. 782 (1992); *Adams v. United States*, 78 Fed. Cl. 536 2007); *Ahearn v. New York*, 807 F. Supp. 919 (N.D.N.Y. 1992); *Roney v. United States*, 790 F. Supp. 23 (D.D.C. 1992) and *Harris v. District of Columbia*, 741 F. Supp. 254 (D.D.C. 1990).

*Carpenters/Contractors Cooperation Committee*, 834 F. Supp. 323 (S.D. Cal.

1993)(investigators for labor law enforcement committee were production workers).

## IV.     THE INVESTIGATORS EXERCISE DISCRETION AND INDEPENDENT JUDGMENT AS TO MATTERS OF SIGNIFICANCE.

### A.     The regulatory definition of discretion and independent judgment

The second part of the duties test requires that the employee's primary duty

include the exercise of discretion and independent judgment with respect to matters of

significance.  29 C.F.R. §541.200(a)(3).  "An administrative employee's 'primary duty'

does not consist of one specific task, but rather of 'administrative duties' generally."

*Robinson-Smith,* 590 F.3d at 894; *Counts v. South Carolina Electric and Gas Co*., 317

F.3d 453, 457 (4th Cir. 2003)("holistic approach" to primary duty).  The exercise of

discretion and independent judgment involves "the comparison and evaluation of possible

courses of conduct and acting or making a decision after the various possibilities have

been considered."  29 C.F.R. § 541.202(a).

The regulation contains a non-exclusive list of factors to be considered in

determining whether an employee exercises discretion and independent judgment.  29

C.F.R. § 541.202(b).  They include "whether the employee investigates and resolves

matters of significance on behalf of management."  *Id.*  Discretion and independent

judgment "implies that the employee has authority to make an independent choice, free

from immediate direction or supervision." 29 C.F.R. § 541.202(c).  "However, employees

can exercise discretion and independent judgment even if their decisions or

recommendations are reviewed at a higher level."  *Id.*  "The fact that an employee's

decision may be subject to review and that upon occasion the decisions are revised or

reversed does not mean that the employee is not exercising discretion and independent

judgment." *Id.*  Discretion and independent judgment involves more than the use of skill in applying "well established techniques, procedures or specific standards described in manuals or other sources."  29 C.F.R. § 541.202(e).  As examples of exempt work performed by insurance adjusters, the regulation lists interviewing insureds and witnesses and inspecting property damage.  29 C.F.R. § 541.203(a).  Nothing in the regulation states that discretion and independent judgment requires expressions of opinion.

>        **B.**        **The investigators exercise discretion and independent judgment.**

GEICO's SIU investigators exercise discretion and independent judgment throughout their investigations.  The investigators expand the scope of investigations and decide when investigations are complete.  They decide what investigative methods to use.  They inspect property damage and clinics and review claims files and medical records.  A key part of investigations, which necessarily involves discretion and independent judgment, is questioning policyholders, claimants and other witnesses, in recorded interviews or deposition-like EUOs.  While GEICO provides some lists of questions, they are at most starting points.  The investigators use their judgment to probe inconsistencies and ask follow-up questions.  They observe demeanor and listen to tone of voice to gauge credibility.  They make findings about credibility, the cause of accidents, the cause and extent of damage, excessive treatment and other issues and report their findings to adjusters, law enforcement and underwriting.  There is no question that SIU investigators resolve whether a claim is fraudulent.  Calderon wrote, "I've handled difficult to very difficult cases, detected the fraud and was able to prove the fraud."  PX 26 Calderon 98-99.  And Fitzgerald testified, the "only thing I can put down, I found fraud or I didn't find fraud."  PX 29 Fitzgerald 96.

Courts have repeatedly found the investigation of insurance claims to be an exercise of discretion and independent judgment. *Robinson-Smith,* 590 F.3d at 897 ("interview insureds about partial loss claims" and "evaluate and make recommendations regarding evidence of preexisting damage and indicia of fraud"); *Roe-Midgett,* 512 F.3d at 874 ("evaluate whether the damage is likely preexisting, inconsistent with the alleged cause, or otherwise suspicious.  The MDA must also be on the lookout for fraud when interviewing the claimant and any witnesses.  These are judgment calls with respect to matters of significance."); *In re Farmers*, 481 F.3d at 1129 ("interview the insured and assess his (or others') credibility" and "advise FIE regarding any fraud indicators or the potential for subrogation and underwriting risk"); *Cheatham*, 465 F.3d at 586 (exercised discretion in "conducting investigations" and "determining the steps necessary to complete a coverage investigation"); *McAllister,* 325 F.3d at 1001 ("also directed investigations of claims, and the claims manual gave McAllister discretion on whether to pursue a fraudulent claim investigation"); *Withrow v. Sedgwick Claims Mgmt. Svc*. , 2012 WL 242773 (S.D. W.Va. 2012)("elicited information from the claimants and their doctors" and "reviewed claims for fraud or subrogation opportunities"); *Marting,* 2006 WL 681060 *14 ("had to exercise some discretion in how to interview witnesses-such as whether to veer off the list of recommended questions-and also in how to draft the substantive portions of her report"); *Jastremski v. Safeco Insurance Cos.,* 243 F. Supp.2d 743, 756 (N.D. Ohio 2003)("had discretion in deciding how to conduct the investigation, including gathering facts, interviewing witnesses, using field representatives and compiling scene diagrams").

Both the Fourth Circuit and the DOL have found investigating to be an exercise of discretion and independent judgment.  *Shockley*, 997 F.2d at 28, involved an ethics and standards officer for a police department.  The Fourth Circuit described the officer's exempt work as "After taking statements from witnesses, she analyzed the relevant facts, interpreted department policy, and made one of four recommendations: sustained, not sustained, unfounded, or exonerated."  *Id.*  In its opinion letter concerning department store loss prevention managers, the DOL stated, "In determining what internal investigations to pursue and when to conduct interviews, in ascertaining prosecutable cases, and investigating harassment allegations, the LPM 'investigates and resolves matters of significance on behalf of management.'"  Opinion Letter 2006-30, 2006 WL at 2792444.

In *Foster*, 2012 WL at 407442, SIU investigators contended that Nationwide's policies limited them to reporting the facts and their investigations were "searches for truth."  *Id.* at *26.  Nevertheless, the court concluded,

> A doctorate in philosophy is not required to realize that "truth" is not an entirely objective concept.  Determining truth requires "factual findings," a process that necessarily requires judgment and discretion.  Nationwide SI's use their experience and knowledge of fraud to distinguish the relevant from the irrelevant, fact from untruth, to resolve competing versions of events.  Accordingly, the Court concludes that through the resolution of indicators of fraud, the SI's exercise discretion and independent judgment.  The Court further concludes that the discretion exercised by the SI's impacts matters of significance.  The facts developed by the SI's during their investigations have an undisputed influence on Nationwide's decisions to pay or deny insurance claims.  Paying insurance claims is central to Nationwide's business, and payment of fraudulent claims would threaten to make the company less competitive in its industry.

*Id.*  The same is true of GEICO SIU investigators.

Another persuasive decision to the same effect is *Mullins,* 2011 WL at 1399262.  The plaintiff in *Mullins* investigated fraud or theft at Target stores.  The court found that

she exercised discretion and independent judgment in deciding whether data or a pattern

of data warranted further investigation, choosing investigative techniques, keeping a case

or passing it to another investigator, and closing cases.  "As for interviews, she testified

that there was a script of questions that she had memorized and used when conducting

interviews of suspects or witnesses, but acknowledged that she asked follow up questions

that were not scripted and that she decided which follow-up questions to ask."  *Id*. at *7.

Although Target prohibited investigators from including subjective assessments in case

reports, she presented subjective views to her supervisor.  She also made an initial

determination whether to present a case to law enforcement.  Based on these facts, the

court concluded that "Her primary duties thus involved the exercise of discretion and

independent judgment."  *Id.* at *8.

In addition, making referrals to the NICB and law enforcement stands on its own

as an exercise of discretion and independent judgment.  *Dymond v. United States Postal

Service*, 670 F.2d 93 (8th Cir. 1982)(postal inspectors' decisions to present cases for

prosecution involved discretion and independent judgment); *Foster,* 2012 WL at 407422

*26 ("referral of claims to law enforcement and the NICB constitutes the exercise of

discretion and judgment with respect to matters of significance"); *Mullins*, 2011 WL at

1399262 *7 ("made an initial determination whether a case was ready to present to law

enforcement and where (which agency) to take the case"); Opinion Letter FLSA2006-30*,

2006 WL at 2792444 ("ascertaining prosecutable cases").

Last but not least, in many instances, GEICO investigators resolve claims by

obtaining withdrawals.  In these instances, the claims are closed, without payment, based

on the investigator's work.  As Calderon's reports show, this is not simply a matter of

passively receiving a withdrawal form from the claimant.  Rather, the investigators

actively generate withdrawals by questioning claimants and confronting them with the

inconsistencies in their claim.

> **C.**    **The investigators exercise their discretion and independent judgment with respect to matters of significance.**

Plaintiffs acknowledge that investigators exercise some discretion and

independent judgment (ECF No. 80-1 at 2) and that they "resolve whether the facts are

consistent with the claim."  ECF No. 80-1 at 35.  They argue, however, that the

regulations "ask whether discretion is exercised '*with respect* to a matter of significance,'

not whether it impacts or affects a matter of significance."  ECF No. 80-1 at 35.  They

cite a portion of the regulation which states that "an employee does not exercise

discretion and independent judgment with respect to matters of significance merely

because their employer will suffer financial losses if the employee does not perform the

job properly."  29 C.F.R. § 541.202(f).  "For example, a messenger who is entrusted with

carrying large sums of money does not exercise discretion and independent judgment

with respect to matters of significance even though serious consequences may flow from

the employee's neglect."  *Id.*  That argument does not fit the facts of this case.  GEICO's

SIU investigators do not affect claims in some roundabout or unintended way.  They are

directly involved in resolving potentially fraudulent claims on behalf of GEICO.

Plaintiffs also argue that the investigators do not provide their investigative

findings to GEICO management.  ECF No. 80-1 at 34.  A similar argument was rejected

in *Withrow*, 2012 WL at 242773*6 ("managerial duties are not necessary for an

individual to qualify as an administrative employee").  The court pointed out that the

regulations require the employees' primary duty be related to management *or* general business operations.  *Id.*

      **D.**      **Investigating fraudulent insurance claims is not a skill, as that term is used by the DOL.**

Investigation is not merely a "skill" as that term is used by the DOL.  The job requires more than "applying well-established techniques, procedures or specific standards described in manuals or other sources."  29 C.F.R. § 541.202(e).  As examples of what it considers skilled work, the regulation lists "public sector inspectors or investigators, such as fire or safety, building or construction, environmental or soils specialists."  29 C.F.R. § 541.203(j).  Notably absent from these examples are investigators who deal with human behavior.  GEICO's manuals do not provide specific instructions for formulating follow-up questions or determining whether a claimant or policyholder is committing fraud or telling the truth.  Determining fraud or truth requires an exercise of judgment.  Court decisions recognize that the "skill" category is limited to an employee who uses his memory to apply a "well-established, specific and constraining standard in assessing the situations he faces in his daily work."  *Haywood v. North American Van Lines*, 121 F.3d 1066, 1072 (7th Cir. 1997); *McAllister* 325 F.3d at 1001 (quoting *Haywood*).

      **E.**      **The investigators are not closely supervised.**

The regulation states that discretion and independent judgment implies freedom from immediate direction or supervision.  29 C.F.R. § 541.202(c).  It is hard to imagine any group of employees less closely supervised than the investigators.  They work in the presence of their supervisors only a few days a year.  It does not matter that their reports may be reviewed by their supervisors.  "Employees can exercise discretion and

independent judgment even if their decisions or recommendations are reviewed at a higher level."  29 C.F.R. § 541.202(c).

Revealingly, Plaintiffs argue that the supervisors exercise discretion and independent judgment in reviewing reports to determine if they are in proper form and whether the "investigator has completed all necessary investigation activities."  ECF No. 80-1 at 16.  Of course, writing a report requires as much, or more, discretion and independent judgment than reviewing it.  After all, the supervisor can review only the evidence that the investigator has developed and recorded.

> **F.    The court decisions cited by Plaintiffs concerning discretion and independent judgment are distinguishable and unpersuasive.**

The Minnesota district court decisions, *Fenton,* 663 F. Supp.2d at 718 and *Ahle*, 738 F. Supp.2d at 896, are both distinguishable and unpersuasive on the discretion and independent judgment issue.  They are distinguishable because GEICO does not impose the same restrictions on its investigators as the defendants in those cases.  In *Fenton*, "FIE concedes that the investigators' subjective opinions and conclusions are excluded from their written reports."  663 F. Supp.2d at 727.  In *Ahle*, the investigators "do not provide opinions and conclusions about their investigative observations."  738 F. Supp.2d at 906.  That is not true here.  The evidence in this case shows that GEICO's investigators report findings concerning fraud or lack thereof, credibility, caused accidents, excessive treatment and other similar issues.

*Fenton* and *Ahle* are unpersuasive for three reasons.  One, they place more weight on *Gusdonovich,* 507 F. Supp. at 262, than it will bear.  In *Gusdonovich*, there was no record evidence concerning the employee's exercise of discretion and independent

44

judgment.  *See Stout,* 2007 WL 2765519 at n. 2 (distinguishing *Gusdonovich* on that basis).

Two, *Fenton* and *Ahle* make expression of opinion the *sine qua non* for discretion and independent judgment in findings.  There is no support in the regulation for that requirement.  Especially in a legal context–insurance fraud being a legal issue–finding the facts is an exercise of independent judgment.  *See e.g., Holsey v. Armour & Co*., 743 F.2d 199 (4ᵗʰ Cir. 1984)("[T]he district court's findings are demonstratively the result of the court's independent judgment.").  Moreover, there is no bright line between fact and opinion.  *Stevens v. Tillman*, 855 F.2d 394, 398 (7ᵗʰ Cir. 1988)(Easterbook, J.)("Every statement of opinion contains or implies some proposition of fact, just as every statement of fact has or implies an evaluative component.").  Or, as *Foster* puts it, "Determining truth requires 'factual findings' a process that necessarily requires judgment and discretion."  2012 WL at 407442 *26.

Three, as *Foster* points out, 2012 WL at 407442 *27, *Fenton* and *Ahle* incorrectly give *Auer* deference to the DOL's 2005 opinion letter concerning background investigators.  After *Auer*, the Supreme Court clarified that because DOL opinion letters are not subject to notice and comment, they are entitled to deference only to the extent the court considers them persuasive.  *Christensen v. Harris County*, 529 U.S. 576 (2000)(declining to follow DOL opinion letter).[15]  The result of incorrectly deferring to

---

[15] *Auer v. Robbins*, 519 U.S. at 452(1997) held that the DOL's interpretation of an ambiguous regulation concerning the salary basis test was entitled to deference.  In *Christopher v. SmithKline Beecham*, 2012 WL 2196779 (June 18, 2012), the Supreme Court declined to follow the DOL's interpretation of the outside sales exemption, finding it "quite unpersuasive."  The Fourth Circuit declined to follow DOL opinion letters in *Purdom v. Fairfax County School Bd.*, 637 F.3d 421, 432 (4ᵗʰ Cir. 2011) and *Benshoff v. City of Virginia Beach*, 180 F.3d 136 (4ᵗʰ Cir. 1999).

the opinion letter is that *Fenton* and *Ahle* fail to give the investigators credit for exercising discretion and independent judgment in the conduct of their investigations, as well as in reporting the results.

      **G.**     **The DOL Opinion Letter concerning background investigators is distinguishable and unpersuasive.**

The DOL Deputy Administrator's 2005 opinion letter concerning background investigators, FLSA2005-21, 2005 WL at 3308592, which was incorrectly afforded deference in *Ahle* and *Fenton*, is both unpersuasive and distinguishable with respect to the discretion and independent judgment issue.

The opinion letter is unpersuasive because it finds that "*most of the work* of the Investigators typically involves the use of skill" as opposed to work requiring the exercise of discretion and independent judgment.  (emphasis added).  That statement is inconsistent with the letter's earlier statement that "investigators must possess a high level of professional judgment in pursing investigative leads" and "[a]dditional investigation is permitted at the investigator's discretion."  In a particularly muddled and self-contradictory sentence, the opinion letter states, "Even though, as you state, the investigators are 'evaluating alternative courses of conduct and acting upon that evaluation without immediate supervision,' in our view, the Investigators are merely applying their knowledge in following prescribed procedures or determining which procedure to follow, or determining whether standards are met."  In any event, by basing its opinion on "most of the work" the letter makes the same mistake as the decision it cites, *Robinson-Smith v. GEICO*, 323 F. Supp. 2d 12, 26 (D.D.C. 2004)("vast majority of the adjusters' work consists of using their training and skills"), *reversed*, 590 F.3d at 886. Whether "most of the work" includes discretion and independent is not the test.  The test

46

is whether the administrative work *includes* exercise of discretion and independent

judgment. *Robinson-Smith*, 590 F.3d at 886.

Compounding its mistakes, the opinion letter misreads *Clark v. J.M. Benson*, 789

F.2d 282 (4th Cir. 1986) as support for the proposition that "planning one's own

workload," such as planning an investigation, cannot constitute exercise of discretion and

independent judgment with respect to matters of significance.  Opinion Letter, 2005 WL

at 3308592.  In *Clark,* the Fourth Circuit held that a bookkeeper's choices, such as what

document to prepare first and whether to perform work at home or in the office, did not

justify a directed verdict for the employer.  *Clark*, 789 F.2d at 288.  It based that decision

on the triviality of the decisions–not on any blanket rule that choosing how to perform an

assignment can never be a matter of significance.  The opinion letter's misinterpretation

of *Clark* is contrary to both the regulation and precedent.  The regulation specifically

states that discretion and independent judgment involves choosing among "possible

courses of conduct."  29 C.F.R. § 541.202(a).  Thus, when employees' choices about how

to perform their work can make a significant difference, courts find discretion and

independent judgment.  *Reich v. John Alden Life Insurance Co.*, 126 F.3d 1, 13 (1st Cir.

1997)(marketing representatives "choosing which agents to contact on any given day and

concerning which products to discuss with each agent"): *Schaefer-LaRose v. Eli Lilly &

Company*, 2012 WL 1592552 (7th Cir. 2012)(pharmaceutical sales representatives plan

sales calls and tailor prepared messages to respond to the circumstances).  As discussed

above at 39-41, courts have repeatedly found that conducting insurance investigations

includes discretion and independent judgment.  Likewise, after the background

investigator opinion letter, the DOL opined that loss prevention managers exercise

discretion and independent judgment in, among other things, "selecting appropriate steps to address the problem of inventory shortage and pursuing the selected course of action," "investigating harassment allegations," and determining "when to conduct interviews." Opinion Letter, 2006 WL at 2792444.

In any event, the background investigator opinion letter is distinguishable because the investigators in question were merely doing background checks, not investigating fraud. [16] As *Foster* says, background checks can be formulaic. 2012 WL at 407422 * 27. By contrast, "The nature of fraud itself does not lend itself to a simple definition, or a one-size fits all set of parameters." *Id.* GEICO's SIU investigators have a much broader set of choices than the background investigators. GEICO's investigators investigate and make findings concerning many types of fraud, the cause of accidents, theft, arson, property damage, personal injuries, excessive treatment, and many other issues. They generate withdrawals of claims and refer policyholders to underwriting. They directly refer claims to the NICB and law enforcement which exposes GEICO to potential bad faith claims. *Id.* at 28. Again, in the insurance and loss prevention contexts, these activities have been found repeatedly to include exercise of discretion and independent judgment. See above at 39-41.

## CONCLUSION

There are only two legal issues before the court. The first is whether the work performed by GEICO's SIU investigators is administrative in nature. It is undisputed that the investigators are part GEICO's claims function, which the regulation and case law

---

[16] Earlier opinion letters, also cited by Plaintiffs, finding investigators did not exercise discretion and independent judgment are distinguishable and unpersuasive for the same reasons. Opinion Letter, 1998 WL at 852752 (medical legal investigator); Opinion Letter 1997 WL at 971811 (background investigator).

recognize as administrative in nature.  The second issue is whether the investigators

excise discretion and independent judgment as to matters of significance.  The record

shows that the investigators make tactical decisions and report their findings to

investigators, who rely on them.  Both the tactics and findings include exercise of

discretion and independent judgment with respect to suspected insurance fraud, which is

plainly a matter of significance to an insurance company.  For these reasons, GEICO's

motion for summary judgment should be granted, and Plaintiffs' motion for partial

summary judgment should be denied.

Respectfully submitted,


___/s/_____
Bruce S. Harrison, Esq., Bar No. 00887
Eric Hemmendinger, Esq., Bar No. 02050
SHAWE & ROSENTHAL, LLP
20 S. Charles Street, 11th Floor
Baltimore, MD 21201
410-752-1040 Telephone
410-752-8861 Facsimile